**SEEGER WEISS LLP**
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Tel.:  (212) 584-0700
Fax:  (212) 584-0799
E-Mail:  cseeger@seegerweiss.com

**COHN LIFLAND PEARLMAN**
 **HERRMANN & KNOPF LLP**
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.:  (201) 845-9600
Fax:  (201) 845-9423
E-Mail:  psp@njlawfirm.com

*Attorneys for Plaintiff*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br>           Plaintiff, <br><br> vs. <br><br> PRUDENTIAL FINANCIAL, INC., CHARLES F. LOWREY and KENNETH Y. TANJI, <br><br>           Defendants. | Civil Action No.: <br><br> Class Action <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS & JURY DEMAND** |

Plaintiff City of Warren Police and Fire Retirement System ("plaintiff"), maintaining is principal place of business at Warren, Michigan, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Prudential Financial, Inc. ("Prudential" or the "Company"), as well as media and analyst reports about the Company and Company press releases and conference call transcripts.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    This is a securities class action on behalf of all persons or entities who purchased the common stock of Prudential between February 15, 2019 and August 2, 2019, inclusive (the "Class Period").  The defendants are Prudential, the Company's President and Chief Executive Officer ("CEO"), Charles F. Lowrey, and its Chief Financial Officer ("CFO"), Kenneth Y. Tanji.  Plaintiff seeks remedies for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## INTRODUCTION AND BACKGROUND

2.      Prudential describes itself as providing a wide range of insurance, investment management, and other financial products and services to both individual and institutional customers throughout the United States and in many other countries. The Company's principal products and services include life insurance, annuities, retirement-related services, mutual funds, and investment management.  Prudential's principal operations comprise five divisions encompassing seven segments, including U.S. Individual Solutions, which consists of the business segments Individual Annuities and Individual Life.  The Individual Life business segment, according to Prudential, develops and distributes term life, variable life, and universal life insurance products primarily to mass middle, mass affluent, and affluent households with a focus on providing life insurance solutions for individuals, families, and businesses and supporting estate and wealth transfer planning.  Prudential trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PRU."

3.      On December 6, 2018, defendants held a Guidance Call for analysts and investors in which they provided earnings per share ("EPS") guidance at $12.50-$13.00 for the upcoming 2019 fiscal year.

4.      On February 15, 2019, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2018, which provided the Company's full year and fourth quarter 2018 financial results, including reported net income of

$4.09 billion (or $9.50 EPS) and $842 million (or $1.99 EPS), respectively. The Form 10-K stated that reserves for future policy benefits were established consistent with Generally Accepted Accounting Principles ("GAAP") and described the Company's methodology and assumptions used to determine its reserves:

> *The assumptions used in establishing reserves are generally based on the Company's experience, industry experience and/or other factors, as applicable*.[1]

5.      The Form 10-K represented that reserves were updated on a quarterly basis and changes were not expected in the short term:

> We typically update our actuarial assumptions, *such as mortality*, morbidity, retirement and *policyholder behavior assumptions*, annually, unless a material change is observed in an interim period that we feel is indicative of a long-term trend. *Generally, we do not expect trends to change significantly in the short-term and, to the extent these trends may change, we expect such changes to be gradual over the long-term*.

6.      In addition, the Form 10-K stated that, in light of the current low-interest-rate environment, the Company's current reserves for future policyholder benefits might be higher than necessary – thus potentially understating the Company's income and financial strength:

> *In a sustained low interest rate environment, there is an increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities*.

7.      Finally, the Form 10-K purportedly warned that *if* changes in mortality trends occurred, the changes *could* necessitate an increase in reserves, but this was

---

[1]   Emphasis has been added unless otherwise noted.

described as a future potential risk and not a contingency that had already manifest itself and was currently impacting the Company's performance and outlook:

- *Mortality trend* is the risk that mortality improvements in the future deviate adversely from what is expected. . . . **If this risk were to emerge, the Company would update assumptions used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims**.

8. Following the filing of the Form 10-K, Prudential's stock traded at artificially inflated prices of more than $97 per share.

9. On May 1, 2019, the Company issued a press release announcing its financial results for the first quarter of 2019, including EPS of $3.00, which missed analyst expectations. However, despite disappointing earnings results, defendant Lowrey described Prudential's balance sheet as "rock-solid":

> "**With a foundation of a rock-solid balance sheet, we continued to return capital totaling $915 million to shareholders via share repurchases and dividends**."

