SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212/584-0700
212/584-0799 (fax)

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | No. 2:19-CV-20839-SRC-CLW |
| Plaintiff, | CLASS ACTION |
| vs. | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| PRUDENTIAL FINANCIAL, INC., CHARLES F. LOWREY, KENNETH Y. TANJI, and ROBERT M. FALZON | |
| Defendants. | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ........................................................................1

INTRODUCTION AND BACKGROUND ........................................................2

JURISDICTION AND VENUE........................................................................13

PARTIES.........................................................................................................14

SOURCES OF INFORMATION......................................................................15

CONTROL PERSONS ....................................................................................17

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD................................................................19

Prudential Files FY18 Form 10-K Claiming to Be Over-Reserved, Conceals Material Negative Mortality Development in Individual Life .....................19

Prudential Holds Investor Day Conference, Fails to Disclose Known Adverse Mortality Trends and Materially Understated Reserves, Tells Investors Mortality Experience is Normal.................................................32

THE TRUE FACTS BEGIN TO BE REVEALED .............................................36

PRUDENTIAL'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES ..............................................................................................................46

Prudential Materially Understated Its Individual Life Insurance Reserves in Violation of GAAP .....................................................................................47

Prudential Failed to Disclose in SEC Filings Its Exposure to Additional Liabilities In Its Individual Life Reserves Due to the Known Negative Mortality Trend..............................................................................................52

Prudential's GAAP and SEC Violations Were Material to Prudential's Financial Statements and Related Disclosures ............................................57



4851-4203-8463.v1

**Page**

LOSS CAUSATION/ECONOMIC LOSS ....................................................... 60

NO SAFE HARBOR ........................................................................................ 68

APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTION OF RELIANCE ................................ 69

CLASS ACTION ALLEGATIONS ................................................................... 70

COUNT I ................................................................................ 72

COUNT II ............................................................................... 73

PRAYER FOR RELIEF .................................................................................. 74

JURY DEMAND .............................................................................................. 74

Plaintiff City of Warren Police and Fire Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Prudential Financial, Inc. ("Prudential" or the "Company"), Company press releases and conference call transcripts, analyst reports and media coverage, as well as interviews with former employees of Prudential. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all persons or entities who purchased the common stock of Prudential between February 15, 2019, and August 2, 2019, inclusive (the "Class Period"). The defendants are Prudential, the Company's President and Chief Executive Officer ("CEO"), Charles F. Lowrey, its Chief Financial Officer ("CFO"), Kenneth Y. Tanji, and its Vice Chairman of Prudential Financial and Prudential Insurance, Robert M. Falzon. Plaintiff seeks

remedies for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## INTRODUCTION AND BACKGROUND

2. Insurance has been Prudential's flagship offering since its inception over 140 years ago and the Company claims to be the largest life insurer in the United States. Prudential's life insurance business exists within its Financial Wellness franchise, its core operation in the United States, comprised of the U.S. Workplace Solutions division and U.S. Individual Solutions division. According to Prudential, the Individual Life business segment develops and distributes term life, variable life, and universal life insurance products to mass middle, mass affluent, and affluent households. Over the years, Prudential has considered Individual Life an important part of its business mix.

3. In January 2013, Prudential acquired The Hartford's Individual Life Insurance business ("Hartford") for $615 million both to more rapidly increase the size of its Individual Life business and to gain access to a new portfolio of customers who could be cross-sold Prudential products. Prudential assumed the responsibilities for approximately 700,000 insurance policies (primarily universal life policies) with a face amount of approximately $141 billion. Prudential received both the right to collect customer premiums and the obligation to pay claims.

4. Historically, Prudential's Individual Life business segment was consistently profitable. From 2011 to 2015, Prudential reported annual Individual Life adjusted operating income ("AOI") ranging from $384 million to $635 million. However, following the integration of the legacy Hartford policies in 2015, the Company reported poor results in 2016 and 2017 for the Individual Life business segment in connection with its annual actuarial review occurring during the second quarter of each year. The Company attributed the charges to the implementation of new modeling and accounting standards, but indicated they were largely one-time adjustments due to the universal life policies acquired from Hartford. Nonetheless, the Company told investors the acquisition remained a positive. And, in 2018, Individual Life adjusted operating income rebounded to $223 million.

5. In the lead up to the Class Period, in their December 6, 2018 Form 8-K filed with the SEC defendants provided 2019 full year earnings guidance to investors, including earnings per share ("EPS") guidance of $12.50-$13.00. Prudential also published a sensitivity analysis for mortality in the Individual Life business segment: one standard deviation change from expected mortality impacts annual adjusted operating income by $55 million to $80 million.[1]

[1] The Company's sensitivity disclosure provided investors with information concerning the likelihood that the Company would incur a charge for unexpected mortality experience within Individual Life during 2019; the expectation was that no mortality charge would be incurred. The analysis indicated to investors that, given a normal distribution, the Company would incur a mortality charge greater than $55-

6. On February 15, 2019, the start of the Class Period, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2018 ("2018 Form 10-K") which overstated the Company's financial results for the fourth quarter and full year 2018 ("4Q18" and "FY18"), including EPS of $1.99 and $9.50, respectively. The 2018 Form 10-K falsely represented that reserves for future policy benefits were established consistent with Generally Accepted Accounting Principles ("GAAP") and that "[t]he assumptions used in establishing reserves are ***generally based on the Company's experience***."[2]

7. While the Company stated that reserves were typically updated annually in the second quarter, the 2018 Form 10-K falsely asserted that if a material change occurred, the Company would update reserves more frequently and assured investors that no short-term changes in assumptions – like mortality – were anticipated:

> We typically update our actuarial assumptions, ***such as mortality***, morbidity, retirement and policyholder behavior assumptions, annually, ***unless a material change is observed in an interim period that we feel is indicative of a long-term trend.*** Generally, ***we do not***

---

$80 million (*i.e.*, one standard deviation) just 32% of the time; the Company would incur a mortality charge greater than $110-$160 million (*i.e.*, two standard deviations) less than 5% of the time; and the Company would incur a charge greater than $165-$240 million (*i.e.*, three standard deviations) less than 0.3% of the time. Typically, events which are two or more standard deviations from the mean are considered statistically significant.

[2] Emphasis has been added unless otherwise noted.

> ***expect trends to change significantly in the short-term and, to the extent these trends may change, we expect such changes to be gradual over the long-term***.

8. In addition, the Company stated that current reserves were likely to be greater than necessary, thus falsely suggesting that its income and financial strength may be understated:

> In a sustained low interest rate environment, there is an ***increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities***.

9. Finally, the 2018 Form 10-K purportedly warned that ***if*** changes in mortality trends emerged, the changes ***could*** necessitate an increase in reserves, but this was described as a future potential risk and not an actuality that had already manifested:

> ***If [mortality trend] risk were to emerge, the Company would update assumptions used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims.***

10. Following the February 15, 2019 publication of the 2018 Form 10-K, including the false and misleading statements set forth above, Prudential's stock traded at artificially inflated prices of more than $97.00 per share.

11. During the first quarter of 2019 ("1Q19"), defendants made further false and misleading statements in meetings with analysts and investors. A February 20, 2019 analyst report described defendants Lowrey and Falzon discussing ongoing efforts to reduce earnings volatility and negative accounting adjustments which had

previously hurt reported earnings and shareholder value. A March 31, 2019 analyst report stated that defendants reaffirmed the Company's 2019 outlook and were optimistic on growth prospects, reporting that "Falzon noted ***that there are no systemic issues with underwriting or mortality assumptions***, and that results should stabilize."

12. On May 1, 2019, the Company announced its results for the first quarter of 2019, once again overstating its financial results, including EPS. While the Company missed analysts' earnings expectations, defendant Lowrey bolstered the stock price by falsely describing Prudential's balance sheet – which included the Company's insurance reserves – as "***rock-solid***," and claimed it would drive shareholder returns. The following day, defendant Lowrey falsely reiterated that the strength of the Company's balance sheet would drive growth:

> [Lowrey:] [T]he scale of our businesses and the ***strength of our balance sheet . . . should lead to growth in our businesses and greater value for our shareholders***.

13. On May 3, 2019, the Company filed its 1Q19 SEC Form 10-Q reiterating the false and misleading quarterly financial results and claiming that Individual Life results were "driven by a ***favorable impact from mortality experience***" without disclosing the truth concerning ongoing negative mortality trends impacting the legacy Hartford policies.

14. Despite the earnings miss, multiple analysts reacted favorably to the 1Q19 results, as well as defendants' commentary, and recommended that investors purchase Prudential stock. Following defendants' false and misleading statements and omissions in connection with the 1Q19 financial results, from May 1 to 3, 2019, Prudential's stock continued to trade at artificially inflated prices of more than $101.00 per share.

15. At the Company's Investor Day conference on June 5, 2019, with less than a month remaining in the second quarter, and investors seeking information concerning the Company's in-progress annual actuarial assumption review, defendant Tanji repeatedly and falsely indicated that no material changes to mortality had occurred since the prior year's update. Tanji falsely claimed that mortality experience over the preceding year was in the range of "normal volatility" and quarters were "both positive and negative" and overall mortality was "slightly negative":

> [Tanji:] ***And then the third area of interest is [sic] involves our individual life business in our mortality experience. And our recent experience has been in between range of what we'd expect normal volatility, but net it has been below our experience***.
>
> * * *
>
> [Analyst:] ***And then when you're going to the assumption review*** . . . ***I just wondered, I missed what you've said***. ***Has mortality been more favorable is that relative to what your expectations are*** or . . . ?

> [Tanji:] No. ***It's very quarter-to-quarter, both positive and negative***. If you looked at it, it has been ***slightly negative*** and we're taking a look at that.

