**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>PRUDENTIAL FINANCIAL, INC., CHARLES F. LOWREY, KENNETH Y. TANJI, and ROBERT M. FALZON,<br><br>    Defendants. | **Civil Action No. 2:19-CV-20839-SRC-CLW**<br><br><br>Oral Argument Requested<br><br><br>*Electronically Filed* |

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

---

Tricia B. O'Reilly
David D. Cramer
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100

Maeve L. O'Connor (admitted *pro hac vice*)
Susan R. Gittes (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 4

I.    Prudential's Business ................................................................................................ 4

II.   Reserves for Individual Life Insurance Contracts ............................................... 4

III.  The Annual Second Quarter Assumption Review Process ................................... 5

IV.   Plaintiff's Allegations Regarding Mortality Experience in the Hartford Block ................. 6

V.    The Alleged Mistatements ........................................................................................ 8

VI.   The Alleged Corrective Statements ......................................................................... 9

ARGUMENT .......................................................................................................................... 9

I.    The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter. ................... 10

      A.    Plaintiff Fails to Plead Actual Knowledge or Recklessness as to the Individual Defendants. ........................................................................ 12

            1.    Plaintiff Fails to Plead Particularized Allegations To Support A Cogent Inference of Scienter ................................................ 12

            2.    Plaintiff's Remaining Allegations of Scienter Also Fail. ......................... 16

            3.    The Opposing Inference Of Non-Fraudulent Intent Is Far More Compelling. ................................................................. 17

      B.    The Amended Complaint Fails to Plead Scienter as to Prudential. ...................... 19

II.   The Section 10(b) Claim Should Be Dismissed for Failure to Plead an Actionable Misrepresentation. ............................................................................. 19

      A.    Plaintiff's Allegations Regarding Prudential's Reserve Estimates Are Inactionable Statements of Opinion. ...................................................... 20

            1.    Plaintiff Alleges No Facts Indicating That Defendants Did Not Believe The Company's Reserve Estimates or Statements About Reserves........ 21

            2.    Plaintiff Has Not Alleged Particularized Facts Indicating That The Company's Reserve Estimates Did Not Fairly Align With Information In Its Possession. ................................................................. 22

      B.    Alleged Misstatements Based on the Same Flawed Theory Are Inactionable. .... 23

C.    Item 303 and GAAP Do Not Create A Duty To Disclose. ................................. 25

    1.    Item 303 Does Not Give Rise to a Claim Under Section 10(b) .............. 25

    2.    GAAP Does Not Create A Duty To Disclose. ....................................... 26

D.    Statements Regarding "Rock-Solid" Reserves and a "Strong" Balance Sheet Are Inactionable Puffery. ........................................................................................ 27

E.    Statements About Growth Prospects And Future Results Are Inactionable Forward-Looking Statements ............................................................................. 28

III.    The Amended Complaint Does Not Adequately Plead Loss Causation. .......................... 29

IV.    Plaintiff Fails to Plead Control Person Liability as to the Individual Defendants. ........... 30

CONCLUSION ................................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013) .......................................... 10, 30

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004).............................. 12, 24

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 Fed. Appx. 672 (3d Cir. 2011).... 19

*Fain v. USA Techs., Inc.*, 707 Fed. Appx. 91 (3d Cir. 2017)........................................................ 11

*Fan v. StoneMor Partners LP*, 927 F.3d 710 (3d Cir. 2019)....................................................... 28

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ...................................... 13

*In re Advanta Corp. Sec. Litig.*, 180 F. 3d 525 (3d Cir. 1999) ..................................................... 28

*In re Amarin Corp. PLC.*, No. 13-CV-6663, 2015 WL 3954190 (D.N.J. Jun. 29, 2015) ............ 18

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ................................................................................................................................. 20, 26

*In re Hertz Global Holdings Inc*, 905 F.3d 106 (3d Cir. 2018) ........................................ 10, 11, 16

*In re Hertz Global Holdings Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) ................................................................................................................................. 14, 26, 28

*In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143 (D.N.J. Jul. 22, 2015) ........................................................................................................................................... 14

*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ............................................... 29

*In re Merck & Co., Inc. Sec., Deriv. & Erisa Litig.*, No. 05-1151, 2012 WL 3779309 (D.N.J. Aug. 29, 2012) ............................................................................................................................. 16

*In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002) ................................. 10

*In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367 (D.N.J. 2010) ........................................ 18, 28

*Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020)................................................... 22

*Kanefsky v. Honeywell Int'l Inc.*, No. 18-cv-15536, 2020 WL 2520669 (D.N.J. May 18, 2020) 29

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007) ...................................................... 29

*Monk v. Johnson & Johnson*, No. 10-4841, 2011 WL 6339824 (D.N.J. Dec. 19, 2011) ............. 25

*Nasyrova v. Immunomedics, Inc.*, No. 14-1269, 2015 WL 4388310 (D.N.J. July 15, 2015) ......... 4

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517 (D.N.J. 2010) 12

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................. 13

*OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016) ......................... 4, 13, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)

......................................................................................................................... *passim*

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ........................................................ 25, 26

*Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013) ...................................................... 14, 24

*Roofer's Pension Fund v. Papa*, No. 16-2805, 2019 WL 3601229 (D.N.J. Jul. 27, 2018) .......... 15

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801

(2d Cir. 1996) ............................................................................................................... 17, 18

*Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019) .............................. 20

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) ................................ 10

*Tellabs, Inc. v Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) .................................................. 10

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017) .................................................. 11, 15

### STATUTES

15 U.S.C. § 78j(b) .......................................................................................................... 10

15 U.S.C. § 78u-4 ....................................................................................................... 1, 10

15 U.S.C. § 78u-5(c)(1) ................................................................................................... 28

### RULES

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................... 1

Federal Rule of Civil Procedure 9(b) ...................................................................................... 1, 10

Defendants Prudential Financial, Inc. ("Prudential"), Charles F. Lowrey, Kenneth Y. Tanji, and Robert M. Falzon ("Individual Defendants" and with Prudential, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint ("AC" or "Amended Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

## PRELIMINARY STATEMENT

The Amended Complaint is nothing more than a misguided attempt to transform an annual actuarial assessment related to Prudential's life insurance reserves into a claim for securities fraud. In the second quarter of every year, Prudential reviews the actuarial assumptions underlying its long-term life insurance reserve estimates to determine whether any of those assumptions should be adjusted and, if so, whether those adjustments impact the Company's reserve estimates. In 2019, that annual review process resulted in an increase to reserves and a corresponding charge to adjusted operating income. Plaintiff alleges based on hindsight that Prudential should have disclosed the need for a reserve increase by February 15, 2019 – in other words, that Prudential should have disclosed the outcome of the second-quarter assumption review process before that process even began. This theory rests on a presumption — unsupported by factual allegations — that Defendants had advance knowledge of the outcome of the 2019 assumption review. That flawed premise cannot support a claim for securities fraud.

Indeed, the Amended Complaint contains no allegations regarding the inherently judgment-based actuarial process that resulted in the 2Q 2019 increase of reserves at issue in this case, except to say that one input – "mortality experience" – was negative as to a portion of the Company's Individual Life Insurance business, the legacy "Hartford block" of policies. Standing alone, this allegation is devoid of significance. "Mortality experience" refers to actual

deaths as compared to expected deaths for a particular time period for a particular group of policies. It indicates what happened in a particular period in the past, but not whether that experience would support an adjustment to the Company's overall life insurance reserve estimates, much less whether the financial impact of any such adjustment would be material. Plaintiff's failure to plead any facts regarding this actuarial review process, let alone facts demonstrating that any relevant person knew or should have known that the Company would decide to increase reserves as a result of its comprehensive annual review, is fatal to its claims.