10. The next day, defendants Lowrey and Tanji participated in an investor conference call to discuss the Company's first quarter 2019 results with analysts, reiterating the strength of the Company's balance sheet as a basis for its positive outlook:

> [Lowrey:] [T]he scale of our businesses and the **strength of our balance sheet . . . should lead to growth in our businesses and greater value for our shareholders**.

11.    Following the announcement of the Company's first quarter 2019 financial results on May 1 and 2, 2019, Prudential's stock continued to trade at artificially inflated prices of more than $101 per share.

12.    On June 5, 2019, with just three weeks remaining in the second quarter, the Company held an Investor Day conference during which defendants provided assurances concerning the Company's past and current financial performance and its prospects and future growth.  Defendants also specifically addressed the Company's then-underway annual actuarial review and assured investors that Prudential's mortality experience was in the normal range of expectations, even if slightly below the Company's experience:

> [Tanji:]  ***And then the third area of interest is [sic] involves our individual life business in our mortality experience.  And our recent experience has been in between range of what we'd expect normal volatility, but net it has been below our experience***.
>
> *      *      *
>
> [Analyst:]   And then when you're going to the [actuarial] assumption review . . . I just wondered, I missed what you've said.  ***Has mortality been more favorable is that relative to what your expectations are or*** . . . ?
>
> [Tanji:]   No.  It's very quarter-to-quarter, both positive and negative.  If you looked at it, it has been ***slightly negative*** and we're taking a look at that.

13.    Each of the statements set forth above regarding: (i) the Company's reported first quarter 2019 financial results, including its net income and EPS; (ii) the methodology utilized to determine the Company's reserves; (iii) the stability of

reserve levels and the potential that the Company was over-reserved; (iv) the risk that negative mortality trends had already materialized and were impacting the Company; and (v) the strength of the Company's balance sheet was materially false and misleading because defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)      the Company's reserve assumptions failed to account for adversely developing mortality experience in the Individual Life business segment;

(b)      the Company was not over-reserved, but instead, its reported reserves, particularly for the Individual Life business segment, were insufficient to satisfy its future policy benefits liabilities; and

(c)      the Company had materially understated its liabilities and overstated net income as a result of flawed assumptions in calculating mortality experience.

14.      On July 31, 2019, after the close of the market, the Company shocked analysts and investors when it announced its second quarter 2019 financial results, including EPS of $3.14, which missed analyst consensus estimates by *$0.09*, and disclosed that the Company would take a pre-tax charge of $208 million as a result of its market experience update.   In the earnings release, defendant Lowrey acknowledged that the changes in "mortality assumptions" had negatively impacted the Company's results and would "trim" near-term momentum:

"Although the recent decline in interest rates and *our revised mortality assumptions may trim near-term earnings momentum*, we remain confident in our planned initiatives for growth as we execute on the priorities that we outlined during our Investor Day."

15.     On July 31, 2019, following the announcement of the Company's second quarter 2019 results, UBS issued a report reducing its earnings targets and stating that the Company should have disclosed this new negative information at the June 5, 2019 Investor Day conference in order to "reset [investor] expectations":

> *[W]e think mgmt should have used its June investor day to lay out the new disclosure and reset the bar at that point*.

16.     Also on July 31, 2019, Wells Fargo issued a report, titled "PRU: Q2 Misses Consensus; Run-Rate Earnings Also Lower," questioning why the Company was so upbeat at the Investor Day conference and predicting the stock price would fall on the surprise negative results:

> *We think PRU shares likely trade down Thursday (8/1) as the base-line EPS number for Q3 (of $3.00) is below expectations and investors will most likely be surprised since this came so close to its investor day in June*.

17.     On August 1, 2019, the Company held a conference call for analysts and investors to discuss its second quarter 2019 financial results.  Following defendants' prepared remarks, analysts sought details regarding the impact of the reserve charge in the Individual Life business segment attributed to the changed mortality assumptions. Defendants revealed that the change in mortality assumptions would have a much more significant effect on the Company's financial condition and would require a

negative earnings impact of $25 million per quarter for the foreseeable future, wiping out approximately one third of the earnings attributable to the Individual Life business segment:

> [Tanji:] ***We also updated this quarter our mortality assumptions in Individual Life, and that will have an ongoing impact into the second quarter***.

*   *   *

> [Analyst:] ***[W]hat would you sizes [sic] that ongoing impact for Individual Life?  And is it something that should persist into perpetuity***?

> [Tanji:] ***Yes, it's about $25 million a quarter.  And it would be reoccurring for the foreseeable future***.