16. Each of the statements set forth above regarding, among other things: (i) the sufficiency of reserves, including the likelihood the Company was over-reserved; (ii) the absence of systemic mortality issues; (iii) the merely contingent possibility of negative mortality development; (iv) the purportedly normal variation of Individual Life mortality; (v) the Company's overall current financial condition and outlook, including the strength of its balance sheet; (vi) the Company's reported 4Q18, FY18 and 1Q19 financial results; and (vii) the Company's compliance with GAAP and SEC disclosure rules were materially false and misleading when made. In truth, the Company's reserve methodology – purportedly based on its actual mortality experience – omitted and failed to account for known material adverse mortality development in the legacy Hartford block and the Company's Class Period reserves were insufficient to meet known and expected policyholder obligations. As a result, the Company's earnings were overstated and liabilities understated, undermining the Company's guidance and ability to drive growth going forward. As detailed below, defendants knew or recklessly disregarded and failed to disclose the following material facts:

(a) From its acquisition, the legacy Hartford block was closely monitored because of its impact on the overall financial performance of Individual

Life and regularly missed internal performance expectations due to adverse mortality development. Adverse mortality developments in Individual Life, including those publicly reported charges in 2016 and 2017, resulted from the legacy Hartford life policies which were poorly underwritten and not priced to cover their mortality risk, though Prudential was powerless to increase the premiums. Compounding the problem, the legacy Hartford block had poor actuarial and data administration systems, including the data utilized by the mortality models. Prudential was well aware of these facts; during the Class Period (years after the acquisition and integration) the quarterly Individual Life forecasts still reported separately the legacy Hartford block of business, including its mortality development, in order to assess its performance relative to the policies underwritten by Prudential.

(b) Although the Company stated that it updated actuarial assumptions annually, internally Prudential monitored and evaluated mortality experience within Individual Life monthly and incorporated current mortality data into the quarterly Individual Life forecast. Following the 2Q18 actuarial update, from 3Q18 (*i.e.*, July 2018) and continuing throughout the Class Period, the legacy Hartford block experienced consistently negative mortality quarter-over-quarter. As early as May 2019, it was discussed in internal forecast meetings that Individual Life was performing poorly due to negative mortality experience in the legacy Hartford block and that the Company would need to take a significant charge to Individual

Life adjusted operating income. The negative mortality development – which had been occurring consistently since the middle of 2018 and necessitated a $208 million charge to earnings – was not within the normal range of volatility but was in fact highly unusual and a significant deviation from expected performance, according to Prudential's own sensitivity analysis. Moreover, the change in mortality assumptions had material future impacts, reducing earnings by $25 million per quarter in perpetuity, wiping out one third of expected Individual Life income.

(c) These facts, combined with the disclosures on July 31, August 1 and August 2, 2019, establish that Defendants knew, or recklessly disregarded, and failed to disclose that reserves were materially understated, and as a result, the Company's financial results, particularly net income, operating earnings and EPS, were materially overstated in violation of GAAP and SEC disclosure rules. Defendants' related representations concerning the Company's financial condition were similarly knowingly false and misleading and lacked a reasonable basis: including representations that the Company was likely "over-reserved"; that its balance sheet was strong and supportive of continued growth; that it did not suffer from systemic mortality issues; and that mortality volatility was normal even if slightly negative. In truth, the Company was historically unable to accurately reserve for the legacy Hartford life block, failed to account for extreme deviations in quarter-over-quarter mortality experience prior to and during the Class Period,

was under reserved and failed to adequately reserve for current and future policy benefits liabilities and, as a result, materially understated liabilities, and overstated net income, AOI and EPS. *See*, *e.g.*, ¶¶52-53, 58-59.[3]

17. When defendants disclosed the true financial condition of the Company, beginning after market close on July 31, 2019, analysts and investors were shocked. The Company's second quarter 2019 ("2Q19") EPS of $3.14 missed analyst consensus by ***$0.09*** per share. As a result of the annual actuarial review, the Company would take a charge of ***$208 million*** for changes in "mortality assumptions" in Individual Life. Due to defendants' failure to timely account for the negative mortality trend in Individual Life, Prudential overstated Individual Life adjusted operating income by 800% in 4Q18, 93% in FY18 and nearly 200% in 1Q19. Analysts reduced earnings targets and stated that defendants "***should have used its June investor day to lay out the new disclosure and reset the bar at that point***." Another analyst report stated that: "***investors will most likely be surprised since this came so close to its investor day in June***."

[3] Defendants Lowrey and Tanji's Sarbanes-Oxley certifications for the 2018 Form 10-K and 1Q19 Form 10-Q, dated February 15, 2019 and May 3, 2019 respectively, were also materially false and misleading because defendants knew or deliberately disregarded that the Company's financial statements did not fairly present the results of operations and financial condition of the Company for the same reasons.

18. During the Company's August 1, 2019 conference call, defendants disclosed that the change in mortality assumptions would also reduce Individual Life earnings by $25 million per quarter for the foreseeable future: "Yes, it's about $25 million a quarter. ***And it would be reoccurring for the foreseeable future***." A J.P. Morgan report from the same day called third quarter guidance "***Atrocious***" and reported that the $96 million annual going-forward cost would erase "***close to a third of our previously assumed earnings for the [Individual Life] business in 2020***."

19. As a result of these disclosures concerning its true financial condition, Prudential's stock price declined more than 10%, from a close of $101.31 per share on July 31, 2019 to a close of $91.09 per share on August 1, 2019, on massive and uncharacteristically high volume of more than 7.6 million shares traded.

20. Investment analysts continued expressing concern about Prudential's disclosures: Aftermarket on August 1, 2019, Wells Fargo issued an analyst report on Prudential's "Rocky Day" noting the "deterioration in mortality" and reduced its earnings estimates for 2019, 2020 and 2021, as well as cutting its stock price target. On August 2, 2019, RBC Capital Markets followed suit, noting its disappointment about "various guidance items that spill into 2020 estimates" and lowering 2019 and 2020 earnings estimates, as well as the stock price target.

21. The stock price continued to decline from a close of $91.09 per share on August 1, 2019, to $88.56 per share on August 2, 2019, on trading volume of more than 4.3 million shares.

22. The following chart illustrates the performance of Prudential common stock as compared to the S&P 500 during the relevant period:




## JURISDICTION AND VENUE

23. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-

5, promulgated thereunder. Jurisdiction is conferred by §27 of the Exchange Act. Venue is proper pursuant to §27 of the Exchange Act. Prudential's headquarters are located in Newark, New Jersey, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

**PARTIES**

24. Plaintiff City of Warren Police and Fire Retirement System, maintaining its principal place of business at Warren, Michigan, purchased Prudential common stock during the Class Period and was damaged by the conduct asserted herein.

25. Defendant Prudential describes itself as a provider of a wide range of insurance, investment management, and other financial products and services. Prudential offers its services in the United States and in other countries. The Company is headquartered in Newark, New Jersey and its common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "PRU."

26. Defendant Charles F. Lowrey ("Lowrey") is and was at all relevant times the Company's CEO, President, and Director of Prudential Financial and Prudential Insurance. In 2018, Lowrey earned a base salary of $1.2 million and total compensation of $13.6 million. In 2019, Lowrey signed the FY18 Form 10-K and Sarbanes-Oxley certifications for the 2018 Form 10-K and 1Q19 Form 10-Q, filed with the SEC.

27. Defendant Kenneth Y. Tanji ("Tanji") is and was at all relevant times the Company's Executive Vice President and CFO of Prudential Financial and Prudential Insurance. Mr. Tanji joined Prudential in 1988. Tanji was SVP and Treasurer of Prudential Financial and Prudential Insurance from March 2013 to November 2018. In 2018, Tanji earned a base salary of $600,000 and total compensation of $4.3 million. Tanji signed the 2018 Form 10-K and 1Q19 Form 10-Q and accompanying Sarbanes-Oxley certifications filed with the SEC.

28. Defendant Robert M. Falzon ("Falzon") is and was at all relevant times the Vice Chairman of Prudential Financial and Prudential Insurance. Falzon joined Prudential in 1983. Falzon was EVP and CFO of Prudential Financial from 2013 to 2018. In 2018, Falzon earned a base salary of $1 million and total compensation of over $10.6 million.

29. Defendants Lowrey, Tanji and Falzon are collectively referred to herein as the "Individual Defendants."

## SOURCES OF INFORMATION

30. The allegations herein are based in part on information and belief and are supported by first-hand accounts of former Prudential employees, referred to herein as "former employees" or "FE's." Each of the former Prudential employee witnesses: (i) worked at Prudential's offices in Newark, New Jersey, prior to, during and/or after the Class Period; (ii) held one or more positions within Prudential with

responsibilities demonstrating that each had access to the facts on which s/he reported; (iii) provided accounts that are corroborated by others or publicly available information concerning the Company's business as alleged herein. In addition, each of the witness's educational background, credentials and experience lend credibility to their accounts:

(a) FE1 holds a Master of Business Administration and worked at Prudential's Newark, New Jersey offices from November 2013 until February 2020. FE1 was a Financial Analyst in the Company's Life Insurance business and was responsible for monitoring and compiling weekly sales updates during the integration of the Hartford Life insurance business. Between November 2016 and February 2020, FE1 was an Associate Manager in Prudential's Planning & Analysis group and responsible for creating quarterly sales forecasts for Individual Life that were submitted to Prudential's actuarial team as an input for the Company's GAAP earnings models. FE1 regularly attended Individual Life quarterly forecast meetings with the business' actuarial, capital and financial planning and analysis teams;

(b) FE2 holds a Bachelor of Science in Business Administration and worked in Prudential's Newark, New Jersey offices from April 2001 to July 2019. FE2 had various actuarial positions at the Company including Manager in the Actuarial Project Management Office. From 2018 to his/her departure in 2019, FE2 was a Manager, Business Risk Management, and his/her responsibilities included

assessing model risks and improving the Company's model practices. As part of his/her duties, FE2 was required to assess the financial impact of quarterly mortality experience and respective changes in assumptions; and

(c) FE3 holds a Bachelor of Science in Finance and worked at Prudential's Newark, New Jersey offices from 2011 to June 2018. FE3 held various positions at the Company, including Associate Manager in Individual Life Insurance Financial Planning and Analysis, where s/he was responsible for financial forecasting for the Company's Individual Life business, including the legacy Hartford block that Prudential acquired in 2013. FE3 was also part of a finance team that was responsible for creating quarterly forecasts for Prudential's Individual Life business, which were submitted to the chief financial officer of the Individual Life business, and then shared up to the executive head of Individual Life.

**CONTROL PERSONS**

31. As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NYSE and governed by the provisions of the federal securities laws, the defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects; not to make material misrepresentations with respect thereto or to omit material facts

necessary to make the statements contained therein not misleading; and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports, and other communications complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom and their materially false and misleading nature. Because of their membership(s) on Prudential's Board of Directors and/or executive and managerial positions within Prudential, the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Prudential and its business, or adopted by the Company, materially false and misleading.

33. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements

pertaining to the Company during the Class Period. Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after issuance, and/or had the ability and/or opportunity to prevent issuance of those documents, or cause them to be corrected. Accordingly, defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

34. The Company and the Individual Defendants, by disseminating materially false and misleading statements and/or concealing material adverse facts, are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Prudential common stock. The scheme: (i) deceived the investing public regarding Prudential's business, operations, management, and the intrinsic value of Prudential common stock; and (ii) caused plaintiff and other members of the Class (as defined below) to purchase Prudential common stock at artificially inflated prices.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### Prudential Files FY18 Form 10-K Claiming to Be Over-Reserved, Conceals Material Negative Mortality Development in Individual Life

35. False and Misleading Statements and Omissions: On February 15, 2019, the Company filed its 2018 Form 10-K, signed by defendants Lowrey and Tanji, among others. The 2018 Form 10-K reiterated the Company's false and

misleading 4Q18 and FY18 financial results (which were first reported on February 6, 2019), including 4Q18 net income of $842 million, or $1.99 EPS, and FY18 net income of $4.09 billion, or $9.50 EPS. For the Individual Life business segment, Prudential reported 4Q18 adjusted operating loss of $26 million and full year adjusted operating income of $223 million.

36. With respect to Individual Life, the 2018 Form 10-K compared the performance of the business segment in FY18 to FY17, noting that Individual Life had incurred a $65 million reserve increase as a result of the annual assumption review – a process that occurred in 2Q18 – and made no mention of subsequent negative mortality developments:

> *2018 to 2017 Annual Comparison.* Adjusted operating income increased $414 million, primarily reflecting favorable comparative net impacts from our annual reviews and update of assumptions and other refinements. Results for 2018 included a $65 million net charge from this annual review, mainly driven by unfavorable impacts related to lapse and mortality rate assumptions.

37. In addition to the financial results, the 2018 Form 10-K reported that the methodology used by Prudential to determine reserves, including mortality assumptions, was based on the Company's experience and complied with GAAP:

> ***We establish reserves for future policy benefits to, or on behalf of, policyholders using methodologies prescribed by U.S. GAAP.***
>
> * * *
>
> ***The assumptions used in establishing reserves are generally based on the Company's experience***, industry experience and/or other factors, as applicable.

38. The Company also stated in the 2018 Form 10-K that actuarial assumptions like mortality – though typically updated annually – would be adjusted in an interim period if a material change arose. However, the Company stated it did not expect any significant change to assumptions in the short-term, and thus had no expectation of short-term changes in reserves. The Company further assured investors that, even if a change in short-term trends occurred, it expected such changes to be gradual over the long-term:

> We typically update our actuarial assumptions, such as ***mortality***, morbidity, retirement and policyholder behavior assumptions, annually, ***unless a material change is observed in an interim period that we feel is indicative of a long-term trend***. Generally, ***we do not expect trends to change significantly in the short-term*** and, to the extent these trends may change, ***we expect such changes to be gradual over the long-term.***

39. The 2018 Form 10-K further discussed the adequacy of the Company's current reserves necessary to satisfy future policyholder obligations, which was a key component of its bottom-line performance. With respect to the sufficiency of reserves, the 2018 Form 10-K stated that as of December 31, 2018, in light of low interest rates, there was a "***likelihood***" that the Company was in fact "***over-reserved***" and current reserves for future policyholder benefits might be higher than necessary.[4] The potential to be over-reserved indicated that the Company was

[4] During the Class Period, defendants acknowledged that interest rates have remained low for almost a decade.

purportedly conservative in the presentation of its financials and that it could be more profitable than represented with greater income and lesser liabilities:

> ***In a sustained low interest rate environment, there is an increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities***.

40. Lastly, the 2018 Form 10-K also purported to warn investors that ***if*** changes in mortality, in the form of mortality trends, occurred, the changes would be long-term and emerge over time and ***could*** necessitate an increase in reserves:

- Mortality trend is the risk that mortality improvements in the future deviate adversely from what is expected. ***Mortality trend is a long-term risk in [sic] that can emerge gradually over time***. . . . ***If this risk were to emerge,*** the Company would update assumptions used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims.[5]

41. Following the publication of the 2018 Form 10-K, Prudential's stock traded at artificially inflated prices of more than $97.00 per share.

42. On February 20, 2019, Sandler O'Neill & Partners issued a report on Prudential, titled "Thoughts Following Meeting with Management – Maintaining

[5] The 2018 Form 10-K also attached Sarbanes-Oxley Act of 2002 ("SOX") certifications, pursuant to §§302 and 906 of SOX, signed by defendants Lowrey and Tanji, affirming that the Form 10-K fairly presented the financial condition and operations of the Company, did not contain any material misrepresentation or omission, and that the financial statements were in compliance with GAAP. Nearly identical misrepresentations were made in connection with the Company's 1Q19 Form 10-Q. ¶16 n.3; *see also* ¶54 n.7.

BUY Rating," which reported on a February 19, 2019 meeting with Prudential's management, including defendants Lowrey and Falzon. The report presented the Company's expectations for its upcoming initiatives, including a reduction in negative accounting adjustments, which increased volatility and reduced earnings and shareholder value. According to the Company, new initiatives would lead to fewer negative adjustments and improvement in the stock price:

> At the June 2019 investor day, investors should expect metrics to be laid out by which success of the financial wellness program can be judged. . . . The company believes the financial wellness program as well as some other initiatives being pursued ***should lead – over time – to valuation improvement in the stock from***: 1) ***a consistency of earnings (i.e. less earnings volatility)*** . . .

43. False and Misleading Statements and Omissions: On March 31, 2019, Credit Suisse issued a report, titled "Mgmt. Meeting Highlights Positive Outlook," about its March 28, 2019, meetings with Prudential management, including defendant Falzon. The report stated that Prudential remained comfortable with its 2019 EPS outlook of $12.50-$13.00 per share and was optimistic about its growth prospects. According to the report, Falzon assured investors that there were no "systemic" issues related to the Company's mortality assumptions and investors should expect Individual Life financial performance to stabilize:

> Mr. Falzon was optimistic about growth prospects at PRU . . . . He cited PRU's ability to accelerate execution and thus growth via integration of its U.S. Financial Wellness platform, which involves its Retirement Services, Group Insurance, Annuities, and Individual Life businesses.

* * *

> ***Mr. Falzon noted that there are no systemic issues with underwriting or mortality assumptions, and that results should stabilize*.**

44. Following analyst management meetings in February and March 2019, the Company's stock price continued to trade at artificially inflated prices. By April 16, 2019, the Company's stock price was trading above $104.00 per share.

45. False and Misleading Statements and Omissions: On May 1, 2019, the Company issued a press release announcing its financial results for the first quarter of 2019, including EPS of $3.00, which missed analyst expectations. The press release quoted defendant Lowrey, who continued to tout the strength of Prudential's balance sheet, which included the Company's current assets and liabilities, *i.e.*, reserves to pay life insurance claims:

> • ***Net income attributable to Prudential Financial of $932 million or $2.22 per Common share*** versus $1.363 billion or $3.14 per share for the year-ago quarter.
>
> * * *
>
> "With a foundation of a rock-solid balance sheet, we continued to return capital totaling $915 million to shareholders via share repurchases and dividends."[6]

---

[6] The balance sheet reports a snapshot of the company's assets, liabilities, and shareholders' equity at a specific point in time, and provides a basis for computing rates of return and evaluating its capital structure. *See* Hayes, Adam, *Balance Sheet*, Investopedia (May 13, 2020) investopedia.com/terms/b/balancesheet.asp.

46. The May 1, 2019 press release also highlighted results for the Individual Life segment, reporting adjusted operating income of $105 million, a significant increase over the first quarter in the prior year:

> ***The Individual Life segment reported adjusted operating income of $105 million for the current quarter***, compared to $36 million in the year-ago quarter. Underwriting experience in the current quarter was consistent with our seasonal expectation.

47. False and Misleading Statements and Omissions: On May 2, 2019, the Company held a conference call to discuss the Company's 1Q19 financial results with analysts and investors hosted by defendants Lowrey, Tanji and Falzon. Defendants reiterated the financial results and emphasized the strength of the Company's balance sheet as a basis for its positive financial outlook and claimed that current mortality trends affecting the Company were positive:

> [Tanji:] [U]nderwriting experience was in line with our seasonal expectations and ***reflects the benefit of our complementary mortality*** . . .
>
> * * *
>
> ***We also maintained a strong balance sheet***.
>
> * * *
>
> [Lowrey:] [T]he scale of our businesses and the ***strength of our balance sheet*** . . . ***should lead to growth in our businesses and greater value for our shareholders***.

48. On May 2, 2019, Morgan Stanley issued a report, titled "Results Miss, Mostly Due to Market Influence," reporting that management attributed the poor

earnings results ***not*** to any Company specific performance issues, but rather to the strong performance of the stock market; the report also stated that these impacts were already priced into the stock:

> ***Earnings ran considerably below, although it mostly reflected escalated pension expenses due to strength in the equity markets***.
>
> **Investment Thesis**: Prudential has a track record of delivering strong, broad-based growth and returns, with core results typically hitting or exceeding expectations. But for the second quarter in a row, results ran considerably shy of expectations. While last quarter management put the weakness down to seasonality and the impact of weak equity markets, ***this quarter they put the shortfall mostly to pension and retirement expenses related to the strength in the equity markets***.
>
> ***We continue to see Prudential as having a strong franchise and would recommend investors be buyers on weakness*** . . . .

49. On May 2, 2019, Sandler O'Neill & Partners issued a report titled "1Q19 Earnings Review – A Good Q despite the Miss; Increasing EPS Estimates" stating that emerging trends in 1Q19, like strong equity markets and distribution, provided a basis to ***increase*** future EPS estimates:

> After incorporating trends that emerged from 1Q19 earnings such as a strong equity market and distribution backdrop, ***we are increasing our EPS estimates.*** We are increasing our 2019 EPS estimate to $12.80 from $12.75; this compares to current consensus of $12.78. We are increasing our 2020 EPS estimate to $13.90 from $13.70; this compares to current consensus of $13.83 (emphasis in original).

50. Following the announcement of Prudential's first quarter 2019 financial results, Prudential's stock continued to trade at artificially inflated prices of more than $100.00 per share.

51. False and Misleading Statements and Omissions: On May 3, 2019, the Company filed its 1Q19 SEC Form 10-Q which reiterated the false 1Q19 financial results in the press release and attributed the performance of the Individual Life business segment to purportedly ***favorable*** quarterly mortality experience with respect to current underwriting:

> Adjusted operating income increased $69 million, primarily reflecting a favorable comparative net impact of $49 million from changes in our estimated profitability of the business driven by equity market performance on policyholder accounts. ***Excluding this impact, adjusted operating income increased $20 million, primarily reflecting higher underwriting results driven by a favorable impact from mortality experience***, net of reinsurance.