The Amended Complaint should be dismissed because Plaintiff fails to plead any of the core elements of a securities fraud claim. Most glaringly, Plaintiff fails to allege particularized facts giving rise to a strong inference of scienter – *i.e.*, that Defendants knew or recklessly disregarded that the Company's life insurance reserves were insufficient. Indeed, Plaintiff fails even to plead an actionable misstatement or omission, relying instead on inactionable opinions, puffery and protected forward-looking statements. Moreover, Plaintiff fails to plausibly allege a causal connection between the alleged misstatements and a decline in Prudential's stock price.

*First*, the Amended Complaint contains no particularized factual allegations indicating that any Defendant was aware of alleged negative mortality experience in the Hartford block, much less knew or recklessly disregarded that such experience would, in the exercise of Prudential's actuarial judgment, result in a material increase in the Company's reserves. Indeed, Plaintiff's principle "fact" is an allegation of a meeting where a "significant charge" was discussed by unknown attendees, with unknown data, without quantification and with no connection to any Individual Defendant. AC ¶ 53(d). Plaintiff's conclusory assertions and inconsequential allegations attributed to unnamed former employees in peripheral roles do not satisfy the Third Circuit's high bar for pleading scienter.

2

***Second***, Plaintiff fails to identify any actionable misstatement. Cutting through the scattershot allegations, Plaintiff's core theory is that the Company fraudulently understated its life insurance reserves. Because Prudential's reserves reflect estimates and judgments, they constitute "opinions" under the securities laws. Under the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), such statements of opinion are not actionable unless Plaintiff alleges particularized facts indicating that Prudential (*i*) did not genuinely believe its reserve estimates or (*ii*) omitted material facts regarding the basis of those estimates that rendered them misleading to a reasonable investor. Plaintiff alleges no such facts, and offers nothing to support its premise that unquantified adverse mortality experience in one part of Prudential's Individual Life business renders the Company's statements regarding its reserve estimates false or misleading.

The hodgepodge of other alleged misstatements in the Amended Complaint are equally inactionable. These include statements that are derivative of Plaintiff's core theory regarding reserves and fail for the same reasons, AC ¶¶ 39-40, statements of opinion regarding compliance with Generally Accepted Accounting Principles ("GAAP") that do not satisfy the particularized pleading standards of *Omnicare*, inactionable puffery (*e.g.*, that the Company's balance sheet was "rock solid, *id.* ¶45), and protected forward-looking statements (e.g., that the strength of the balance sheet "should lead to growth," *id.* ¶12).

***Third***, Plaintiff fails to adequately plead loss causation because they have not pleaded that the information allegedly concealed—the results of the annual assumption review—even existed at the time of the alleged misstatements.

Plaintiff has failed to plead its claims, and the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

### I.    Prudential's Business

For over 140 years, Prudential has been a provider of a wide range of insurance, investment management, and other financial products and services.  AC ¶¶ 2, 25.  Prudential's sizeable business spans the United States and other countries.  *Id*. ¶ 25.  The Individual Life business develops and distributes term life, variable life, and universal life insurance products.  *Id*. ¶ 2.  Individual Life is a small fraction of the Company's overall business.[2]

### II.    Reserves for Individual Life Insurance Contracts

Individual life insurance policies are contracts between a company and a policyholder.  *See*, *e.g.*, *id*. ¶ 79.  In the simplest form of life insurance, a policyholder makes periodic payments (or premiums), and in exchange the insurance company agrees to provide a payment, or death benefit, to beneficiaries upon an insured's death.  Given the nature of life insurance products, life insurers often are not obligated to make any payment under a policy for several decades, if not longer.  *Id*. ¶ 79.  As a result, in taking on liabilities for these "long duration" contracts, insurance companies set aside amounts of money, or reserve estimates, to meet future policy obligations.  *See, e.g., id*. ¶ 78.  Life insurers setting reserves must make predictions of

---

[1] The factual allegations in the AC are taken as true solely for purposes of this motion, except where those allegations contradict the contents of SEC filings and other documents cited in the AC.  *See Nasyrova v. Immunomedics, Inc.*, No. 14-1269, 2015 WL 4388310, at *3 (D.N.J. July 15, 2015) (a court need not accept as true allegations contradicted by cited, attached documents).  A court may consider materials of which it may take judicial notice and which are integral to the complaint even if they are not explicitly incorporated by reference therein.  *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).  Copies of such relevant documents are attached as exhibits to the accompanying Declaration of Susan Gittes ("Gittes Decl.").

[2] *See* Gittes Decl. Ex. D, at 65 ("The reserves for future policy benefits of our Individual Life segment … represented 5% of our total future policy benefit reserves" as of December 31, 2018), and at 284 (ILI segment is approximately 10% of total revenues for the year ended December 31, 2018), and at 282 (ILI segment is less than 4% of adjusted operating income for year ended December 31, 2018).

what will happen in the future—*e.g.*, how long insureds will live, how much premium insureds will pay, what will happen with interest rates—based on a company's actuarial judgment.

Prudential uses a range of factors in estimating life insurance reserves, including mortality, policyholder behavior, and investment income. *See*, *e.g.*, *id*. ¶¶ 7, 38; *see also* Gittes Decl. Ex. D, at 64. For each of these "inputs," the Company must develop actuarial assumptions, or forecasts used to predict what it expects to happen in the future. *See, e.g.,* AC ¶¶ 7, 8,9,15, 81, 82; *see also* Gittes Decl. Ex. D, at 64. To set each separate actuarial assumption, the Company must weigh different sources of data, including the Company's own experience across multiple metrics, data from the industry, and other factors. *See*, *e.g.*, AC ¶ 37 (actuarial assumptions "are generally based on the Company's experience, industry experience, and/or other factors, as applicable"). Using this multi-step process, the Company's actuaries set initial reserve assumptions when policies are issued, and then annually revisit the assumptions underlying those reserves to evaluate whether, in their actuarial judgment, an adjustment is warranted.

## III.    The Annual Second Quarter Assumption Review Process

In the second quarter of each year, the Company undertakes a "comprehensive" review of each of its actuarial assumptions. *See* Gittes Decl. Ex. H, at 56 ("So, in ordinary course in our rigorous process, we will factor that in to our study . . . our process is very comprehensive"); *see also* Gittes Decl. Ex. D at 62 (annually, the Company "perform[s] a comprehensive review of the assumptions used in estimating gross profits for future periods."). The Amended Complaint contains no allegations regarding the nature of the analysis performed during this annual review.

As a result of the second quarter process, the Company may update its assumptions and make refinements to its models "based upon emerging experience, future expectations and other data, including any observable market data." Gittes Decl. Ex. D at 64. Only if "a material change is observed in an interim period that we feel is indicative of a long-term trend" does the

5

Company consider changing assumptions outside of the normal second quarter review.  AC ¶ 38.  The Company generally "do[es] not expect trends to change significantly in the short-term and, to the extent these trends may change, . . . expect[s] such changes to be gradual over the long-term."  *Id*.  In the second quarter of 2019, the Company conducted its annual comprehensive review of the actuarial assumptions underlying its life insurance reserves for the entirety of the Individual Life business.  The Amended Complaint contains no factual allegations regarding the 2019 process, when it was commenced, when it was completed or what specific assumptions were considered.