18.    As a result of these disclosures, including the $208 million reserve charge, the earnings miss, the $25 million earnings impact in each quarter for the foreseeable future, and the implied reduction in guidance, Prudential's stock price declined more than 10%, from a close of $101.31 per share on July 31, 2019 to a close of $91.09 per share on August 1, 2019, on massive volume of more than 7.6 million shares traded.

19.    On August 2, 2019, Prudential filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2019, which provided additional information concerning the Company's adjustments to operating income by segment, including that the $208 million pre-tax charge to reserves was entirely attributable to the

Individual Life business segment.  In comparing the second quarter of 2019 to the same period the prior year, the Form 10-Q stated:

> Adjusted operating income decreased $178 million, primarily reflecting an unfavorable comparative net impact from our annual reviews and update of assumptions and other refinements.  ***Results for the second quarter of 2019 included a $208 million net charge from this annual review, mainly driven by unfavorable impacts related to mortality rate assumptions***.

20.     On August 2, 2019, RBC Capital Markets issued an analyst report commenting on the third quarter 2019 guidance reduction and the impact of the actuarial review on the Individual Life business segment, noting: "We definitely didn't love the reduced guidance for the third quarter and the various guidance items that spill into 2020 estimates:"

> • **Actuarial review**:  In the aggregate the review netted to a $49 million net charge.  ***The two notable items were a $208 million charge to the individual life business . . . . The adjustment to the individual life business will have an ongoing impact to earnings of about $25 million per quarter.  It primarily related to mortality assumptions within longer dated vintages of universal life business***.

21.     As a result of these further negative disclosures in the Form 10-Q, Prudential's stock price declined another 5.6%, from a close of $91.09 per share on August 1, 2019 to $88.56 per share on August 2, 2019, and to $85.95 per share on August 5, 2019, on volume of more than 4.2 million shares traded on both August 2 and 5, 2019.

22.     The following chart illustrates the performance of Prudential common stock as compared to the S&P 500 during the relevant period:



## JURISDICTION AND VENUE

23.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.   Jurisdiction is conferred by §27 of the Exchange Act. Venue is proper pursuant to §27 of the Exchange Act.   Prudential's headquarters are

located in Newark, New Jersey, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## PARTIES

24.     Plaintiff City of Warren Police and Fire Retirement System purchased Prudential common stock as described in the attached certification and was damaged thereby.

25.     Defendant Prudential describes itself as a provider of a wide range of insurance, investment management, and other financial products and services. Prudential offers its services in the United States and in other countries. The Company is headquartered in New Jersey and its common stock trades on the NYSE under ticker symbol "PRU."

26.     Defendant Charles F. Lowrey ("Lowrey") is and was at all relevant times the Company's CEO and President. He also serves on the Board of Directors. Lowrey participated in analyst conference calls and presentations and signed the Form 10-K filed with the SEC on February 15, 2019.

27.     Defendant Kenneth Y. Tanji ("Tanji") is and was at all relevant times the Company's Executive Vice President and CFO. Tanji participated in analyst conference calls and presentations and signed the Form 10-K filed with the SEC on February 15, 2019.

28.     Defendants Lowrey and Tanji are collectively referred to herein as the "Individual Defendants."

## CONTROL PERSONS

29.     As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NYSE and governed by the provisions of the federal securities laws, the defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects; not to make material misrepresentations with respect thereto or to omit material facts necessary to make the statements contained therein not misleading; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom and their materially false and misleading nature.  Because of their Board membership and/or executive and managerial

positions with Prudential, the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Prudential and its business or adopted by the Company materially false and misleading.

31.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

32.    The Company and the Individual Defendants, by disseminating materially false and misleading statements and/or concealing material adverse facts, are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Prudential common stock.  The scheme: (i) deceived the investing public regarding Prudential's business, operations, management, and the intrinsic value of Prudential common stock; and (ii) caused

plaintiff and other members of the Class (as defined below) to purchase Prudential common stock at artificially inflated prices.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

33.     On February 15, 2019, the Company filed with the SEC its annual report on Form 10-K for the period ending December 31, 2018.  The Form 10-K was signed by defendants Lowrey and Tanji, among others.  The Form 10-K included the Company's 2018 fourth quarter and annual financial results.  For fiscal 2018, the Company reported net income of $4.09 billion or $9.50 EPS; for the fourth quarter of 2018 the Company reported net income of $842 million or $1.99 EPS.