52. Reasons Why the Statements in ¶¶35-40, 42-43, 45-47, 51 Were Knowingly False and Misleading: Each of the statements set forth above regarding: (i) the methodology and mortality assumptions used to determine the Company's reserves; (ii) the adequacy of reserves including the likelihood that the Company was over-reserved; (iii) the absence of systemic issues with mortality or underwriting problems in Individual Life; (iv) the Company's overall current financial condition and outlook; (v) the strength of the Company's balance sheet; (vi) the merely contingent possibility of the future emergence of mortality trends necessitating updates to reserve assumptions; and (vii) the Company's 4Q18, FY18 and 1Q19 financial results, particularly net income, operating earnings and EPS, were materially false and misleading when made. In truth, the Company's

methodology for setting reserves, which was purportedly based on its mortality experience, lacked a reasonable basis. To the extent the Company's representations are considered opinions, such opinions did not rest on a meaningful inquiry and did not fairly align with known or recklessly disregarded facts including the failure to adequately account for known material adverse developments in mortality, in particular consistently adverse mortality experience in the legacy Hartford block prior to and during the Class Period.

53. As opposed to a mere potential risk, negative mortality trends had already materialized as of the Class Period and the Company's reserves were insufficient to meet known and expected policyholder obligations. As confirmed by the $208 million earnings charge (¶¶5 n.1, 17, 60), the Company had experienced a year of extreme negative deviation in mortality far outside normal volatility expectations, according to the Company's sensitivity assessments. By failing to adequately reserve for policyholder claims, the Company materially overstated its 4Q18, FY18 and 1Q19 financial results, placed in jeopardy the Company's FY19 guidance and undermined the purported strength of the Company's balance sheet and its ability to drive growth or reduce volatility going forward. Just as important as the resulting $208 million charge, the $25 million per quarter charge to earnings in perpetuity (wiping out one third of expected Individual Life income) further demonstrates the severity and significance of the mortality problem impacting

Individual Life. As detailed below, defendants knew or recklessly disregarded and failed to disclose the following material facts:

(a) The legacy Hartford block was closely monitored because of its impact on the overall financial performance of Individual Life and – from the time of its acquisition in 2013 – regularly missed internal performance expectations due to adverse mortality development. Following the integration in 2015 of the Hartford policies into Prudential's Individual Life business, the Individual Life business segment experienced negative mortality development. The adverse mortality developments in Individual Life were consistently traced back to the legacy Hartford policies. The performance of the legacy Hartford block was easily monitored throughout the Class Period as, according to FE1 and FE3, the team that created the quarterly Individual Life forecasts (which included mortality), maintained two separate forecasts for each respective book of business. According to FE1, the legacy Hartford block was separated from Prudential's book so that the Company could assess the performance of this book of business relative to the policies underwritten by Prudential.

(b) According to FE1 and FE3, the legacy Hartford policies were not priced to cover the adverse mortality trends being experienced, but Prudential was unable to increase the premiums to account for the increased claim costs. This was confirmed by the Company on August 1, 2019, when it revealed that underwriting

in the longer dated vintages of universal life business, *i.e.*, the legacy Hartford policies, was inadequate. Compounding such problems, FE2 reported that Hartford had poor actuarial and data administration systems, including the data utilized by the mortality models. This was corroborated by another former employee, FE3, who reported that Hartford's antiquated computer systems and processes sometimes produced inaccurate and inconsistent forecasting data and analyses – and therefore FE3 did not utilize this information.

(c) FE1 and FE3 reported that Prudential evaluated mortality experience ***at least quarterly*** as it was a key component of Individual Life's business performance. FE3 reported that s/he received both monthly and quarterly updates from the actuaries on actual mortality results within the Individual Life block which s/he incorporated into the quarterly Individual Life forecast update. Furthermore, FE2 reported that during 2019, Prudential was particularly focused on the financial impact of quarterly mortality experience.

(d) According to FE1, from 3Q18 (*i.e.*, July 2018) and continuing into and through 2019, the legacy Hartford block experienced consistently negative mortality experience quarter-over-quarter. FE1 reported that as early as May 2019, it was discussed in forecast meetings that Individual Life was performing poorly due to negative mortality experience in the legacy Hartford block and that the Company would need to take a significant charge to Individual Life adjusted operating income.

(e) FE1 reported that the duration and magnitude of the known adverse mortality developments was confirmed in a "results package" that s/he reviewed, as part of his/her responsibilities for creating Individual Life sales forecasts. The year-end "results package" summarized financial results for Individual Life for 4Q19 and noted a negative mortality performance trend attributed to the legacy Hartford business extending back six consecutive quarters – *i.e.*, from 3Q18 through the end of 4Q19.

(f) These facts, combined with the disclosures on July 31, August 1 and August 2, 2019 (¶¶60, 63-66, 72), establish that defendants knew, or recklessly disregarded, and failed to disclose that the Company's reserves were materially false and misleading and lacked a reasonable basis. As a result the Company's financial results, particularly net income, operating earnings and EPS (¶¶35-36, 445-46, 51), were knowingly or recklessly materially misstated and violated GAAP and SEC disclosure rules under Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), as set forth in ¶¶77-97. Defendants' related representations concerning the Company's financial condition were similarly knowingly or recklessly false and misleading and lacked a reasonable basis, including that: the Company was likely "over-reserved" (¶39), that its balance sheet was strong and supportive of continued growth (¶¶45, 47), that it did not suffer from systemic mortality issues (¶43) and that it was reducing volatility connected to actuarial reviews (¶¶42-43, 54). In truth,

historically the Company was unable to accurately reserve for the legacy Hartford life block, failed to account for highly unusual adverse quarter-over-quarter mortality experience prior to, and during, the Class Period, and failed to adequately reserve for current and future policy benefits liabilities and, as a result, materially understated liabilities and overstated net income and EPS. *See* ¶¶52-53, 58, 60, 64-66.[7]

**Prudential Holds Investor Day Conference, Fails to Disclose Known Adverse Mortality Trends and Materially Understated Reserves, Tells Investors Mortality Experience is Normal**

54. False and Misleading Statements and Omissions: On June 5, 2019, with just three weeks remaining in the second quarter, the Company held an Investor Day conference to discuss the Company's current financial condition and future prospects. During the Investor Day conference, defendants Lowrey, Tanji and Falzon made multiple presentations to investors. Most critically, defendant Tanji spoke with analysts about the status of the annual second quarter actuarial update – evidencing knowledge of the review – and assured investors that current mortality, while "slightly" negative, was within normal expectations, thereby conveying that

---

[7] Defendants Lowrey and Tanji's Sarbanes-Oxley certifications dated February 15, 2019 and May 3, 2019, were also materially false and misleading because defendants knew or deliberately disregarded that the Company's financial statements did not fairly present the results of operations and financial condition of the Company for the same reasons.

no material reserve charge was imminent. In addition, defendants provided assurances that the Company remained focused on connecting the Company's purportedly strong operating fundamentals with the financial results reported to investors and the Company was poised for future growth:

> [Tanji:] And then the third area which can lead to quarter-to-quarter volatility is updates of our insurance reserves for both market and actuarial assumptions. And this is where even small adjustments to our long term reserves can cause our earnings to vary in a certain period. So, over the short-term, these items can vary quarter-to-quarter.
>
> * * *
>
> [Tanji:] ***And then the third area of interest is [sic] involves our individual life business in our mortality experience. And our recent experience has been in between range of what we'd expect normal volatility, but net it has been below our experience***.
>
> * * *
>
> [Analyst:] ***And then when you're going to the assumption review*** . . . ***I just wondered, I missed what you've said***. ***Has mortality been more favorable is that relative to what your expectations are*** or . . . ?
>
> [Tanji:] No. ***It's very quarter-to-quarter, both positive and negative***. If you looked at it, it has been ***slightly negative and we're taking a look at that***.

55. Following the June 5, 2019 Investor Day, the Company's stock price increased from a close of to $97.82 on June 4, 2019, to a close of $99.86 on June 6, 2019. By June 11, 2019, the Company's stock price was trading over $100.00 per share.

56. On June 6, 2019, Wells Fargo issued a report titled "PRU: Pulling Growth From Under the Rock; Highlights From Investor Day" which highlighted key takeaways from investor day and particularly noted that mortality experience in Individual Life was within the range of "normal volatility":

> **Financial update for the Q2**. . . . The company also highlighted that it updated its long-term care assumptions last year and morbidity has been slightly better than expectations since then. ***Additionally, individual life mortality experience has been within the range of normal volatility***.

57. On June 17, 2019, Barclays issued a report titled "PRU Meeting Takeaways: Favorable Outlook Despite Rate Headwinds" which reported on investor meetings during the week of June 10, 2019, and management's confidence in the Company's growth prospects, in particular that Financial Wellness – *i.e.*, Individual Life – would deliver near-term earnings growth:

- ***PRU's overall tone was positive in terms of its ability to generate solid revenue growth and margin expansion*** in PGIM (asset management) and ***the US Financial Wellness businesses (individual life***, annuities, retirement, group products) . . . .

* * *

- Prudential targets intermediate-term adjusted EPS growth in the high-single digits range . . . . ***The US financial wellness businesses*** and PGIM ***are expected to deliver near-term earnings growth in the mid-to-high single digits***.

58. <u>Reasons Why the Statements in ¶¶54, 57 Were Knowingly False and Misleading</u>: Each of the Company's statements during the June 5, 2019 Investor Day, and in subsequent meetings with analysts, as set forth above, including that: (i)

the Company's mortality development within Individual Life was within the range of normal volatility or just slightly negative; and (ii) that the Company was positioned to deliver on its guidance and achieve increased growth were knowingly false and misleading. In truth, as of May 2019, the Company experienced nearly one year of highly unusual material negative development in mortality within Individual Life, particularly in the legacy Hartford Life block, and needed to take a material reserve charge as a result.