**IV.     Plaintiff's Allegations Regarding Mortality Experience in the Hartford Block**

Plaintiff's claims are premised on allegedly adverse mortality experience in one part of the Company's Individual Life business.  In the ordinary course of its business, the Company monitors (among other things) "mortality experience," or the observed number of insureds who died in a given period.  The Company usually reports on this experience quarterly.  *See* Gittes Decl. Ex. A at 4, Ex. B at 4-5, 10, Ex. C at 8.  Plaintiff alleges that the Company "evaluated mortality experience at least quarterly" within Individual Life and that actuaries generated updates on "actual mortality results within the Individual Life block."  AC ¶¶ 16(b), 53(c).

Plaintiff's allegations focus on the mortality experience of one part of Prudential's Individual Life business known as the "Hartford block," approximately 700,000 individual life insurance policies acquired by Prudential from The Hartford in 2013.  *Id*. ¶¶ 3, 16(b).  In one portion of the Amended Complaint, Plaintiff alleges that the Hartford block caused "adverse mortality developments in Individual Life" beginning in 2015.  *Id*. ¶ 53(a).  Elsewhere, however, Plaintiff alleges that there was negative mortality in the Hartford block from the third quarter of 2018 through the end of the putative class period.  *Id*. ¶ 53(e).

The Amended Complaint does not contain any factual allegations quantifying this alleged negative mortality experience, proffering just *two* factual allegations about the Hartford block:

- According to confidential witness "FE1", there was discussion "as early as May 2019" in "forecast meetings" that the Company would need to take a "significant charge" to Individual Life adjusted operating income due to purported negative mortality experience in the Hartford block. *Id.* ¶¶ 16(b), 53(d).

- FE1 asserts that a "results package" for Individual Life from the fourth quarter of 2019—two quarters *after* the disclosures at issue—noted a "negative mortality performance trend attributed to the legacy Hartford business extending back six consecutive quarters – *i.e.*, from 3Q18 through the end of 4Q19." *Id.* ¶ 53(e).

Based on these two allegations, Plaintiff characterizes the negative mortality experience in the Hartford block as "extreme" and "highly unusual," *see, e.g.*, AC ¶¶ 16(b-c), 91, and asserts that the Company should have adjusted its mortality assumptions and increased reserves at some unspecified time before the conclusion of the 2019 second quarter actuarial assumption review process. Significantly, Plaintiff offers no facts to connect an unspecified amount of negative mortality experience in one portion of the Company's Individual Life business to a need to adjust the Company's actuarial assumptions and materially increase reserves.

Indeed, although Plaintiff seems to equate mortality *assumptions* with mortality *experience*, Plaintiff's own allegations make clear that they are two different things. Mortality experience is retrospective: it refers to the actual number of policyholder deaths in a particular time period in the past. *See, e.g., id.* ¶ 53(c). Mortality assumptions, by contrast, are forward-looking: they are used to project anticipated mortality out into the future in connection with the estimation of reserves. *See, e.g., id.* ¶¶ 65, 81. The Amended Complaint does not contain any factual allegations regarding the relationship between near-term mortality experience in one portion of the Individual Life business and the Company's long-range actuarial assumptions for Individual Life as a whole. Plaintiff offers no allegations regarding the type, duration or

7

magnitude of purportedly adverse mortality experience that would justify an adjustment to the Company's mortality assumptions, let alone allegations regarding how such adjusted assumptions would affect the Company's reserves overall.  Further, Plaintiff's allegations acknowledge that Prudential's own experience is one of several factors that the Company considers in reviewing its actuarial assumptions for mortality, and that mortality assumptions, in turn, are just one set of factors considered in setting reserves overall.  *See*, *e.g.*, *id.* ¶ 37.

## V.      The Alleged Mistatements

The Amended Complaint points to a series of statements that Plaintiff contends were false or misleading.  Most of these statements, drawn from the Company's Forms 10-K and 10-Q, are premised on Plaintiff's core contention that Prudential's reserves were deficient as a result of the allegedly negative mortality experience in the Hartford block.  *See, e.g., id.* ¶¶ 51-53 (claiming that results reported in the 2018 10-K and 1Q19 10-Q were false or misleading because "negative mortality trends had already materialized as of the Class Period and the Company's reserves were insufficient"); *id.* ¶ 36 (claiming that the 2018 Form 10-K reported a "reserve increase" but "made no mention of subsequent negative mortality developments").

Plaintiff also points to a handful of statements by the Individual Defendants that it claims were false or misleading.  *First*, Plaintiff pleads that on June 5, 2019, while the assumption review process was underway, the Company held its Investor Day meeting.  Defendant Chief Financial Officer Ken Tanji discussed the Company's recent mortality experience in the Individual Life Insurance business as a whole, stating:

> [O]ur recent experience has been in between [the] range of what we'd expect normal volatility, but net it has been below our experience. So, in ordinary course in our rigorous process, we will factor that into our study and we'll take a closer look at that. So I know these are areas of current topical interest, our process is very comprehensive and that work is underway and <u>we cannot comment yet because the work's not complete on the potential outcome</u>.

8

AC ¶ 54; Gittes Decl. Ex. H , at 56 (emphasis added).  Plaintiff omits the portion of the quotation making clear that that the assumption review process is underway and not yet complete.

Later in the June 5, 2019 Investor Day event, Tanji was asked about mortality experience in the Individual Life Insurance business: "Q: And then when you're going to the assumption review commentary, you talked about the life business. And I just wondered, I missed what you've said. Has mortality been more favorable is that relative to what your expectations are or...?  A: No. It's very quarter-to-quarter, both positive and negative. If you looked at it, it has been slightly negative and we're taking a look at that."  AC ¶ 54, *see also* Gittes Decl. Ex. H, at 60-61.  Neither the question nor Tanji's response mentioned the Hartford block.

*Second*, Plaintiff points to a March 31, 2019 Credit Suisse analyst report which allegedly recounted a meeting with Defendant Falzon, who allgedly was "optimistic" about the Company's "growth prospects."  AC ¶ 43.  According to the report, Falzon commented that there "are no systemic issues with underwriting or mortality assumptions" and "results should stabilize."  *Id.*

*Third*, Plaintiff points to statements from Defendant Lowrey and others in announcing the first quarter 2019 financial results regarding the "strength of [the Company's] balance sheet" and prospects for "growth in our businesses and greater value for our shareholders."  *Id.* ¶ 47.

## VI.    The Alleged Corrective Statements

On July 31, 2019, Prudential announced its second quarter earnings, disclosing a charge of $208 million "related to market experience updates," including an adjusted operating loss of $135 million in the Individual Life segment due in part to the impact of Prudential's annual reviews and updates of its assumptions and "other refinements." AC ¶ 60; Gittes Decl. Ex. I, at 4.

## ARGUMENT

Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  To state a claim under Section 10(b), a plaintiff must adequately allege, among other

things, that the defendant made a material misrepresentation or omission, that the defendant acted with scienter, and that the material misrepresentation caused investors loss. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78j(b). Additionally, Rule 9(b) and the PSLRA impose "heightened pleading requirements" that a securities fraud plaintiff must meet to survive a motion to dismiss. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 223-24 (3d Cir. 2002). To state a claim under Section 20(a), Plaintiff must plead: (*i*) a primary violation; (*ii*) actual control of the primary violator; or (*iii*) that "the defendant 'must have been a 'culpable participant' in the 'act or acts constituting the violation or cause of action.'" *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484-85 (3d Cir. 2013). Plaintiff has failed to sufficiently plead each requisite element.