34.     The Form 10-K also described the methodology used by Prudential to determine its reserves and represented that the assumptions used to set reserves were based on the Company's experience and complied with GAAP:

> We establish reserves for future policy benefits to, or on behalf of, policyholders using methodologies prescribed by U.S. GAAP.

*     *     *

> ***The assumptions used in establishing reserves are generally based on the Company's experience, industry experience and/or other factors, as applicable***.

35.     The Form 10-K suggested that the Company's current reserves might be even higher than necessary, thus potentially understating the Company's income and financial strength, as the current low-interest-rate environment was likely to lead to the Company over-reserving.  The Company also confirmed that reserves were

consistently updated on a quarterly basis to ensure that any changes would be gradual and long term, and that no changes to underlying mortality trends, and thus reserves, were expected in the short term:

> We typically update our actuarial assumptions, **such as mortality**, morbidity, retirement and **policyholder behavior assumptions**, annually, unless a material change is observed in an interim period that we feel is indicative of a long-term trend. **Generally, we do not expect trends to change significantly in the short-term and, to the extent these trends may change, we expect such changes to be gradual over the long-term**. **In a sustained low interest rate environment, there is an increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities**.

36.     Finally, the Form 10-K purported to warn investors that **if** changes in mortality, in the form of mortality trends, occurred, the changes **could** necessitate an increase in reserves. However, that risk was described as a future potential risk and not a contingency that had already manifest itself and was currently impacting the Company's performance and outlook:

- *Mortality trend* is the risk that mortality improvements in the future deviate adversely from what is expected. Mortality trend is a long-term risk in [sic] that can emerge gradually over time. Longevity products, such as annuities, pension risk transfer and long-term care, experience adverse impacts due to higher-than-expected mortality improvement. Mortality products, such as life insurance, experience adverse impacts due to lower-than-expected improvement. **If this risk were to emerge, the Company would update assumptions used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims**.

37.     Following the filing of the February 15, 2019 Form 10-K, which included the Company's 2018 fourth quarter and annual financial results and the representations concerning the Company's reserves, Prudential's stock traded at artificially inflated prices of more than $97 per share.

38.     On May 1, 2019, the Company issued a press release announcing its financial results for the first quarter of 2019, including EPS of $3.00, which missed analyst expectations in what some analysts described as a very "noisy" quarter.  The press release also reported first quarter 2019 results for the Individual Life business segment, including adjusted operating income of $105 million, and quoted defendant Lowrey, who described Prudential's balance sheet as "rock-solid":

•     Net income attributable to Prudential Financial of $932 million or $2.22 per Common share versus $1.363 billion or $3.14 per share for the year-ago quarter.

*    *    *

"*With a foundation of a rock-solid balance sheet, we continued to return capital totaling $915 million to shareholders via share repurchases and dividends*."[2]

---

[2]   The balance sheet reports a company's assets, liabilities, and shareholders' equity at a specific point in time, and provides a basis for computing rates of return and evaluating its capital structure.  It provides a snapshot of what a company owns and owes, as well as the amount invested by shareholders.  It is used alongside other important financial statements, such as the income statement and statement of cash flows, in conducting fundamental analysis or calculating financial ratios.  *See* Investopedia, *Balance Sheet* (May 19, 2019), investopedia.com/terms/b/balancesheet. asp.

39.     On May 2, 2019, defendants Lowrey and Tanji participated in an investor conference call to discuss the Company's first quarter 2019 financial results with analysts.  During the call, defendants reiterated the strength of the Company's balance sheet as a basis for its positive outlook going forward:

> [Tanji:]  Our cash and liquid assets at the parent company amounted to $5.5 billion at the end of the quarter, consistent with year-end 2018 and higher than our $3 billion to $5 billion liquidity target range. We also maintained a **strong balance sheet**.
>
> *              *              *
>
> [Lowrey:]  [T]he scale of our businesses and the **strength of our balance sheet** . . . **should lead to growth in our businesses and greater value for our shareholders**.

40.     Following the announcement of Prudential's first quarter 2019 financial results on May 1 and 2, 2019, Prudential's stock continued to trade at artificially inflated prices of more than $101 per share.