59. In particular, defendant Tanji's representations that mortality experience was within the "range of . . . normal volatility," "quarter-to-quarter, both positive and negative" and "slightly negative" were false and misleading because defendants knew, or recklessly disregarded, and failed to disclose the known facts detailed in ¶53(a)-(f). In particular, defendant Tanji's representations were directly contradicted by the account of FE1 who reported that as early as May 2019, it was discussed in forecast meetings that Individual Life was performing poorly due to negative mortality experience in the legacy Hartford block and that the Company would need to take a significant charge to Individual Life adjusted operating income. Further, contrary to defendant Tanji's statement that mortality was within the range of "normal volatility," the Company's own sensitivity analysis indicated that its mortality experience prior to and during the Class Period was an extreme deviation

from expectations set for investors and would purportedly occur less than one percent of the time.

**THE TRUE FACTS BEGIN TO BE REVEALED**

60. On July 31, 2019, after the close of the market, Prudential issued a press release announcing its financial results for the second quarter of 2019. The Company's financial results included EPS of $3.14, which missed analyst consensus estimates of $3.23 by $0.09, or $39 million. Specifically, the Company reported that the Individual Life business segment had ***lost*** $135 million in 2Q19 against expected income of $108 million. Driving this miss was a pre-tax charge of $208 million due to unfavorable updates to the Company's mortality assumptions. Based on the Company's own stated sensitivity analysis that a one standard deviation change from expected mortality experience would impact annual pre-tax AOI by $55 million to $80 million, the $208 million charge indicated that the Company experienced highly unusual and extremely aberrant negative mortality development in the Individual Life business that it concealed from investors throughout the Class Period. This was the opposite of "normal" volatility, in fact, defendants own metrics demonstrated it to be extreme volatility:

> • Net income attributable to Prudential Financial of $708 million or $1.71 per Common share versus $197 million or $0.46 per share for the year-ago quarter. ***The current quarter included a net after-tax charge from our annual reviews and update of assumptions and other refinements of $32 million or $0.08 per Common share*** versus $1.5 billion or $3.40 per share in the year-ago quarter.

• After-tax adjusted operating income of $1.307 billion or $3.14 per Common share versus $1.298 billion or $3.01 per share for the year-ago quarter. ***The current quarter included a net after-tax charge from our annual reviews and update of assumptions and other refinements of $39 million or $0.09 per Common share*** versus $126 million or $0.29 per share in the year-ago quarter.

* * *

Individual Life Segment:

• ***Reported an adjusted operating loss of $135 million in the current quarter***, compared to operating income of $43 million in the year-ago quarter. ***This decrease includes a more unfavorable comparative impact from our annual reviews and update of assumptions and other refinements of $153 million***.

* * *

"Although the recent decline in interest rates and ***our revised mortality assumptions may trim near-term earnings momentum*** . . . ."

61. The reported results disappointed the investment community and analysts immediately seized on the surprise negative development in light of the positive comments during the Company's June 5, 2019 Investor Day and follow-on meetings with management. For example, on the evening of July 31, 2019, following the Company's press release, UBS issued a report including a sharp rebuke of management specifically stating that the Company should have disclosed this new negative information at the June 5, 2019 Investor Day conference, which would have allowed investors to "reset expectations":

**Reported and Core EPS Below Expectations**

> PRU reported 2Q19 Op. EPS of $3.14, well below our $3.25 estimate and consensus $3.23. . . . Adjusting for these, Core EPS was $3.08 vs. our $3.20 . . . .
>
> * * *
>
> ***[W]e think mgmt should have used its June investor day to lay out the new disclosure and reset the bar at that point***.

62. Also on the evening of July 31, 2019, Wells Fargo issued a report, titled "PRU: Q2 Misses Consensus; Run-Rate Earnings Also Lower," discussing the results and specifically noting its surprise that Prudential's poor financial results and charge to earnings coming so close on the heels of defendants' positive commentary at the Company's Investor Day. Wells Fargo also predicted the Company's stock price would fall in the next day's trading session as a result:

> **Summary**. PRU reported Q2 2019 adjusted operating EPS of $3.14, in line with our estimate, but below the $3.23 consensus. . . . ***We think PRU shares likely trade down Thursday (8/1)*** as the base-line EPS number for Q3 (of $3.00) is below expectations and ***investors will most likely be surprised since this came so close to its investor day in June***.

63. On August 1, 2019, the Company held a conference call for analysts and investors to discuss the Company's second quarter 2019 financial results, including the $208 million charge to earnings in Individual Life. On the call, defendants explained the impact of the change in mortality assumptions on the Company's quarterly results and future earnings:

> [Lowrey:] In the near term, however, ***we expect several factors to impact our level of earnings***. . . . ***this quarter's assumption update in Individual Life reduced future earnings***.

64. Defendants' conceded that the Company's internal forecasts of financial performance were inconsistent with, and needed to be better aligned with, external expectations that had been set by the Company and that changes were made to provide investors a better view of expected financial performance:

> [Lowrey:] As we said during our last call and on Investor Day, we're also very focused on connecting our track record of operating fundamentals with commensurate financial outcomes. . . . ***But part of this relates to better aligning external expectations with our internal forecast*** . . . . As a result, ***we enhanced our disclosures this quarter*** to help give you better visibility on our expected results, and Ken will cover this in more detail.

65. Following defendants' prepared remarks, analysts sought further details regarding the surprising poor financial results and concerning the reserve charge in Individual Life due to the changed mortality assumptions, including whether there would be an impact during future periods. Defendant Tanji stated that the impact of the actuarial review was not limited to the current $208 million charge but also would negatively impact future earnings by $25 million per quarter for the foreseeable future:

> [Analyst:] [Y]ou've baselined the earnings at $3, would annualize to $12. This implies significant reduction from the $12.75 midpoint guidance you provided at the outlook call. Now in your prepared remarks, you highlighted a number of factors behind that, but hoping you can run through each of those into more detail?
>
> [Tanji:] So, we don't want to update guidance, but what I thought I could do is highlight a few items to consider ***that were not in our guidance that we gave last December***. . . .

> ***We also updated this quarter our mortality assumptions in Individual Life, and that will have an ongoing impact into the second quarter***.
>
> * * *
>
> [Analyst:] ***[W]hat would you sizes [sic] that ongoing impact for Individual Life? And is it something that should persist into perpetuity***?
>
> [Tanji:] ***Yes, it's about $25 million a quarter. And it would be reoccurring for the foreseeable future***.

66. In response to analyst questioning, Defendants also revealed that it was older vintage universal life policies – *i.e.*, the legacy Hartford block – which required the reserve increase and that the underwriting of these policies was not up to current standards, corroborating the account of multiple former employees:

> [Analyst:] ***I just wanted to come back to the mortality topic. And I was curious, is the deterioration related to any specific vintages or types of policies? Are you really reflecting a broader trend?***
>
> [Steven Pelletier, Prudential EVP and COO of US Businesses:] ***The main point is that the updates really related to the longer-dated vintages, earlier vintages in our book of business. In regard to looking at specific product categories, the onetime impact is largely experienced in the Universal Life block.***
>
> * * *
>
> [Analyst:] And then as you mentioned potential in-force actions as one of the possible offsets, can you expand in terms of what you might be contemplating there?
>
> [Pelletier:] In Individual Life, we're looking at 3 main drivers in an effort to improve returns in that business over the next few years. . . . ***The new business that we've been writing over the last few years,*** I should point out, ***has been priced using much more current assumptions that are very different from the assumptions used to***

> ***price the legacy products that have generated some of the recent charges we've taken.***

67. On August 1, 2019, J.P. Morgan issued a report on the Company and its second quarter 2019 results, titled "***2Q Results Poor, 3Q Guidance Atrocious***," noted that it considered "***mortality/morbidity variances . . . a core part of the company's operations***" and described Prudential's second quarter results as "poor" and its "EPS guidance [as] even worse." The report noted that the forward effects of the actuarial review would reduce Individual Life income by one third in 2020. The report also attributed the earnings charge to negative mortality development in the legacy Hartford block:

> Yesterday evening, PRU announced 2Q19 operating EPS of $3.14. Results were affected by a few unusual items, adjusted for which we estimate that the company would have earned $3.06, below our $3.14 estimate and consensus of $3.22.
>
> * * *
>
> **U.S. Individual Solutions: Weak Results, Outlook Cautious**
>
> **Operating trends in the U.S. individual solutions business were weak, affirming our negative outlook for the business**. . . . ***Also, the individual life business incurred a balance sheet charge as part of PRU's assumption review. Management expects the change in assumptions related to the actuarial review to reduce future annual income in the individual life business by roughly $96 million, close to a third of our previously assumed earnings for the business in 2020***.
>
> * * *
>
> **Individual Life: Earnings Hurt by Reserve Charge; Outlook Negative**

> ***The individual life business reported a loss of $135 million versus expected earnings of $74 million***. . . . Individual life earnings have dropped by almost half compared to four years ago, ***and we expect them to drop by another third due to updated reserving patterns as part of the 2019 actuarial review***. Prudential's individual life business has incurred significant charges as part of the actuarial review process in each of the past 3 years (including 2019). . . . ***We attribute the poor performance of the individual life business partly to weak results in the legacy Hartford life block*** that Prudential acquired in 2015[*sic*].

68. As a result of these disclosures, including the $208 million reserve charge, the earnings miss, the negative $25 million earnings impact in each quarter for the foreseeable future, and the implied reduction in guidance, Prudential's stock price declined more than 10%, from a close of $101.31 per share on July 31, 2019 to a close of $91.09 per share on August 1, 2019, on massive, abnormally high volume of more than 7.6 million shares traded.

69. The next day, on August 2, 2019, Wells Fargo issued an analyst report, titled "PRU: A Rocky Day; Conference Call Round-Up," that noted it was the assumptions "used on the legacy products that have caused the recent charges" in Individual Life and stated that "[t]he deterioration in mortality was principally concentrated within the Universal life business for longer-dated vintages." Following Prudential's second quarter 2019 conference call, Wells Fargo reduced its earnings estimates for 2019, 2020 and 2021, as well as cutting its price target $10, from $115 to $105:

> **Summary**. ***PRU hosted its Q2 earnings call on 8/1. The call largely focused on its assumption review charge combined with the***

> ***lower forward earnings profile for both Individual Life*** and Gibraltar. Our EPS estimates fall to $12.00, $12.75 and $13.95 in 2019, 2020 and 2021 from $12.50, $13.55 and $14.90 and our price target is now $105 from $115. ***PRU shares traded down significantly Thursday (7/31) owing to a series of quarters where PRU has fallen short of expectations***, ***combined with the lower Q3 earnings base*** . . . . Given the 10% drop in the shares 7/31 (***vs. the S&P which was down 1%***) we believe the market has more than factored in the new lower earnings profile of the company.
>
> ***Market factors in a new earnings base for PRU. Following on the assumption review, PRU now sees lower forward earnings for both Individual Life (about $25 million a quarter) to factor in the mortality changes from the assumptions review*** . . . .