## I.  The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter.

Each of Plaintiff's claims must be dismissed because Plaintiff pleads no facts remotely approaching the "strong inference" of scienter required under the PSLRA. To plead a claim for securities fraud, Plaintiff must plead facts giving rise to a "strong inference that the defendant acted with the required state of mind" – *i.e.*, "an intent to deceive, manipulate or defraud, either knowingly or recklessly." *In re Hertz Global Holdings Inc*, 905 F.3d 106, 114 (3d Cir. 2018) (internal quotations omitted) (citations omitted); 15 U.S.C. § 78u-4(b)(2). To qualify as "strong," the inference of scienter "must be more than merely plausible or reasonable—it must be ***cogent*** and at least as ***compelling*** as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) (emphases added). The Court must "engage in a comparative evaluation," considering "not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged." *Id*. To the extent the Plaintiff seeks to rely on recklessness rather than intent to deceive, the particularized

10

facts pleaded must be sufficient to establish "an extreme departure from the standards of ordinary care." *Fain v. USA Techs., Inc.*, 707 Fed. Appx. 91, 96 (3d Cir. 2017) (citations omitted).

Plaintiff's core theory is that the Company's reserves were understated, but Plaintiff alleges no facts supporting an inference, much less a cogent or compelling one, that any of the Individual Defendants knew or recklessly disregarded a purported reserve deficiency. Instead, Plaintiff's claim depends on a chain of unsupported assumptions that fall far short of the PSLRA's high bar for pleading scienter.

- Plaintiff starts with the allegation that the Company monitored mortality experience within the Hartford block.

- Plaintiff next assumes that adverse mortality experience in the Hartford block – which Plaintiff does not quantify as to materiality or degree – necessarily means that the Company will adjust the actuarial assumptions used to estimate reserves for future policy benefits.

- And finally, Plaintiff assumes that any such adjustment will necessarily result in a material increase in reserves.

Plaintiff sets forth no particularized facts supporting any of these leaps of logic and therefore cannot meet its high burden of pleading scienter. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 246 (3d Cir. 2017) (affirming dismissal for failure to plead scienter because "actual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false"); *see also In re Hertz*, 905 F.3d at 121 (holding that plaintiffs pled an insufficient "string of inferences" that "do not give rise to a cogent inference" of scienter). Plaintiff pleads no facts establishing that any Individual Defendant even knew of the alleged negative mortality experience in the Hartford block, much less that the outcome of the judgment-based actuarial assumption review process would be a material charge. As a result, Plaintiff fails to allege facts demonstrating the requisite strong

11

inference of scienter as to any Defendant.  For this reason alone, the Court should dismiss Plaintiff's Amended Complaint.

> **A.  Plaintiff Fails to Plead Actual Knowledge or Recklessness as to the Individual Defendants.**
>
> **1.  Plaintiff Fails to Plead Particularized Allegations To Support A Cogent Inference of Scienter**

Plaintiff fails to plead scienter because it does not allege facts giving rise to a strong inference that any of the Individual Defendants knew or recklessly disregarded that the alleged poor mortality *experience* in the Hartford block would lead to a change in the Company's mortality *assumptions* going forward, much less that such a change would have a material impact on reserves.  The Amended Complaint contains no factual allegations whatsoever indicating that Defendants Lowrey, Tanji or Falzon themselves received reports regarding mortality experience in the legacy Hartford block or otherwise knew of "adverse mortality development" in that block.  Plaintiff's vague allegations that other unidentified individuals possessed such knowledge are insufficient to establish knowledge on the part of the Individual Defendants.  *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 154 (3d Cir. 2004) (holding that vague allegations of a meeting where poor quarterly performance was discussed "say[] nothing with particularity about whether a meeting was in fact held, . . . whether any Defendants were in fact present at such a meeting, or whether the . . . results were even available at that time"); *see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 555 (D.N.J. 2010) (assertions by confidential witnesses did not support an inference of scienter where "not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants" about the relevant financial issues).

Nor does Plaintiff plead that negative mortality experience in the Hartford block necessarily meant mortality experience for Individual Life overall would be negative.  In fact, the

Amended Complaint concedes the opposite, admitting that in the first quarter of 2019 the Company's overall mortality experience for Individual Life was favorable, notwithstanding Plaintiff's allegation of an allegedly negative trend of the Hartford block at that time.  AC ¶ 13.

Moreover, Plaintiff alleges no facts to support an inference that any Individual Defendant—or anyone senior enough to speak for Prudential—knew in advance that the Company's actuaries would exercise their judgment to adjust the Company's mortality assumptions and materially increase the Company's reserves.  Merely alleging the possibility that information existed at the Company that could have supported the need to increase reserves is not sufficient.  *See OFI Asset Mgmt.*, 834 F.3d at 497 (although plaintiff adequately pleaded that defendants knew of and were preparing for a potential risk, the allegation still "falls well short of demonstrating with particularity" that the speaker knew the risk would actually materialize at the time the statement was made); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Lacking any factual allegations to support these inferences, Plaintiff attempts to reverse-engineer an inference of scienter based on the fact that the Company ultimately determined to increase its reserves as a result of its assumption review process in the second quarter of 2019. Third Circuit precedent is clear that this kind of "fraud by hindsight" is "both conclusory and circular" and insufficient to plead scienter.  *See OFI Asset Mgmt.*, 834 F.3d at 497 ("[P]reparing for responses to a major announcement does not mean that [defendant] knew which responses would occur, and relying on the fact that" "grievances" were "ultimately file[d]" is "'an attempt to prove fraud by hindsight, something our Court has long rejected.'") (internal citations omitted); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) ("Of

13

course, it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."); *see also In re Hertz Global Holdings Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *17 n. 6 (D.N.J. Apr. 27, 2017) (dismissing where "the only support for that allegation is the fact that the statement turned out to be untrue").

Plaintiff's allegations based on confidential witnesses do nothing to remedy this core pleading deficiency.  Plaintiff relies most heavily on an allegation attributed to "FE1" regarding discussion at a meeting "as early as May 2019" that the Individual Life business was "performing poorly due to negative mortality experience in the legacy Hartford block" and that "the Company would need to take a significant charge to Individual Life adjusted operating income." AC ¶¶ 16(b), 59.  But there is no allegation that "FE1" personally attended that meeting, no information about others who were allegedly present, and no corroborative detail or information about "FE1's" alleged basis of knowledge or reliability.  *Id.* ¶ 53(d).  Rather, "FE1" is alleged to have been a low-level employee whose responsibility was limited to creating quarterly sales forecasts, and the Amended Complaint provides no basis to evaluate the supposed "significance" of the charge purportedly discussed.  *Id.* ¶ 30(a).  Accordingly, the Court must discount any allegations attributed to "FE1."  *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013) (instructing that allegations from confidential witnesses should be "discount[ed] … steeply" where "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia" indicates witness lacked personal knowledge); *see also In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143, at *20 (D.N.J. Jul. 22, 2015) (rejecting assertions of confidential witnesses

14

providing no "suggestion that any of the [witnesses] communicated in any way with [the individual defendants] or any person . . . who might have been familiar with [their] thinking").