41.     Each of the statements set forth above regarding: (i) the Company's first quarter 2019 financial results, including its net income and EPS; (ii) the methodology utilized to determine the Company's reserves; (iii) the stability of reserve levels and the potential to be over-reserved; (iv) the potential of future changed mortality assumptions to impact the Company; and (v) the strength of the Company's balance sheet was materially false and misleading because defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)     the Company's reserve assumptions failed to account for adversely developing mortality experience in the Individual Life business segment;

(b)     the Company was not over-reserved, but instead, its reported reserves, particularly for the Individual Life business segment, were insufficient to satisfy its future policy benefits liabilities; and

(c)     the Company had materially understated its liabilities and overstated net income as a result of flawed assumptions in calculating mortality experience.

42.     On June 5, 2019, with just three weeks remaining in the second quarter, the Company held an Investor Day conference to discuss the Company's current financial condition and future prospects.  During the Investor Day conference, defendants Lowrey and Tanji made multiple presentations to investors in which they provided assurances concerning the Company's past and current financial performance and its prospects and future growth:

> [Lowrey:] *[W]e have been and remain highly aware of and focused on connecting our track record of strong operating fundamentals with financial outcomes*.
>
> *       *       *
>
> [Tanji:]  And then *the third area which can lead to quarter-to-quarter volatility is updates of our insurance reserves for both market and actuarial assumptions*.  And this is where even small adjustments to our long term reserves can cause our earnings to vary in a certain period.  So, over the short-term, these items can vary quarter-to-quarter.

43.     During the Investor Day conference, defendants also specifically addressed the performance of the Company's Individual Life business segment, noting that its annual actuarial review performed during the second quarter was underway and assuring investors that the Company's mortality experience was in the normal range of volatility, even if slightly below the Company's experience:

> [Tanji:] ***And then the third area of interest is [sic] involves our individual life business in our mortality experience.  And our recent experience has been in between range of what we'd expect normal volatility, but net it has been below our experience***.
>
> *            *            *
>
> [Analyst:]  And then when you're going to the assumption review . . . ***I just wondered, I missed what you've said***.  Has mortality been more favorable is that relative to what your expectations are or . . . ?
>
> [Tanji:]   No.   It's very quarter-to-quarter, both positive and negative.  If you looked at it, it has been ***slightly negative*** and we're taking a look at that.

44.     Each of the statements set forth above regarding: (i) the Company's current financial condition and future prospects; (ii) the Company's recent mortality experience, including its volatility and potential impact; and (iii) the stability of Prudential's reserve levels was materially false and misleading because defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)     the Company's reserve assumptions failed to account for adversely developing mortality experience in the Individual Life business segment;

- 20 -

(b)    the Company was not over-reserved, but instead, its reported reserves, particularly for the Individual Life business segment, were insufficient to satisfy its future policy benefits liabilities; and

(c)    the Company had materially understated its liabilities and overstated net income as a result of flawed assumptions in calculating mortality experience.

## THE TRUE FACTS BEGIN TO BE REVEALED

45.    On July 31, 2019, after the close of the market, Prudential issued a press release announcing its financial results for the second quarter of 2019.  The Company's financial results included EPS of $3.14, which missed analyst consensus estimates of $3.23 by $0.09.  In addition, the Company reported it would take a pre-tax charge of $208 million as a result of its market experience update and that the Individual Life business segment had lost $135 million, but did not provide information concerning the impact of the revised mortality assumptions on the Company's financial performance going forward:

Prudential Financial, Inc. Announces Second Quarter 2019 Results

•    Net income attributable to Prudential Financial of $708 million or $1.71 per Common share versus $197 million or $0.46 per share for the year-ago quarter.  ***The current quarter included a net after-tax charge from our annual reviews and update of assumptions and other refinements of $32 million or $0.08 per Common share*** versus $1.5 billion or $3.40 per share in the year-ago quarter.

\*        \*        \*

Individual Life Segment:

•       Reported an adjusted operating loss of $135 million in the current quarter, compared to operating income of $43 million in the year-ago quarter. ***This decrease includes a more unfavorable comparative impact from our annual reviews and update of assumptions and other refinements of $153 million***.

46.     The earnings release quoted defendant Lowrey, who acknowledged that the changes in "mortality assumptions" had negatively impacted the Company's results and would "trim" near-term momentum:

"Although the recent decline in interest rates and ***our revised mortality assumptions may trim near-term earnings momentum***, we remain confident in our planned initiatives for growth as we execute on the priorities that we outlined during our Investor Day."