70. On August 2, 2019, RBC Capital Markets issued a report stating it did not love the third quarter guidance reduction, nor the $25 million per quarter impact of the mortality adjustments in the Individual Life business segment, and lowered its 2019 and 2020 earnings estimate, as well as the stock price target:

> **Our view**: We didn't love the quarter . . . . ***We definitely didn't love the reduced guidance for the third quarter and the various guidance items that spill into 2020 estimates***.
>
> * * *
>
> **Estimates & PT:** We've lowered our 2019 estimate to $12.00 from $12.60. Many of the adjustments also impacted 2020 estimates which we lower from $13.75 to $13.00. We are initiating a 2021 estimate of $14.25.
>
> We reduce our price target to $110 from $120.
>
> * * *
>
> **Actuarial review**: In the aggregate the review netted to a $49 million net charge. ***The two notable items were a $208 million charge to the individual life business . . . . The adjustment to the individual life business will have an ongoing impact to earnings of about $25***

> ***million per quarter. It primarily related to mortality assumptions within longer dated vintages of universal life business***.

71. On August 2, 2019, Prudential's stock price continued to decline from a close of $91.09 per share on August 1, 2019, to $88.56 per share on August 2, 2019.

72. On August 2, 2019, after market close, Prudential filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2019 ("2Q19 Form 10-Q"), which detailed the Company's adjustments to operating income by segment, including the Individual Life business segment which performed $178 million worse in the second quarter of 2019, as compared to the second quarter of 2018, primarily due to the $208 million reserve charge from the annual review driven by negative mortality rate assumptions:

> *Three Month Comparison*. Adjusted operating income decreased $178 million, primarily reflecting an unfavorable comparative net impact from our annual reviews and update of assumptions and other refinements. ***Results for the second quarter of 2019 included a $208 million net charge from this annual review, mainly driven by unfavorable impacts related to mortality rate assumptions***.

73. On August 5, 2019, Prudential stock price continued to decline from a close of $88.56 per share on August 2, 2019, to a close of $85.95 per share on August 5, 2019, on a volume of more than 4.2 million shares trades on August 5, 2019.

74. On August 5, 2019, Bloomberg published an article titled, "Prudential Cut as Citi Sees 'Muted' Earnings Growth Ahead," which stated Citi's analyst had downgraded Prudential's stock due to its 2Q19 financial results:

- ***Prudential Financial Inc. was cut to neutral from buy at Citi*** (PT lowered to $94 from $112), ***which cited weakness in the company's second-quarter results***.

- ***Stock down as much as 3.2% in its sixth straight negative session, longest losing streak since June 2018*** . . . .

75. In an unusual development, on August 6, 2019, Deutsche Bank issued a report, titled "Lowering Estimates Post Earnings," which revealed that Prudential's Investor Relations, had been in communication with sell-side analysts concerning their financial models for the Company "[i]n an effort to be more transparent" and, as a result, Deutsche Bank was reducing its fiscal year 2019 EPS guidance for Prudential by more than 4% to $12.25. The report did not specifically reveal what information Prudential's Investor Relations revealed:

> We are updating our model to reflect 2Q19 earnings. ***In an effort to be more transparent, IR has been reaching out to the sell-side to discuss modeling considerations, particularly given newer disclosures***. Management had set 3Q19 "baseline" EPS at $3.00 (relative to the $3.14 reported in 2Q19) resulting from backing out a $0.09/sh benefit from the assumption review, offset by $0.17/sh in higher-than-average VII and $15mn of earnings headwinds in each Gibraltar and Corporate. . . .
>
> ***Further, updated mortality assumptions based on the annual review is expected to lower Individual Life earnings by $25mn/quarter for the foreseeable future*** . . . .

76. Following these disclosures, Prudential's stock price continued declining, from a close of $86.23 per share on August 6, 2019 to a close of $85.17 per share on August 7, 2019, and to reaching below $80 per share on August 15, 2019.

**PRUDENTIAL'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES**

77. As detailed herein, throughout the Class Period, defendants concealed significant and continuing negative mortality experience in its Individual Life insurance business, including in the legacy Hartford block. This known significant, adverse mortality experience caused Prudential to materially overstate net income and EPS, and materially understate liabilities, in violation of GAAP[8] in financial

[8] GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). SEC Regulation S-X, Rule 4-01, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures. On June 30, 2009, the FASB issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*. FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.

statements filed for 4Q18, FY18 and 1Q19.[9] Prudential also violated ASC 944 and American Institute of Certified Public Accountants ("AICPA") insurance accounting rules by understating reserves for Individual Life, and also violated GAAP and SEC disclosure rules by failing to disclose a material, adverse trend in mortality experience within Individual Life. The understatement of reserves was material under applicable GAAP and SEC rules, resulting in Prudential overstating reported Individual Life AOI by ***800%, 93% and 198%*** in 4Q18, FY18 and 1Q19, respectively.

**Prudential Materially Understated Its Individual Life Insurance Reserves in Violation of GAAP**

78. During the Class Period, the applicable GAAP that applied to Prudential's obligation to adequately reserve for its life insurance claims was ASC 944, *Financial Services – Insurance*. Reserves for life insurance claims represented a liability for "future policy benefits" reported on the Company's balance sheet in quarterly financial statements filed with the SEC.[10] Prudential's 2018 Form 10-K stated its reserves for future policy benefits for its Individual Life insurance business

[9] Prudential's Class Period financial statements were included in the following filings with the SEC: 2018 Form 10-K filed on February 15, 2019, and 1Q19 Form 10-Q filed on May 3, 2019.

[10] "Liability for Future Policy Benefits" is defined as "[a]n accrued obligation to policyholders that relates to insured events, such as death or disability." ASC 944-40-20.

primarily related to term life, universal life and variable life products, and also included reserves for claims reported but not yet paid and claims incurred but not yet reported ("IBNR").

79. In general, life insurance policies are long-duration contracts, *i.e.*, contracts that remain in force for an extended period of time. Universal life, whole life and term life insurance contracts are all examples of long-duration contracts, as specified in ASC 944.[11] ASC 944-40-25-7 and 944-40-25-8 provide overall guidance for appropriately establishing liabilities or reserves for future policy benefits on long-duration contracts:

> A liability for expected costs relating to most types of long-duration contracts shall be accrued over the current and expected renewal periods of the contracts.
>
> The present value of estimated future policy benefits to be paid to or on behalf of policyholders less the present value of estimated future net premiums to be collected from policyholders – that is, a liability for future policy benefits – shall be accrued when premium revenue is recognized.[12]

---

[11] ASC 944-20-15-11.

[12] Similarly, ASC 944-40-25-1 and 944-40-25-2 recognize that liabilities accrued for life insurance policies will also include unpaid claims pertaining to: (1) claims that have been reported to the insurer; (2) claims relating to insured events (*e.g.*, a policyholder death has occurred) that have occurred but have not been reported; and (3) claim adjustment expenses incurred in connection with the settlement of unpaid claims.

80. Further, ASC 944-40-30-6 states the liabilities for future policy benefits accrued under ASC 944-40-25-8 must take in to account certain key assumptions, including mortality.

> Estimates for purposes of recognizing liability for future policy benefits under paragraph 944-40-25-8 shall be based on assumptions, such as estimates of expected investment yields, ***mortality***[13], morbidity, terminations, and expenses, applicable at the time the insurance contracts are made.[14]

81. Accordingly, Prudential was required to use appropriate GAAP assumptions and adequately reserve for its future policy benefits. The assumptions used to project these future payment obligations – including mortality rates – have a direct and material effect on the amount of required reserves.

82. To establish reliable GAAP assumptions, Prudential was required to use known, current experience and various actuarial methods and assumptions to ensure that reserves for future policy benefits were adequate, which the Company failed to do. For example, Prudential disclosed in its 2018 Form 10-K that its assumptions used for establishing future policy benefits – including mortality – were

[13] Mortality is defined as "[t]he relative incidence of death in a given time or place." ASC 944-40-20. Similarly, mortality risk is defined as "[t]he obligation to make payments that are contingent upon the death or continued survival of a specific individual or group." *Id.*

[14] *Also see* the AICPA *Audit and Accounting Guide for Life and Health Insurance Entities* ("AICPA Audit and Accounting Guide") at §7.72.

based on ***the Company's experience***, as well as industry experience. Further, these assumptions were updated at least annually, however, Prudential also stated that material changes in experience observed in a quarterly period required the Company to update their assumptions. *See* ¶¶38, 40.

83. Correspondingly, when Prudential experienced a material negative mortality development within Individual Life in the legacy Hartford block prior to and throughout the Class Period, GAAP and the Company's own policy required its mortality assumption be updated to account for known adverse experience and a corresponding increase be recognized to the Company's reserves for future policy benefits. *See* ¶¶37-38, 40. For example, GAAP states "[a]n insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised."[15] Additionally, GAAP requires that material changes that result from a company's new experience and trends be recognized in income in the period in which the changes occurs.[16]

84. Because Prudential knew that the legacy Hartford block had consistently under-performed expectations and because it monitored the mortality

---

[15] ASC-944-40-35-9.

[16] ASC 944-40-35-6.

results in its Individual Life business on a monthly and quarterly basis, the Company would have known that adverse mortality experience during the seven and a half months prior to the Class Period (*i.e.*, since July 2018) required updated mortality estimates and a corresponding material increase in reserves under GAAP. *See*, *e.g.*, ¶¶52-53. However, in violation of GAAP, defendants failed to appropriately account for this known material trend in adverse mortality experience (*see id.*). Despite this known adverse mortality experience in Individual Life, defendants failed to use an appropriate assumption of "expected mortality" that reflected then-existing conditions in estimating its Class Period Individual Life reserves, causing the Company to materially understate reserves for future policy benefits and overstate earnings in the Company's Class Period financial statements, and also rendered reserve related statements made in the Company's 2018 Form 10-K false and misleading.[17]

85. In addition, former employees confirm that the negative mortality trend in the legacy Hartford block was significant to Prudential's reserves because there were reportedly no compensating factors, such as the ability to increase premiums

---

[17] *See* ASC 944-40-30-11 states: "[m]ortality assumptions used in estimating the liability for future policy benefits shall be based on estimates of ***expected mortality***." Similarly, the AICPA Audit and Accounting Guide states that "mortality assumptions reflect ***realistic expectations of future results, considering historical experience***." AICPA Audit and Accounting Guide at §7.61.

on these legacy policies to offset the negative mortality impact. *See*, *e.g.*, ¶53(a)-(b). Moreover, these policies were known to be poorly underwritten and historically performed below expectations. As a result, defendants materially overstated income and EPS for 4Q18, FY18 and 1Q19 by materially understating its reserves for future policy benefits in violation of GAAP.