Equally deficient is Plaintiff's claim that "FE1" reviewed a "year-end 'results package'" for the fourth quarter of 2019 indicating negative mortality experience in the Hartford block for the prior six quarters.  AC ¶ 53(e).  Based on this vague "review" allegation, Plaintiff attempts to establish that negative quarterly experience in one segment of the Individual Life business is sufficient to find that Defendants possessed a purported "knowledge" that the Company's reserves, as a whole, were materially false.  *Id*. ¶ 53(f).  This conclusory allegation is insufficient because "FE1" provides no details on the amount of this alleged negative mortality experience, its effect on mortality in the Individual Life business as a whole, or its financial impact, if any.  *See Roofer's Pension Fund v. Papa*, No. 16-2805, 2019 WL 3601229, at *19 (D.N.J. Jul. 27, 2018) (allegations that defendants had contemporaneous access to publicly available information contradicting their statements insufficient to plead scienter absent allegations of "internal reports, documents, or communications" and failed to plead "particularized facts showing that Defendants actually knew their representations were false or that they acted with an intent to defraud").  Nor does the Amended Complaint explain what data allegedly reviewed at least five months *after* the charge was taken indicates about any relevant person's knowledge at the time of the alleged misstatements.  *See Williams*, 869 F.3d at 244 (finding failure to plead falsity when plaintiff relied on "subsequent events" rather than "contemporaneous sources").

The other two confidential witnesses cited in the Amended Complaint add nothing to the Plaintiff's scienter allegations.  For example, the allegations attributed to "FE2" are simply that "Hartford had poor actuarial and data administration systems" and that Prudential was "focused on the financial impact of quarterly mortality experience."  AC ¶¶ 53(b), 53(c).  With respect to

"FE3," this individual allegedly left Prudential in June 2018 – more than six months before the proposed class period begins – and allegedly reported that Prudential "evaluated mortality experience at least quarterly." *Id*. ¶ 53(c). None of these allegations – even if true – suggest that any of the Defendants had knowledge or recklessly disregarded information that reserves were understated. Nor has Plaintiff alleged any facts to suggest that purported issues with the Hartford block's data systems, *id*. ¶ 16(a), played any role in the decision to adjust the Company's reserves, which would be required to support a cogent inference of scienter.

### 2.      Plaintiff's Remaining Allegations of Scienter Also Fail.

Unable to allege facts indicating that Defendants had actual knowledge or recklessly disregarded information that the Company's reserves were inadequate, Plaintiff relies solely on naked conclusory allegations that Defendants "knew" of the need to update assumptions and increase reserves. AC ¶¶ 53, 59, 84, 91, 93, 118, 129. Courts consistently hold that knowledge cannot be presumed based on the senior positions held by the Individual Defendants. *See In re Merck & Co., Inc. Sec., Deriv. & Erisa Litig.*, No. 05-1151, 2012 WL 3779309, at *11 (D.N.J. Aug. 29, 2012) (scienter not sufficiently pled where defendants' senior positions within the company allowed them access to certain information because "mere reliance on a person's title or management role within a company will not suffice").

Nor do Plaintiff's allegations that Defendants Lowrey and Tanji signed Sarbanes Oxley certifications establish scienter. In the absence of particularized facts indicating that Defendants knew the certifications were false or were reckless as to their accuracy, these allegations establish nothing about the signer's state of mind. *See In re Hertz Global Holdings Inc*, 905 F.3d at 118 ("An allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence

16

of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing.").

### 3. The Opposing Inference Of Non-Fraudulent Intent Is Far More Compelling.

Rather than support Plaintiff's tenuous chain of inferences, the facts pleaded in the Amended Complaint point to a non-fraudulent inference that is far more compelling: the information Plaintiff alleges was knowingly omitted—that the outcome of the assumption review process would be a material charge—was in fact not yet known prior to 2Q 2019.

Plaintiff's allegations regarding Defendant Tanji's purported statements on June 5, 2019 at an Investor Day presentation are illustrative. On the topic of "mortality experience" in Individual Life, Tanji allegedly stated:

> [O]ur recent experience has been in between [the] range of what we'd expect normal volatility, but net it has been below our experience. So, in ordinary course in our rigorous process, we will factor that into our study and we'll take a closer look at that. So I know these are areas of current topical interest, our process is very comprehensive and that work is underway and <u>we cannot comment yet because the work's not complete on the potential outcome</u>.

AC ¶ 54, Gittes Decl. Ex. H at 56 (emphasis added). Later in the event, Defendant Tanji allegedly responded to an analyst's question about mortality in "the life business" as follows: "It's very quarter-to-quarter, both positive and negative. If you looked at it, it has been slightly negative and we're taking a look at that." AC ¶ 54; Gittes Decl. Ex. H at 61. None of these statements suggests that Tanji, or any other Individual Defendant, knew that the assumption review process would lead to a purportedly material change in reserves. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (affirming dismissal where plaintiff had failed to show that statements about performance "were not based on the facts available to the company at the time the statements were made"). Instead, they suggest that Tanji meant what he said—the Company was in the midst of its

17

assumption review process and unable to comment as to its results.  That the outcome two months later was an allegedly material charge does not support an inference from hindsight that Tanji spoke in June 2019 with fraudulent intent.  *See id.* at 812 (rejecting allegations of scienter even though statement that retail sales were "strong" was made "at least three weeks before" announcement that sales were declining).

Equally unavailing in support of a fraudulent intent inference is Defendant Falzon's alleged statement in March 2019 that "there are no systemic issues with underwriting or mortality assumptions." AC ¶ 11.  As a threshold matter, this statement is merely attributed to Falzon in the Credit Suisse analyst report and is inactionable on that basis alone.[3]  Furthermore, Plaintiff pleads no facts specifying what "systemic issues" purportedly existed and no facts suggesting that Falzon was aware of any such issues at the time of the statement attributed to him.  The Amended Complaint provides no basis to reject the more compelling, non-fraudulent inference that Mr. Falzon's purported statement reflected his understanding at the time the report was issued, when the second quarter assumption review process had not yet begun.

Courts in the Third Circuit have squarely rejected allegations of securities fraud based on far more specific allegations of purported wrongdoing than Plaintiff pleads here based on a conclusion that the competing non-fraudulent inference was more plausible.  *See*, *e.g.*, *In re Amarin Corp. PLC.*, No. 13-CV-6663, 2015 WL 3954190, at *13, 15 (D.N.J. Jun. 29, 2015)

---

[3] Plaintiff has not alleged that either Falzon or the Company controlled the content of the report or the context provided for the statement attributed to him.  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 403 (D.N.J. 2010) (statements in analysts' reports are not actionable unless the complaint actually alleges "that the management either: (1) retained the services of the analysts; or (2) passed a clear misinformation to the analysts with intention that the analysts would communicate the misinformation to the market" supported by "'facts showing that a particular defendant both made the statement to the analyst and controlled the content of the [analyst's] report.'").  For the same reason, the statement quoted from the Sandler O'Neill report is not actionable because Plaintiff has failed to plead facts sufficient to attribute the unspecified "management" statement to any particular Individual Defendant.

(allegations that defendants resigned due to knowledge that false or misleading statements were "soon to be exposed" were insufficient to support a strong inference of scienter and instead it was "more plausible" that defendants resigned for other reasons unrelated to the alleged misstatements).  Here, Plaintiff pleads no facts remotely suggesting that the statements made by the Individual Defendants were even incorrect at the time they were made, much less facts sufficient to reject the far more compelling inference that the Individual Defendants simply intended to accurately convey information they knew at the time.