47.     On July 31, 2019, following the announcement of the Company's second quarter 2019 financial results, UBS issued a report discussing the Company's results, reducing its earnings targets, and stating specifically that the Company should have disclosed this new negative information at the June 5, 2019 Investor Day conference, which would have allowed investors to "reset expectations":

**Reported and Core EPS Below Expectations**

PRU reported 2Q19 Op. EPS of $3.14, well below our $3.25 estimate and consensus $3.23. . . .  Adjusting for these, ***Core EPS was $3.08 vs. our $3.20*** on comparable basis . . . .

*       *       *

***[W]e think mgmt should have used its June investor day to lay out the new disclosure and reset the bar at that point***.

48.     Also on July 31, 2019, Wells Fargo issued a report, titled "PRU: Q2 Misses Consensus; Run-Rate Earnings Also Lower," discussing the results and specifically noting its surprise that Prudential's poor financial results and charge to earnings came so close on the heels of defendants' positive commentary at the Company's June 5, 2019 Investor Day conference.   Wells Fargo predicted the Company's stock price would fall on the negative earnings surprise:

> **Summary**.  PRU reported Q2 2019 adjusted operating EPS of $3.14, in line with our estimate, ***but below the $3.23 consensus. . . . We think PRU shares likely trade down Thursday (8/1) as the base-line EPS number for Q3 (of $3.00) is below expectations and investors will most likely be surprised since this came so close to its investor day in June***.

49.     On August 1, 2019, the Company held a conference call (with presentation slides) for analysts and investors to discuss the Company's second quarter 2019 financial results, including the $208 million charge to earnings due to changes in mortality assumption, which was entirely attributable to the Individual Life business segment.  On the call, defendants noted the impact of the change in mortality assumptions on the Company's quarterly results:

> [Lowrey:]  In the near term, however, we expect several factors to impact our level of earnings.  First, as we discussed on Investor Day, there will be implementation costs from accelerating our strategy. Second, the significant decline in long-term interest rates over the past 6 months obviously affects our spread income and reinvestment rates of our general account.  ***Third, this quarter's assumption update in Individual Life reduced future earnings***.

> *         *         *

As we said during our last call and on Investor Day, we're also very focused on connecting our track record of operating fundamentals with commensurate financial outcomes. . . . ***But part of this relates to better aligning external expectations with our internal forecast*** . . . . As a result, ***we enhanced our disclosures this quarter*** to help give you better visibility on our expected results, and Ken will cover this in more detail.

\* \* \*

[Tanji:]  Now there are 3 categories to consider.  ***First, the second quarter included a net unfavorable impact of $49 million from this year's annual actuarial review, which will not occur in the third quarter***.

50.     Following defendants' prepared remarks, analysts sought further details regarding the surprise earnings miss, the reserve charge in the Individual Life business segment attributed to the changed mortality assumptions and its impact during future periods, and why the Company was not updating guidance despite indicating the negative future financial impact of the reported results.  Even more significant, defendants explained that the change in mortality assumptions would require a negative earnings impact of $25 million per quarter for the foreseeable future, wiping out approximately one third of the earnings attributable to the Individual Life business segment:

[Analyst:]  [Y]ou've baselined the earnings at $3, would annualize to $12.  This implies significant reduction from the $12.75 midpoint guidance you provided at the outlook call.  Now in your prepared remarks, you highlighted a number of factors behind that, but hoping you can run through each of those into more detail?

[Tanji:]  Yeah, sure.  This is Ken.  So, we don't want to update guidance, but what I thought I could do is highlight a few items to

consider that were not in our guidance that we gave last December.  Now first is we've articulated the Financial Wellness implementation costs we announced at Investor Day.  ***That's going to trim EPS in the second half of the year***.

***We also updated this quarter our mortality assumptions in Individual Life, and that will have an ongoing impact into the second quarter***.

*       *       *

[Analyst:] ***I just wanted to come back to the mortality topic.  And I was curious, is the deterioration related to any specific vintages or types of policies?  Are you really reflecting a broader trend***?

. . . [Steven Pelletier, Prudential EVP and COO of US Businesses:] ***The main point is that the updates really related to longer-dated vintages, earlier vintages in our book of business***.  In regard to looking at specific product categories, the onetime impact is largely experienced in the Universal Life block.

*       *       *

[Analyst:] ***Got it.  And just to be – make sure we have it correct, what would you sizes [sic] that ongoing impact for Individual Life?  And is it something that should persist into perpetuity***?

[Tanji:] ***Yes, it's about $25 million a quarter.  And it would be reoccurring for the foreseeable future***.