**Prudential Failed to Disclose in SEC Filings Its Exposure to Additional Liabilities In Its Individual Life Reserves Due to the Known Negative Mortality Trend**

*ASC 450 and ASC 944*

86. The Company's 2018 Form 10-K and 1Q19 Form 10-Q violated GAAP and SEC disclosure rules by failing to disclose the Company's exposure to additional liabilities in its Individual Life segment due to the known negative mortality trend.

87. Under ASC 450, *Contingencies*, estimated life insurance claims and reserves are a type of loss contingency which is defined as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[18] Further, an accrual for a loss contingency (*i.e.*, a reserve or liability) and related loss provision (*i.e.*, charge to income or expense) must be made when both of the following conditions are met:

---

18 ASC Master Glossary – Loss contingency.

> a. Information available [prior to issuance of the financial statements] indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. . . .
>
> b. The amount of loss can be reasonably estimated.[19]

88. When a probable or "likely" loss is not accrued because a reasonable estimate cannot be made, ASC 450 requires that a company disclose such conditions.[20]

89. The disclosure of the nature and amount of a loss contingency is also required when it is at least reasonably possible (*i.e.*, more than a remote likelihood) that a loss will be incurred.[21] The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss, or state that such an estimate cannot be made.[22]

90. ASC 450 refers to ASC 944-40 for rules applicable to insurance entities, including required disclosures in financial statements.[23] SEC Staff Guidance SAB Topic 5.W quoted in ASC 944-40-S99-1 ("SAB Topic 5.W"),

---

[19] ASC 450-20-25-2.

[20] ASC 450-20-50-5.

[21] ASC 450-20-50-3-50-4.

[22] ASC 450-20-50-4.

[23] ASC 450-10-60-9.

provides relevant guidance on assessing uncertainties under ASC 450 with respect to insurance reserves.[24] SAB Topic 5.W states that "specific uncertainties (conditions, situations and/or sets of circumstances) not considered to be normal and recurring because of their significance and/or nature can result in loss contingencies" under ASC 450, include "significant risks to an individual claim or group of related claims."[25] SAB Topic 5.W also states that ASC 275, *Risks and Uncertainties*, provides that disclosures regarding certain significant estimates should be made when "'[i]t is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events…[and] the effect of the change would be material to the financial statements.'"[26]

91. In violation of the above guidance, during the Class Period, defendants failed to disclose the negative mortality trend in Individual Life from the legacy Hartford policies that could result in a material increase to the Company's life

---

[24] ASC 944-40-S99-1, SAB Topic 5.W, "Contingency Disclosures Regarding Property-Casualty Insurance Reserves for Unpaid Claim Costs."

[25] *Id.*

[26] *Id.*

insurance reserves, including in the "near term."[27] For example, when defendants filed the Company's 2018 Form 10-K and 1Q19 Form 10-Q during the Class Period, they knew or recklessly disregarded that a significant reserve increase was likely to the Individual Life reserves because of the highly unusual adverse mortality experience in the Hartford book. *See* ¶¶53, 66. In addition, defendants knew of or recklessly disregarded that the mortality experience from the Hartford book was extremely adverse and "significant risks to [Hartford] … related claims" existed that would lead to future material, reserve increases. *See* ¶¶53, 59. Yet, in violation of the GAAP pronouncements above, defendants failed to disclose the negative mortality experience and trends from the Hartford book in the 2018 Form 10-K and 1Q19 Form 10-Q.

*SEC Item 303*

92. Prudential's Management Discussion and Analysis ("MD&A") in its 2018 Form 10-K and 1Q19 Form 10-Q violated Item 303 by omitting known trends or uncertainties concerning mortality experience in the Individual Life business that were likely to have an unfavorable impact. The SEC established the following explicit disclosure requirements set forth in Item 303:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or

[27] ASC 275-10-20 Glossary defines "near term" as: "A period of time not to exceed one year from the date of the financial statements."

> unfavorable impact on net sales or revenues or income from continuing operations.
>
> * * *
>
> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.[28]

93. Disclosures are "mandatory" where there is "a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition and results of operations."[29] As described above, defendants knew of the adverse mortality experience within the Individual Life business, including from the legacy Hartford block, and this quarter-over-quarter trend would have an unfavorable material impact on Prudential's earnings for its Individual Life business. *See* ¶¶53, 66. Yet Prudential's MD&A disclosures failed to disclose the significant, negative mortality trend from the legacy Hartford policies that could result in a material increase to the Company's life insurance reserves and corresponding negative impact on earnings. Defendants' omissions violated the above SEC disclosure rules including that the MD&A should focus on "known trends [and] uncertainties" that will have a material impact on earnings and "material

[28] 17 C.F.R. §229.303(a)(1)-(3).

[29] SEC Release No. 33-8056, Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations (footnote omitted).

events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results." As a result, Prudential's MD&A disclosures included within the Company's annual and quarterly SEC filings made during the Class Period failed to comply with SEC rules.

**Prudential's GAAP and SEC Violations Were Material to Prudential's Financial Statements and Related Disclosures**

94. Prudential's understatement of reserves for future policy benefits and related disclosure violations were material. The SEC Staff Accounting Bulletin: Codification of Staff Accounting Bulletins' Topic 1-M, *Materiality* ("SEC Topic 1-M"), sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants[30]:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[31]

---

[30] *See also* ASC 250-10-S99-1.

[31] SEC Topic 1-M also stresses that materiality requires qualitative, as well as quantitative, considerations: "[T]here are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." SEC Topic 1-M also notes that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law." It notes that the FASB "has long emphasized that materiality cannot be reduced to a numerical formula."

95. The lack of disclosure of the adverse mortality experience in the Individual Life business, including from the legacy Hartford Life block, was qualitatively and quantitatively material during the Class Period. For example, the negative mortality trend in Individual Life resulted in a negative earnings impact of $25 million per quarter for the foreseeable future, wiping out approximately one third of the earnings attributable to the Individual Life business segment on a go forward basis. In addition, when defendants announced the reserve charge of $208 million and negative impact of $25 million on Individual Life earnings for the foreseeable future, analysts and investors reacted harshly driving the stock price down significantly, a qualitative indicator of materiality under SEC Topic 1-M.[32]

96. In addition, Prudential's understatement of its reserves for future policy benefits was qualitatively and quantitatively material. For example, Prudential disclosed on December 6, 2018, the significant impact that mortality changes, positive or negative, could have on the Company's future financial performance. More specifically, as part of its sensitivities for its 2019 EPS guidance, Prudential disclosed that for its Individual Life business a one standard deviation change from expected mortality experience could impact annual pre-tax AOI by $55 million to

[32] SEC Topic 1-M states: "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."

$80 million. This mortality sensitivity assumption demonstrates the $208 million 2Q19 reserve charge was an extreme deviation from expected mortality experience of up to more than three standard deviations. An extreme deviation of this magnitude, which statistically occurred less than one percent of the time, supports that the negative mortality trend was material and would have been known to defendants throughout the Class Period, nor did defendants ever suggest that the reserve charge was the result of a sudden or unexpected change or event.

97. Finally, quantitatively as shown below, the $208 million in pre-tax charges ($165 million after-tax[33]) recorded by Prudential in 2Q19 to correct for the understatement of its reserves for future policy benefits and overstatement of income would have materially impacted Prudential's reported results in each of the quarters during the Class Period.

| ($ in millions except EPS) | **Originally Reported** | **Adjusted** | **$ Overstatement** | **% Overstatement** |
|---|---|---|---|---|
| **4Q 2018** | | | | |
| AOI for Individual Life | $(26) | $(234) | $208 | 800.0% |
| AOI Consolidated | $1,318 | $1,110 | $208 | 15.8% |
| Net Income | $842 | $677 | $165 | 19.6% |
| Diluted EPS | $1.99 | $1.60 | $0.39 | 19.6% |
| | | | | |

33 Assumes a tax rate of 20.5%, which represents the approximate, effective tax rate at Prudential for 4Q18 and 1Q19 on a consolidated basis.

| **1Q 2019** | | | | |
|---|---|---|---|---|
| AOI for Individual Life | $105 | $(103) | $208 | 198.1% |
| AOI Consolidated | $1,605 | $1,397 | $208 | 13.0% |
| Net Income | $932 | $767 | $165 | 17.7% |
| Diluted EPS | $2.22 | $1.82 | $0.40 | 18.0% |

## LOSS CAUSATION/ECONOMIC LOSS

98. As detailed herein, the Company materially misstated its financial results for each of the reporting periods during the Class Period. In addition to the false financial statements, each of which violated GAAP and SEC disclosure rules (¶¶35-40, 45-47, 51, 77-97), defendants materially misrepresented the overall financial condition of the Company's business including the true facts concerning the Company's key business metrics, *e.g.*, mortality experience, reserve setting methodology and reserve sufficiency. *See*, *e.g.*, ¶¶36-40, 43. These material misrepresentations and omissions caused Prudential's stock price to trade at artificially inflated prices throughout the Class Period, including a Class Period high of $106.40 per share on May 1, 2019. When the truth regarding defendants' misrepresentations and omissions became generally known, Prudential's stock price declined precipitously, as the prior artificial inflation came out of the stock's price. As a result of defendants' misrepresentations, omissions and fraudulent conduct alleged herein, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

99. After the close of market on July 31, 2019, the true state of Prudential's financial condition began to emerge when the Company announced its 2Q19 financial results, including EPS of $3.14, which missed analyst consensus estimates by $0.09, and disclosed that the Company would take a pre-tax charge of $208 million in order to increase reserves in Individual Life as a result of changes in "mortality assumptions" which would materially reduce the Company's 2Q19 financial results. The adjustment to mortality assumptions would also result in a continuing charge of $25 million per quarter indefinitely into the future, wiping out approximately one third of the expected earnings of the Individual Life segment. ¶67.

100. These disclosures were contrary to prior assertions and positive statements concerning, among other things: (i) the sufficiency of reserves, including the likelihood the Company was over-reserved; (ii) the absence of systemic mortality issues; (iii) the merely contingent possibility of negative mortality development; (iv) the purportedly normal variation within Individual Life mortality; (v) the Company's overall current financial condition and outlook, including the strength of its balance sheet; and (vi) the Company's reported 4Q18, FY18 and 1Q19 financial results.