> **B.**    **The Amended Complaint Fails to Plead Scienter as to Prudential.**

Because the Amended Complaint fails to plead the requisite strong inference of scienter as to any Individual Defendant, it follows that Plaintiff has failed to plead scienter as to Prudential.  *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 Fed. Appx. 672, 676 (3d Cir. 2011).  The Third Circuit has not adopted the doctrine of "corporate scienter," under which a plaintiff could theoretically plead scienter against a corporation without successfully pleading scienter as against any individual defendant. Regardless, the "corporate scienter" doctrine would not apply here because Plaintiff does not allege facts giving rise to a strong inference that *someone* in the Company acted with scienter.  *Id.* (explaining that courts outside the Third Circuit have only accepted the doctrine of corporate scienter where facts pled are "extraordinary," and holding that even a "long-lasting" price fixing conspiracy that "affected a substantial portion of [the company's] business" was not sufficiently "extraordinary").

**II.    The Section 10(b) Claim Should Be Dismissed for Failure to Plead an Actionable Misrepresentation.**

The flaws in Plaintiff's scienter allegations also doom Plaintiff's efforts to identify an actionable misstatement.  Plaintiff's core theory is that the Company's reserves were understated – a theory built on conclusory assumptions rather than particularized factual allegations.  The

19

Company's reserve estimates are statements of opinion, not fact, and are only actionable if they meet the strict standard set forth by the Supreme Court in *Omnicare*. *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) (holding that reserve estimates are not governed by any objective standard and therefore are analyzed as opinions under *Omnicare*). The standard for pleading a misstatement under *Omnicare* is akin to that for pleading scienter, *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545, 2019 WL 4257110, at *17 (S.D.N.Y. Sept. 9, 2019), and the Amended Complaint falls woefully short as Plaintiff's remaining alleged misstatements fall into four categories: (i) statements that are derivative of and dependent on Plaintiff's core theory that the Company fraudulently understated its reserves; (ii) other opinion statements, such as that the Company complied with GAAP, that fail to satisfy the pleading requirements under *Omnicare*; (iii) inactionable puffery; and (iv) protected forward-looking statements.  None of these conclusory allegations are remotely actionable.

**A.      Plaintiff's Allegations Regarding Prudential's Reserve Estimates Are Inactionable Statements of Opinion.**

The Supreme Court has held that statements of opinion, such as the reserve estimates at the core of Plaintiff's case, are not actionable unless the speaker (*i*) does not genuinely believe them or (*ii*) omits material facts regarding the basis of the opinion such that the statements are rendered misleading. *Omnicare*, 575 U.S. at 185-86, 189.  Under the first prong of *Omnicare,* a plaintiff must allege with particularity that the speaker did not genuinely believe the stated opinion. *Id.* at 185-86.  A "sincere statement" of opinion – even if it later turns out to be incorrect or subject to revision – is not actionable. *Id.* at 186.  Under the second prong of *Omnicare,* a plaintiff must "identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.  As the Supreme Court

made clear, "[t]hat is no small task" for a plaintiff. *Id.* Plaintiff's allegations regarding

Prudential's reserve estimates are insufficient to meet *Omnicare*'s high standard.[4]

> **1.    Plaintiff Alleges No Facts Indicating That Defendants Did Not Believe The Company's Reserve Estimates or Statements About Reserves.**

Plaintiff does not even begin to adequately plead that Prudential's reserves estimates

were "untrue" facts under *Omnicare*'s first prong because, as explained above, *see supra* Section

I, Plaintiff alleges no facts indicating that Defendants did not actually believe those estimates.

*Omnicare*, 575 U.S. at 184-5. A "sincere" statement of opinion – "however irrational[]" – is not

actionable even if it later turns out to be incorrect or subject to adjustment. *Id.* at 188-89.

Plaintiff's attempts to establish that Defendants did not genuinely believe the Company's

reserve estimates, like Plaintiff's scienter allegations, rest entirely on an assumption that

Defendants knew that a material reserve charge would be required, AC ¶ 58, 59, but the

Amended Complaint contains no particularized factual allegations to support that contention.

*See supra* Section I.A.1. Plaintiff's allegations regarding statements purportedly made by

Defendants Tanji, Falzon, and Lowrey, AC ¶¶ 43, 45, 47, 54, fail to satisfy prong one of

*Omnicare* for the same reason that they fail to establish scienter: nothing about these statements

suggests that those statements were untruthful, much less that the Individual Defendants did not

genuinely believe the Company's reserve estimates. *See supra* Section I.A.1. For instance,

Tanji's statement that mortality experience was "slightly negative" referred to Individual Life as

a whole, making no mention of the Hartford block. As discussed above, allegedly negative

mortality experience in the Hartford block does not mean that mortality experience for Individual

Life as a whole was necessarily negative. Similarly, that the Company ultimately determined to

---

[4] This category includes both numerical reserve values in the financial statements as well as the statement that the company will make interim changes if a change is observed that the Company "feel[s] is indicative of a long-term trend." AC ¶ 7.

increase reserves as a result of its assumption review process in the second quarter of 2019 is not sufficient to establish that Defendants knew or should have known that process would result in a material increase in reserves.  *See Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 (3d Cir. 2020) (allegations that a statement was misleading solely because the opinions turned out to be false failed to satisfy *Omnicare*'s "rigorous benchmark").

> **2.  Plaintiff Has Not Alleged Particularized Facts Indicating That The Company's Reserve Estimates Did Not Fairly Align With Information In Its Possession.**

Similarly deficient is Plaintiff's attempt to allege actionable omissions under the second prong of *Omnicare,* as Plaintiff does not identify any information going to the basis of the reserve estimates that was omitted and rendered the statements of opinion misleading to a reasonable investor.  To state a claim based on the Company's reserves under *Omnicare*'s second prong, Plaintiff must plead "particular (and material)" facts to show that the alleged opinion statements do not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189, 194.  A statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id*. at 189.  As *Omnicare* explained, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."  *Id*. at 189-90.

Here again, Plaintiff does not plead any facts to support its assumption that general allegations of knowledge of adverse mortality experience in the Hartford block did not "fairly align" with the Company's estimated reserves during the Class Period.  Indeed, Plaintiff does not allege any facts to support its assumption that knowledge of adverse mortality experience in one portion of the Individual Life business is the same thing as knowledge of adverse mortality experience in Individual Life as a whole, let alone of the necessity of a material charge to

22

reserves.  In fact, Plaintiff's allegations regarding Tanji suggest the opposite:  Tanji told analysts that the assumption review process was underway, that mortality experience for Individual Life *as a whole* was slightly negative, and that it was too soon to say what the outcome of the assumption review process would be.  AC ¶¶ 15, 54.

Moreover, Plaintiff alleges no facts regarding *when* the Company concluded that a purportedly material charge to reserves would be required and therefore cannot plead with particularity that the Company's statements regarding reserves did not align with information that it possessed "at the time."  *Omnicare*, 575 U.S. at 189.  As discussed above, Plaintiff's allegation attributed to "FE1" regarding a meeting "as early as May 2019," AC ¶¶ 16(b), 53(d), 59, fails to specify any details about the alleged meeting, the amount of the alleged charge, or FE1's basis for characterizing the allegedly discussed charge as "significant."  *See supra* Section I.A.1.  Plaintiff's other attempts to satisfy the requirements of *Omnicare*—that a results package from many months after the alleged statements allegedly reported negative mortality experience, AC ¶ 53(e), and other general allegations about the Company's alleged monitoring of mortality experience and poor data systems, *id.* ¶¶ 53(b), 53(c)—similarly fail to demonstrate that any information existed at the time of any alleged misstatement that the Company's comprehensive actuarial review would result in a decision to increase reserves.  *See supra* Section I.A.1.