51.    On August 1, 2019, J. P. Morgan issued a report on the Company and its second quarter 2019 results, titled "2Q Results Poor, 3Q Guidance Atrocious," which described Prudential's second quarter results as "poor" and its "EPS guidance [as] even worse":

Yesterday evening, PRU announced 2Q19 operating EPS of $3.14. Results were affected by a few unusual items, adjusted for which we estimate that the company would have earned $3.06, below our $3.14 estimate and consensus of $3.22.

\*      \*      \*

**U.S. Individual Solutions: Weak Results, Outlook Cautious**

Operating trends in the U.S. individual solutions business were weak, affirming our negative outlook for the business. . . . *Also, the individual life business incurred a balance sheet charge as part of PRU's assumption review. Management expects the change in assumptions related to the actuarial review to reduce future annual income in the individual life business by roughly $96 million, close to a third of our previously assumed earnings for the business in 2020*.

\*      \*      \*

**Individual Life: Earnings Hurt by Reserve Charge; Outlook Negative**

*The individual life business reported a loss of $135 million versus expected earnings of $74 million*. Adjusting for negative DAC/reserve unlocking and high variable investment income, earnings would have been $53 million, still lower than our forecast, because of unfavorable claims experience. . . . *Individual life earnings have dropped by almost half compared to four years ago, and we expect them to drop by another third due to updated reserving patterns as part of the 2019 actuarial review*.

52.     Also on August 1, 2019, Evercore ISI issued a report on the Company's second quarter results, titled "A Challenging Quarter," noting the significance of the "forward earnings drag expected" as a result of the changed mortality assumptions in the Individual Life business segment. Evercore also noted that the slides accompanying the conference call contained a new revelation that the Company was seeking to reinsure certain blocks of its Individual Life business segment:

[T]here was *new disclosure indicating that a key priority for PRU now is to "explore options for optimizing the inforce management of their Life block [sic]. We believe this means that if PRU were to receive an*

- 26 -

*offer to reinsure certain blocks with adverse underwriting experience, they might consider it to free up some capital*.  On the one hand, we view it as a positive that PRU is exploring potential opportunities to mitigate the risk in the Life block where claims have been volatile for several years now, particularly following the acquisition of HIG's legacy life insurance business.  On the other hand, PRU's relatively poor experience in this block over the last several years suggests that pricing on a risk transfer deal may be somewhat unfavorable.

53.    As a result of these disclosures, including the $208 million reserve charge, the earnings miss, the negative $25 million earnings impact in each quarter for the foreseeable future, and the implied reduction in guidance, Prudential's stock price declined more than 10%, from a close of $101.31 per share on July 31, 2019 to a close of $91.09 per share on August 1, 2019, on massive volume of more than 7.6 million shares traded.

54.    On August 2, 2019, Prudential filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2019, which provided additional details concerning the Company's adjustments to operating income by segment.  As forth in the Form 10-Q, the Individual Life business segment performed $178 million worse in the second quarter of 2019, as compared to second quarter of 2018, primarily due to the $208 million reserve charge from the annual review:

> *Three Month Comparison*.  Adjusted operating income decreased $178 million, primarily reflecting an unfavorable comparative net impact from our annual reviews and update of assumptions and other refinements.  *Results for the second quarter of 2019 included a $208 million net charge from this annual review, mainly driven by unfavorable impacts related to mortality rate assumptions*.

55.    On August 2, 2019, RBC Capital Markets issued an analyst report commenting on the third quarter guidance reduction and the impact of the actuarial review on the Individual Life business segment:

> **Our view**: We didn't love the quarter . . . . ***We definitely didn't love the reduced guidance for the third quarter and the various guidance items that spill into 2020 estimates***.
>
> \*          \*          \*
>
> •    **Actuarial review**:  In the aggregate the review netted to a $49 million net charge. ***The two notable items were a $208 million charge to the individual life business . . . . The adjustment to the individual life business will have an ongoing impact to earnings of about $25 million per quarter.   It primarily related to mortality assumptions within longer dated vintages of universal life business***.

56.    As a result of these further negative disclosures in the Form 10-Q, Prudential's stock price declined another 5.6%, from a close of $91.09 per share on August 1, 2019, to $88.56 per share on August 2, 2019, and to $85.95 per share on August 5, 2019, on massive volume of more than 4.2 million shares traded on both August 2 and 5, 2019.