101. Investment analysts immediately published reports expressing shock at the substance and timing of this new information. *See* ¶¶61-62, 67, 69-70. For example, on the evening of July 31, 2019, following the announcement of the

Company's second quarter 2019 results, UBS issued a report, titled "Fifth Consecutive Miss Coupled with a Reset of Segment Baseline; Reducing EST's and PT." The report included a stern rebuke that Prudential should have told investors of this negative information at the June 5, 2019 Investor Day conference in order to "reset [investor] expectations:"

> ***[W]e think mgmt should have used its June investor day to lay out the new disclosure and reset the bar at that point.***

*See* ¶61.

102. Wells Fargo also issued a report on July 31, 2019 report, titled "PRU: Q2 Misses Consensus; Run-Rate Earnings Also Lower" (*see* ¶62), noting investors' surprise by the disclosure, questioning the Company's upbeat Investor Day conference and predicting that Prudential's stock price would decline based on the information disclosed on July 31, 2019:

> ***We think PRU shares likely trade down Thursday (8/1)*** as the base-line EPS number for Q3 (of $3.00) is below expectations and investors ***will most likely be surprised since this came so close to its investor day in June***.

103. On August 1, 2019, the Company held a conference call for analysts and investors in which defendants explained that the change in mortality experience in Individual Life resulted in a $208 million charge to increase reserves and would have an ongoing impact that would reduce the Company's earnings by $25 million per quarter in perpetuity:

[Tanji:] ***We also updated this quarter our mortality assumptions in Individual Life, and that will have an ongoing impact into the second quarter.***

*** * ***

[Analyst:] ***[W]hat would you sizes [sic] that ongoing impact for Individual Life? And is it something that should persist into perpetuity?***

[Tanji:] ***Yes, it's about $25 million a quarter. And it would be reoccurring for the foreseeable future.***

104. On August 1, 2019, J. P. Morgan issued a report on the Company and its 2Q19 results, titled "2Q Results Poor, 3Q Guidance Atrocious" (*see* ¶67), that stated that the reserve charge in Individual Life was a "major negative" and highlighted that the change in mortality assumptions would reduce annual income by nearly $100 million per year:

Also, the individual life business incurred a balance sheet charge as part of PRU's assumption review. ***Management expects the change in assumptions related to the actuarial review to reduce future annual income in the individual life business by roughly $96 million, close to a third of our previously assumed earnings for the business in 2020.***

* * *

**Individual Life: Earnings Hurt by Reserve Charge; Outlook Negative**

***The individual life business reported a loss of $135 million versus expected earnings of $74 million***. . . . ***Individual life earnings have dropped by almost half compared to four years ago, and we expect them to drop by another third due to updated reserving patterns as part of the 2019 actuarial review***.

105. As a result of these disclosures, Prudential's stock price declined from a close of $101.31 per share on July 31, 2019, to a close of $91.09 per share on August 1, 2019, more than 10%, on massive volume of more than 7.6 million shares traded.

106. On August 1, 2019, after market close, Wells Fargo issued an analyst report titled, "PRU: A Rocky Day; Conference Call Round-Up," that noted it was the assumptions "used on the legacy products" that caused the charges in Individual Life and stated that "[t]he deterioration in mortality was principally concentrated within the Universal life business for longer-dated vintages." Wells Fargo reduced its earnings estimates for 2019, 2020 and 2021, as well as cutting its price target $10, from $115 to $105:

> **Summary**. ***PRU hosted its Q2 earnings call on 8/1. The call largely focused on its assumption review charge combined with the lower forward earnings profile for both Individual Life*** and Gibraltar. Our EPS estimates fall to $12.00, $12.75 and $13.95 in 2019, 2020 and 2021 from $12.50, $13.55 and $14.90 and our price target is now $105 from $115. ***PRU shares traded down significantly Thursday (7/31) owing to a series of quarters where PRU has fallen short of expectations***, ***combined with the lower Q3 earnings base*** . . . . Given the 10% drop in the shares 7/31 (***vs. the S&P which was down 1%***) we believe the market has more than factored in the new lower earnings profile of the company.
>
> ***Market factors in a new earnings base for PRU. Following on the assumption review, PRU now sees lower forward earnings for both Individual Life (about $25 million a quarter) to factor in the mortality changes from the assumptions review*** . . . .

107. Similarly, on August 2, 2019, RBC Capital Markets issued a report (*see* ¶70) commenting on the third quarter 2019 guidance reduction and the impact of the actuarial review on the Individual Life business segment, noting that "[m]ost of the difficulties have been with the older blocks of business" in Individual Life and stating: "We definitely didn't love the reduced guidance for the third quarter and the various guidance items that spill into 2020 estimates." The analyst report lowered 2019 and 2020 earnings estimate, as well as the stock price target:

> **Estimates & PT:** We've lowered our 2019 estimate to $12.00 from $12.60. Many of the adjustments also impacted 2020 estimates which we lower from $13.75 to $13.00. We are initiating a 2021 estimate of $14.25.
>
> We reduce our price target to $110 from $120.
>
> * * *
>
> **Actuarial review: In the aggregate the review netted to a $49 million net charge.** ***The two notable items were a $208 million charge to the individual life business . . . . The adjustment to the individual life business will have an ongoing impact to earnings of about $25 million per quarter. It primarily related to mortality assumptions within longer dated vintages of universal life business.***

108. On August 2, 2019, Prudential's stock price continued to decline from a close of $91.09 per share on August 1, 2019, to $88.56 per share on August 2, 2019, or 3%, on trading volume of more than 4.3 million shares.

109. On August 2, 2019, after the close of trading, Prudential filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2019 attributing the $208 million pre-tax charge in the Individual Life business segment to negative

impacts from changes to mortality rate assumptions. In comparing the second quarter of 2019 to the same period the prior year, the 2Q19 Form 10-Q stated:

> Adjusted operating income decreased $178 million, primarily reflecting an unfavorable comparative net impact from our annual reviews and update of assumptions and other refinements. ***Results for the second quarter of 2019 included a $208 million net charge from this annual review, mainly driven by unfavorable impacts related to mortality rate assumptions***.

110. On August 5, 2019, Bloomberg published an article titled, "Prudential Cut as Citi Sees 'Muted' Earnings Growth Ahead," which stated Citi's analyst had downgraded Prudential's stock due to its 2Q19 financial results:

- Prudential Financial Inc. was cut to neutral from buy at Citi (PT lowered to $94 from $112), which cited weakness in the company's second-quarter results.
- Stock down as much as 3.2% in its sixth straight negative session, longest losing streak since June 2018 . . . .

111. Prudential's stock price further declined from a close of $88.56 per share on August 2, 2019, to $85.95 per share on August 5, 2019, or 3%, on volume of more than 4.2 million shares traded on August 5, 2019.

112. On August 6, 2019, Deutsche Bank issued a report, titled "Lowering Estimates Post Earnings," which revealed that Prudential's Investor Relations, "in an effort to be more transparent" had been in communication with sell-side analysts concerning their financial models for the Company and, as a result, Deutsche Bank

was reducing its fiscal year 2019 EPS guidance for Prudential by more than 4% to $12.25:

> We are updating our model to reflect 2Q19 earnings. ***In an effort to be more transparent, IR has been reaching out to the sell-side to discuss modeling considerations, particularly given newer disclosures***. Management had set 3Q19 "baseline" EPS at $3.00 (relative to the $3.14 reported in 2Q19) resulting from backing out a $0.09/sh benefit from the assumption review, offset by $0.17/sh in higher-than-average VII and $15mn of earnings headwinds in each Gibraltar and Corporate. . . .
>
> ***Further, updated mortality assumptions based on the annual review is expected to lower Individual Life earnings by $25mn/quarter for the foreseeable future*** . . . .

113. As the disclosures continued, Prudential's stock price continued to decline, from a close of $86.23 per share on August 6, 2019 to a close of $85.17 per share on August 7, 2019, and reaching to below $80 per share on August 15, 2019.

114. Like other members of the Class who purchased Prudential stock at artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages, when Prudential's stock prices declined upon the disclosures correcting the alleged misrepresentations.

115. The timing and magnitude of Prudential's stock price declines negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

116. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme and misrepresentations to artificially inflate Prudential's stock price and the subsequent significant decline in the value of Prudential's stock when the true facts were revealed.

**NO SAFE HARBOR**

117. Prudential's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

118. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading or that the purportedly warned of event had already come to pass, and the FLS was authorized and/or approved by an executive officer of Prudential who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTION OF RELIANCE

119. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiff and other members of the Class purchased Prudential common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

120. At all relevant times, the market for Prudential common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Prudential filed periodic public reports with the SEC; and

(b) Prudential regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

121. Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## CLASS ACTION ALLEGATIONS

122. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased Prudential common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, directors and officers of Prudential, at all relevant times, and their immediate families, and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

123. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide

substantial benefits to the parties and the Court. Prudential has more than 400 million shares of common stock outstanding, owned by thousands of persons.

124. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether the Exchange Act was violated by defendants;

(b) whether defendants omitted and/or misrepresented material facts;

(c) whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the price of Prudential common stock was artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

125. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

126. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

127. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

128. Plaintiff incorporates ¶¶1-127 by reference.

129. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Prudential common stock during the Class Period.

131. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Prudential common stock. Plaintiff and the Class would not have purchased Prudential common stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

132. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Prudential common stock during the Class Period.

**COUNT II**

**For Violation of §20(a) of the Exchange Act Against Individual Defendants**

133. Plaintiff incorporates ¶¶1-132 by reference.

134. The Individual Defendants acted as controlling persons of Prudential within the meaning of §20 of the Exchange Act. By virtue of their positions and their power to control public statements about Prudential, the Individual Defendants had the power and ability to control the actions of Prudential and its employees. By reason of such conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 3, 2020

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
PETER S. PEARLMAN

s/ Peter S. Pearlman
PETER S. PEARLMAN

Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
DANIEL J. PFEFFERBAUM
ARMEN ZOHRABIAN
HADIYA K. DESHMUKH
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
azohrabian@rgrdlaw.com
hdeshmukh@rgrdlaw.com

VANOVERBEKE, MICHAUD &
TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 3, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Peter S. Pearlman

PETER S. PEARLMAN
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)
Email: psp@njlawfirm.com