### B.    Alleged Misstatements Based on the Same Flawed Theory Are Inactionable.

Plaintiff throws in a hodgepodge of other alleged misstatements that are derivative of the core theory that reserves were understated and amount to different ways of saying the same thing.  Stated simply, none of these are actionable for the same reason that Plaintiff's allegation that reserves were understated is not actionable:  Plaintiff alleges no facts to support its premise that the existence of unquantified adverse mortality experience in a portion of the individual life business means that a material adjustment to the Company's reserves is required.

*First*, Plaintiff alleges that certain of the Company's risk factors are false or misleading, including that (i) the Company would update its actuarial assumptions if "mortality trend" risk were to emerge, AC ¶ 9; and (ii) the Company would update its actuarial assumptions off-cycle if "a material change is observed in an interim period that we feel is indicative of a long-term trend," *id*. ¶ 7. As a threshold matter, by selectively quoting from the Company's Form 10-K, Plaintiff omits the definition of "mortality trend," which refers to changes in mortality in the future, not existing mortality experience, and is irrelevant to their claims. *See* Gittes Decl. Ex. D, at 34 ("Mortality trend is the risk that mortality improvements in the future deviate adversely from what is expected."). In any event, Plaintiff does not allege facts indicating that any of these statements were false or misleading when made.[5] *See Chubb*, 394 F.3d at 142 (affirming dismissal with prejudice where plaintiff failed to "plead with particularity the 'true facts' purporting to show *how* or *why* those statements are false"); *Rahman,* 736 F.3d at 242 (explaining that the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"); 15 U.S.C. § 78u-4(b)(1), and (2).

*Second*, as discussed more fully above, Plaintiff has failed to plead facts indicating that any statement by Defendant Tanji at the Investor Day event was false or misleading. Plaintiff criticizes Tanji's description of overall mortality in Individual Life as "slightly negative," AC ¶ 15, in light of their allegations regarding mortality experience in the Hartford block, but Plaintiff alleges no facts regarding the Company's mortality experience within

---

[5] Plaintiff also points to the statement that, in a sustained low-interest rate environment, "there is an increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities." AC ¶ 8. This statement does not say that it is "likely" that the Company's reserves are greater than its liabilities. Instead, it makes a general observation regarding the intersection between interest rates and "best estimate" assumptions – a term Plaintiff does not define. *Id*. The Amended Complaint contains no allegations that this is false.

24

Individual Life as a whole, and therefore cannot carry its burden under the PSLRA to establish that Tanji's description of that overall experience is false or misleading. *Id*. ¶ 54.

*Third*, Plaintiff's allegations regarding the March 31, 2019 analyst report fail to establish falsity for the same reason. According to Plaintiff, the report stated: "Falzon noted that there are no systemic issues with underwriting or mortality assumptions." AC ¶ 11. Statements attributed to management in an analyst report are inactionable for the reasons discussed above. *See supra* Section I.A.3, note 2. In any event, Plaintiff alleges no particularized facts as to what would constitute a "systemic" issue, much less that "systemic" issues with underwriting or mortality assumptions existed in Individual Life at the time of Falzon's alleged statement.

### C. Item 303 and GAAP Do Not Create A Duty To Disclose.

Plaintiff's failure to allege facts supporting its core premise also means that it has failed to allege facts giving rise to a duty to disclose under Item 303 of Securities and Exchange Commission ("SEC") Regulation S-K or GAAP.

### 1. Item 303 Does Not Give Rise to a Claim Under Section 10(b)

Plaintiff's claim that Defendants violated Item 303, AC ¶¶ 53, 92, by failing to disclose purportedly adverse mortality experience fails as a matter of law because the Third Circuit has held that Item 303 does not give rise to an independent affirmative disclosure obligation that supports a claim under Section 10(b) or Rule 10b-5. *See Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000) (holding that no private cause of action exists to remedy a purported violation of Item 303); *Monk v. Johnson & Johnson*, No. 10-4841, 2011 WL 6339824, at \*12 (D.N.J. Dec. 19, 2011) ("[I]n *Oran*, the Third Circuit has explicitly rejected the argument that SK-303 creates a duty of disclosure that would constitute a material omission under Rule 10b-5."). That is because there is no private right of action under Item 303, *Oran*, 226 F.3d at 287, and the

materiality standard underlying the Item 303 disclosure obligation "differ[s] significantly" from that underlying Rule 10b-5. *Id*. at 288.[6]

### 2.    GAAP Does Not Create A Duty To Disclose.

Like statements regarding the Company's reserves, statements regarding the Company's compliance with GAAP and SEC guidance are inactionable statements of opinion under *Omnicare*. The particular GAAP provisions Plaintiff points to, ASC 450 and ASC 944, are inherently judgment based. See *In re Hertz*, 2017 WL 1536223, at *11-12 (holding that statements about GAAP compliance under ASC 360 and ASC 450 must be evaluated under the *Omnicare* standard because statements of compliance are "subjective" and therefore are opinion statements); *In re AmTrust*, 2019 WL 4257110, at *21 (plaintiffs did not plead a misstatement of fact because they had failed to plead adequately that application of ASC 944 is objective). Here again, Plaintiff's failure to plead facts supporting its assumptions about the import of negative mortality experience in the Hartford block precludes it from establishing a duty to disclose under GAAP. Plaintiff has not pleaded any particularized facts sufficient to demonstrate that statements regarding GAAP compliance were not genuinely believed when made or that they were misleading because of other information possessed at the time.

To the extent that Plaintiff relies upon ASC 944 and ASC 450 to contend that Prudential should have updated its assumptions and reserves earlier than it did, *see* AC ¶ 86, as explained above Plaintiff has failed to plead facts sufficient to show that alleged negative mortality

---

[6] In any event, Item 303 only requires disclosure of *known* trends or uncertainties that are "*reasonably likely to have a material effect* on the registrant's financial condition and results of operations." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016) (emphasis added); 17 C.F.R. 229.303(a)(1)-(3). "It is not enough that it should have known of the existing trend, event or uncertainty." *Indiana Pub. Ret. Sys.*, 818 F.3d at 95. Plaintiff pleads no facts to permit this Court to conclude that the Company or any Individual Defendant "knew" of such a trend as of the filing of its 2019 10-K or first quarter 10-Q. Nor does Plaintiff allege facts indicating that Prudential believed, prior to completion of the annual assumption review process, that the process would result in a "material" impact on its financial results. 17 C.F.R. § 229.303.

26

experience actually *required* an increase of reserves under either provision at the time any statement was made, much less a material reserve increase.  To the contrary, ASC 944 says just the opposite, that reserves are "estimates" subject to the Company's judgment and that mortality is just one of several factors contributing to actuarial assumptions for future policy benefit liabilities.  AC ¶ 80 (ASC 944 states that reserves estimates are based on "assumptions such as estimates of expected investment yields, mortality, morbidity, terminations, and expenses, applicable at the time the contracts are made").  Similarly, ASC 450 requires only that the Company make a disclosure if an obligation was "significant" or "material," and Plaintiff pleads no basis for the Court to conclude that the Company or any Individual Defendant believed that it had a "material" or "significant" liability as of the time  it issued the Form 10-K on February 15, 2019 or 1Q19 Form 10-Q on May 3, 2019, when according to Plaintiff's own allegations the assumption review process was ongoing throughout the second quarter.[7]  AC ¶¶ 7, 51.[8]

> **D.**      **Statements Regarding "Rock-Solid" Reserves and a "Strong" Balance Sheet Are Inactionable Puffery.**

Prudential's characterization of its insurance reserves as "rock-solid" and its balance sheet as "strong," as well as its general statement that the strong balance sheet "should lead to growth in our businesses and greater value for our shareholders," are all inactionable puffery.