57.    On August 6, 2019, Deutsche Bank issued a report, titled "Lowering Estimates Post Earnings," which revealed that Prudential's Investor Relations had been in communication with sell-side analysts concerning their financial models for the Company and, as a result, Deutsche Bank was reducing its fiscal year 2019 EPS guidance for Prudential by more than 4% to $12.25:

We are updating our model to reflect 2Q19 earnings. *In an effort to be more transparent, IR has been reaching out to the sell-side to discuss modeling considerations, particularly given newer disclosures*. Management had set 3Q19 "baseline" EPS at $3.00 (relative to the $3.14 reported in 2Q19) resulting from backing out a $0.09/sh benefit from the assumption review, offset by $0.17/sh in higher-than-average VII and $15mn of earnings headwinds in each Gibraltar and Corporate. . . .

. . . *Further, updated mortality assumptions based on the annual review is expected to lower Individual Life earnings by $25mn/quarter for the foreseeable future* . . . .

58.     These continuing disclosures revealing Prudential's true financial condition caused its stock price to continue to decline, from a close of $86.23 per share on August 6, 2019 to a close of $85.17 per share on August 7, 2019, and to below $80 per share by August 15, 2019.

59.     The market for Prudential common stock was open, well developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions, as set forth above, Prudential common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Prudential common stock relying upon the integrity of the market price of Prudential common stock and market information relating to Prudential, and have been damaged thereby.

60.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Prudential common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to

make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and its operations, as alleged herein.

61.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Prudential's business and prospects. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Prudential and its business and prospects, thus causing the Company's common stock to be overvalued and its price to be artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Prudential common stock was removed and the price of Prudential common stock declined dramatically, causing losses to plaintiff and other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

62.     As alleged herein, Prudential and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Prudential, their control over, and/or receipt and/or modification of Prudential's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Prudential, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

63.     During the Class Period, as detailed herein, defendants made false and misleading statements about Prudential's business and prospects and engaged in a scheme to deceive the market.  This artificially inflated Prudential's stock price and operated as a fraud or deceit on plaintiff and the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Prudential's stock price fell precipitously, as the prior artificial inflation came out of

the stock's price.  As a result of their purchases of Prudential common stock during the Class period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

64.    Prudential's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

65.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Prudential who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

66.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Prudential common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

67.     At all relevant times, the market for Prudential common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Prudential filed periodic public reports with the SEC; and

(b)     Prudential regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-

ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## CLASS ACTION ALLEGATIONS

68.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased Prudential common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, directors and officers of Prudential, at all relevant times, and their immediate families, and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

69.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Prudential has more than 400 million shares of common stock outstanding, owned by thousands of persons.

70.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether the Exchange Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Prudential common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

71.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

72.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

73.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

74.     Plaintiff incorporates ¶¶1-73 by reference.

75.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Prudential common stock during the Class Period.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Prudential common stock.  Plaintiff and the Class would not have purchased Prudential common stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

78.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Prudential common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

79.     Plaintiff incorporates ¶¶1-78 by reference.

80.     The Individual Defendants acted as controlling persons of Prudential within the meaning of §20 of the Exchange Act.  By virtue of their positions and their power to control public statements about Prudential, the Individual Defendants had the power and ability to control the actions of Prudential and its employees.  Prudential controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 27, 2019              COHN LIFLAND PEARLMAN
                                       HERRMANN & KNOPF LLP

                                       *s/ Peter S. Pearlman*
                                       PETER S. PEARLMAN
                                       Park 80 West – Plaza One
                                       250 Pehle Avenue, Suite 401
                                       Saddle Brook, NJ  07663
                                       Tel.:  (201) 845-9600
                                       Fax:  (201) 845-9423
                                       E-Mail:  psp@njlawfirm.com

                                       SEEGER WEISS LLP
                                       CHRISTOPHER A. SEEGER
                                       55 Challenger Road, 6th Floor
                                       Ridgefield Park, NJ  07660
                                       Tel.:  (212) 584-0700
                                       Fax:  (212) 584-0799
                                       E-Mail:  cseeger@seegerweiss.com

                                       ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                       SHAWN A. WILLIAMS
                                       DANIEL J. PFEFFERBAUM
                                       Post Montgomery Center
                                       One Montgomery Street, Suite 1800
                                       San Francisco, CA  94104
                                       Tel.:  (415) 288-4545
                                       Fax:  (415) 288-4534
                                       E-Mail:  shawnw@rgrdlaw.com
                                                dpfefferbaum@rgrdlaw.com

VANOVERBEKE, MICHAUD &
   TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Tel.:  (313) 578-1200
Fax:  (313) 578-1201
E-Mail:  tmichaud@vmtlaw.com

*Attorneys for Plaintiff*