---

[7] Moreover, Plaintiff fails to adequately allege that ASC 450 actually applies to life insurance companies.  ASC 450 specifically states that "insurance entities" are "excluded from the scope" of its requirements for reporting contingencies.  ASC 450-20-15-2(d).  But even assuming it does, Plaintiff's arguments fail for the reasons stated above.

[8] Similarly, Plaintiff alleges no facts regarding the Defendants' scienter as to purported non-compliance with the Company's GAAP and SEC obligations.  Rather, Plaintiff merely contends that "the Company would have known that adverse mortality experience during the seven and a half months prior to the Class Period (i.e., since July 2018) required updated mortality estimates and a corresponding material increase in reserves" under ASC 944.  AC ¶¶ 83-84.  But Plaintiff pleads no specific facts as to why any Individual Defendant knew or should have known that any material increase in reserves would have been required for the reasons discussed above, as necessary to plead a knowing or reckless violation of ASC 450 or ASC 944.  AC ¶ 91.

27

(*See*, *e.g.*, AC ¶¶ 12, 45, 47).  *See In re Advanta Corp. Sec. Litig.*, 180 F. 3d 525, 538 (3d Cir. 1999), *abrogated on other grounds by Tellabs*, 551 U.S. 308 (statements that credit quality "remained excellent," and "better than industry averages" were not materially false or misleading because such statements merely "express[ed] confidence in [defendant's] prospects for future growth" and were "no more than mere 'puffery,'"); *see also Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019) (same); *In re Hertz*, 2017 WL 1536223, at *11 ("[S]tatements about 'strong' and 'record' financial results, as well as the generally optimistic statements [about financial growth], constitute puffery."). These statements are "spin[s] on … historical performance," and "expressions of hope," which courts have found to be inactionable because no reasonable investor would rely on them.  *In re Synchronoss,* 705 F. Supp. 2d at 403.

### E. Statements About Growth Prospects And Future Results Are Inactionable Forward-Looking Statements.

Alleged statements  that various actions "should lead to growth" or that results "should stabilize" are forward-looking statements protected under the PSLRA's "Safe Harbor" provision. 15 U.S.C. § 78u-5(c)(1).  The Safe Harbor immunizes forward-looking statements if they are "either accompanied by 'substantive and tailored' cautionary statements or if the plaintiff fails to show 'actual knowledge of falsehood.'"  *Id.*; *OFI Asset Mgmt.*, 834 F.3d at 491.

Plaintiff identifies three alleged forward-looking statements: (i) on February 19, 2019, the Company's management allegedly told investment analysts at Sandler O'Neill that the Company's "financial wellness program" initiatives "should lead – over time – to valuation improvement," AC ¶ 42; (ii) on May 2, 2019, Defendant Lowrey allegedly told investors during Prudential's earnings call for the first quarter of 2019 that the Company's activities "should lead to growth," AC ¶ 47; and (iii) a Credit Suisse report dated March 28, 2019 stated that Defendant Falzon told investment analysts that Individual Life earnings "results should stabilize," AC ¶ 43.

28

All three were identifiable as forward-looking based on their context and reference to what "should" occur in the future, and all three statements were accompanied by significant cautionary language.[9]  As discussed above, *see supra* Section I, Plaintiff pleads no facts whatsoever to show scienter, much less that Defendants Lowrey or Falzon uttered statements with "actual knowledge" – the heightened standard of scienter applicable to forward-looking statements – of any material issue with mortality experience or reserve adequacy.  15 U.S.C. § 78u–5(c)(1).

## III.      The Amended Complaint Does Not Adequately Plead Loss Causation.

The PSLRA requires the Plaintiff to plead that the purported misrepresentation or omission "proximately caused the economic loss."  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007).  "The misstatements or omissions must have been a 'substantial factor.'"  *Kanefsky v. Honeywell Int'l Inc.*, No. 18-cv-15536, 2020 WL 2520669, at *7 (D.N.J. May 18, 2020).  Because the stock price allegedly fell because of information that did not exist earlier in the Class Period — the results of the assumption review — any earlier misstatement or omission could not have caused Plaintiff's loss.  *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 334 (D.N.J. 2007) ("[T]o be correctively disclosed—and, thus, provide the basis for the loss causation element—the information needs to be initially misrepresented in order to provide the basis for the transactional causation element.").

---

[9] The Sandler O'Neill report warns:  "[m]orbidity and mortality risks are significant. The long-term profitability of PRU's life insurance, annuity, and group insurance products rely upon sound assumptions relating to morbidity and mortality rates.  If morbidity rates are higher or mortality rates lower than assumed, PRU may be required to make larger payments under its annuity, long-term care and disability products than it had assumed." *See* Gittes Decl. Ex. E, at 5.  The Credit Suisse report notes that Mr. Falzon stated that Individual Life earnings had been negatively impacted in the fourth quarter of 2018 "from unfavorable mortality…and lower equity markets," and Credit Suisse warned of the risk of "high equity market sensitivity." *See* Gittes Decl. Ex. F, at 7.  Finally, Defendant Lowrey's statement was prefaced by a discussion of the Company's 1Q19 earnings presentation that warned of the 2Q19 "Impact of annual assumption update" and "the risk that different earnings patterns will emerge" for "Key Financial Items," including mortality in Individual Life. *See* Gittes Decl. Ex. G, at 21, 24.

**IV.**     **Plaintiff Fails to Plead Control Person Liability as to the Individual Defendants.**

Plaintiff fails to state a claim under Section 20(a) because the AC does not plead:  (*i*) a primary violation; or (*ii*) "culpable participation" by the Individual Defendants "in the 'act or acts constituting the violation or cause of action.'"  *Belmont*, 708 F.3d at 484.  *First*, for the reasons stated above, Plaintiff fails to allege a primary violation of Section 10(b), and the Section 20(a) claim should be dismissed on this basis alone.  *See supra* Sections I, II.  *Second*, Plaintiff fails to plead "culpable participation" because Plaintiff has failed to establish that any of the Individual Defendants had "actual knowledge" of a fraud.  *Belmont*, 708 F.3d at 485 (rejecting plaintiffs' argument that culpable participation "may be premised on inaction[] … if it is apparent that the inaction intentionally furthered the fraud *or prevented its discovery*," even if plaintiffs did not allege scienter, reasoning that "[c]ulpable participation requires knowledge because, '[i]n order to be a participant, the defendant must have some actual knowledge of the fraudulent activity taking place or knowledge must be imputed to him or her....'") (internal citations omitted).  Because Plaintiff fails to plead scienter, the Amended Complaint fails to adequately plead "actual knowledge" of the purported fraud and thus has not stated a claim under Section 20(a).  *See supra* Section II.

<strong>CONCLUSION</strong>

For the reasons stated above, Plaintiff's Amended Complaint fails to adequately plead any fraud and should be dismissed.

Dated:  August 19, 2020

*s/ Tricia B. O'Reilly*
Tricia B. O'Reilly
David D. Cramer
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100

30

Maeve L. O'Connor (admitted *pro hac vice*)
Susan R. Gittes (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants*