SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
E-mail:  cseeger@seegerweiss.com

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)
E-mail:  psp@njlawfirm.com

Local Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re PRUDENTIAL FINANCIAL, INC. SECURITIES LITIGATION | ) ) ) Master File No. 2:19-cv-20839-SRC-CLW |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) <u>CLASS ACTION</u> ) ) ) LEAD PLAINTIFF'S OPPOSITION ) TO DEFENDANTS' MOTION TO ) DISMISS ) |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS ......................................................................5

III. LEGAL STANDARD..............................................................................9

IV. ARGUMENT .........................................................................................10

    A.    The Complaint Sufficiently Pleads Falsity .......................................11

        1.    The Complaint Sufficiently Alleges that Defendants Misrepresented the Methods Used to Set Reserves .................11

        2.    The Complaint Sufficiently Alleges that Defendants Overstated Net Income and EPS and Understated Reserves ....................................................................................13

        3.    The Complaint Sufficiently Alleges that the Company Materially Misrepresented Compliance with GAAP ...............15

        4.    The Complaint Sufficiently Alleges that Defendants Misrepresented Mortality Experience at Investor Day ............16

        5.    The Complaint Sufficiently Alleges that Defendants Falsely Assured Investors There Were No Systemic Issues with Underwriting or Mortality Assumptions ...............19

        6.    The Complaint Sufficiently Alleges that Defendants' Risk Warnings Were False and Misleading............................21

        7.    The Complaint Sufficiently Alleges that Defendants Omitted Required SEC Disclosures ......................................21

        8.    *Omnicare* Does Not Shield Defendants' Misrepresentations...................................................................23

    B.    The Complaint Sufficiently Pleads a Strong Inference of Scienter..................................................................................26

4822-3309-1790.v1-10/7/20

**Page**

1.    Defendants' Close Monitoring of Mortality Experience Supports a Strong Inference of Scienter ..................................27

2.    Defendants' Access to Negative Mortality Experience Supports a Strong Inference of Scienter ................................31

3.    Defendants Knew that Mortality Experience Was Materially Negative and Knowingly Concealed Its Magnitude.................................................................................33

4.    Defendants' Admission that Individual Life Suffered from Sub-Standard Underwriting Supports a Strong Inference of Scienter.............................................................35

5.    Holistically Considered, the Complaint Plausibly Alleges a Strong Inference of Scienter.................................................36

C.    The Complaint Sufficiently Pleads Loss Causation...........................38

D.    The Safe Harbor Does Not Immunize Defendants' Knowing Misrepresentations..........................................................................39

E.    The Complaint Sufficiently Pleads Control Person Liability.............40

V.    CONCLUSION ........................................................................................40

- ii -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)....................................................35

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J., July 31, 2019)..............................32, 33

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)......................................................10

*City of Warren Police and Fire Ret. Sys. v. World Wrestling Ent., Inc.*,
2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)............................39

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016)..........................14, 25

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018)...............................32

*Dobina v. Weatherford Int'l*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) ......................................36

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................38

*Foman v. Davis*,
371 U.S. 178 (1962)..................................................................40

*Goldsmith v. Weibo Corp.*,
2018 WL 2733694 (D.N.J. June 7, 2018)................................25

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004)......................................................37

4822-3309-1790.v1-10/7/20

**Page**

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019)..........................................................3

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990)................................................................14

*Hull v. Glob. Digit. Sols., Inc.*,
  2017 WL 6493148 (D.N.J. Dec. 19., 2017)........................................................38

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004)................................................................14

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)................................................................33

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..........................................................12, 14

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)................................................................30

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001)....................................................31, 33

*In re Digit. Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004)................................................................26

*In re Elecs. for Imaging, Inc. Sec. Litig.*,
  2019 WL 397981 (D.N.J. 2019)................................................................31

*In re Galena Biopharma, Inc. Sec. Litig.*,
  336 F. Supp. 3d 378 (D.N.J. 2018)................................................................23

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015)................................................................24

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994)................................................................20

- iv -

**Page**

*In re Great Atl. & Pac. Tea Co., Sec. Litig.*,
103 Fed. App'x 465 (3d Cir. 2004) ..................................................................26

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) ............................................................................27

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2015 WL 4469143 (D.N.J. Jul. 22, 2015) ......................................................30

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2017 WL 1536223 (D.N.J. Apr. 27, 2017),
*aff'd*, 905 F.3d 106 (3d Cir. 2018) .................................................................24

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007)..................................................................33

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002)..................................................................15

*In re Merck & Co., Sec. Derivative & ERISA Litig.*,
2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 13, 2013) .....................................27

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)............................................................................30

*In re OmniVision Techs., Inc. Sec. Litig.*,
937 F. Supp. 2d 1090 (N.D. Cal. 2013)...........................................................19

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) .....................................................33

*In re Synchronoss Sec. Litig.*,
705 F. Supp. 2d 367 (D.N.J. 2010)..................................................................19

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017).......................................................27

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)..........................................................................21, 40

4822-3309-1790.v1-10/7/20

**Page**

*Institutional Invs. Grp. v Avaya Inc.*,
564 F.3d 242 (3d Cir. 2009)......................................................................*passim*

*Jones v. Intelli-Check, Inc.*,
274 F. Supp. 2d 615 (D.N.J. 2003)..................................................................40

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009).........................................................................37

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)................................................................26, 29, 34

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. July 31, 2020).......................................................21

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016)...........................................................................37

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)......................................................................23, 24, 25

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)...........................................................................22

*Panther Partners Inc. v. Jianpu Tech. Inc., et al.*,
2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)..................................................23

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013)...........................................................................30

*Roth v. Goldman Sachs Grp., Inc.*,
740 F.3d 865 (2d Cir. 2014)...........................................................................22

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000).............................................................................33

*SAIC, Inc. v. Ind. Pub. Ret. Sys.*,
No. 16-581 (U.S. Sept. 7, 2017).....................................................................22

4822-3309-1790.v1-10/7/20

**Page**

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018)...............................................................27

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)...........................................................................10

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)...........................................................................12

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)............................................................................22

*Tatis v. Allied Interstate, LLC*,
    882 F.3d 422 (3d Cir. 2018).......................................................................9, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................26, 28, 36

*TSC Indus. V. Northway, Inc.*,
    426 U.S. 438 (1976).....................................................................................12

*Underland v. Alter*,
    2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ..................................15, 16, 17, 24

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997)...........................................................................14

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)...............................................................11, 21, 37

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)...........................................................................11

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78u-4(b)(1)(B) .............................................................................................11

**Page**

17 C.F.R.
  §229.303 ...................................................................................... 21, 22, 23
  §229.303(a)(3)(ii) ..................................................................................21

Federal Rules of Civil Procedure
  Rule 10b-5 ................................................................................. 10, 22, 23
  Rule 12(b)(6) ...........................................................................................9
  Rule 15 ...................................................................................................40

4822-3309-1790.v1-10/7/20

## I.    INTRODUCTION

Plaintiff City of Warren Police and Fire Retirement System ("Plaintiff") hereby submits this opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF No. 26) ("Motion" or "MTD"). The Motion misapplies the law and ignores Plaintiff's strongest allegations. Because the Complaint[1] more than satisfies the pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), the Motion should be denied and this case should proceed to discovery.

The basic events underlying this action are not in dispute: Prior to and during the Class Period,[2] Prudential experienced an extremely large increase in mortality (*i.e.*, deaths) within its Individual Life business segment – particularly in a block of 700,000 universal life insurance policies acquired from Hartford in 2013. Known to Defendants, but not to investors, these policies were poorly underwritten and consistently missed internal benchmarks, including in the two quarters preceding the Class Period. Thus, at the outset of the Class Period, February 15, 2019, the Company faced significant undisclosed liabilities, overstated its reported financial results and understated reserves.

---

[1]    All capitalized terms not defined herein have the same meaning as in the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 22) ("Complaint"). All "¶_" references are to the Complaint. Citations and footnotes are omitted and emphasis is added unless otherwise noted.

[2]    The Class Period is between February 15, 2019, and August 2, 2019, inclusive.

4822-3309-1790.v1-10/7/20

Nonetheless, the Company falsely assured investors that reserves were based on the Company's experience and timely updated to reflect any material changes. Indeed, investors were told reserves were likely *larger* than necessary to meet the Company's insurance liabilities. As negative mortality development continued unabated, Defendants falsely assured investors there were no systemic underwriting or mortality issues and continued to issue overstated financial results. On June 5, 2019, at the Company's Investor Day, Defendants assured investors that the ongoing annual actuarial review showed the prior year of mortality development in Individual Life to be slightly negative but within the range of normal volatility.

Then, on July 31, 2019, Prudential shocked investors: The Company missed earnings estimates by $0.09 per share – a wide margin – due to a $208 million earnings charge in Individual Life because of poorly underwritten policies acquired from Hartford. In addition, the Company would announce a $25 million reduction in expected earnings every quarter going forward for the indefinite future – wiping out a third of the anticipated income for the business segment. Investors were furious and dumped Prudential stock in dramatic volume, driving the price down 10%.

Defendants' Motion tries to paint this all as business-as-usual, falling back on the refrain that reserves are always updated in the second quarter of each year, but

- 2 -

4822-3309-1790.v1-10/7/20

this is not a defense to the Complaint's well-pled allegations.[3]   Defendants improperly label every alleged false statement merely an opinion concerning the sufficiency of reserves, and thus subject to a more rigorous pleading standard.  But Defendants fail to recognize that many of the statements are not opinions and are false for reasons besides the inadequacy of reserves.  And, due to their omissions, the reserve statements are also actionable.

For example, Defendants cannot escape their misrepresentation that reserve assumptions were based on experience and would be updated in an interim period (not annually) in the event of material changes in mortality.  Nonetheless, despite particularized allegations that the Company experienced more than two quarters of material negative mortality development preceding the Class Period, the Motion argues that Defendants could not know reserves were inadequate until the Company finished its annual actuarial review in 2Q19.  But this only underscores the falsity of Defendants' statement:   Either Defendants analyzed the adequacy of reserves quarterly, as was represented in the 10-K, and knew them to be insufficient; or they failed to make such an evaluation and the assurances in the 10-K were false.

---

[3]   While the Court may consider the documents attached to Declaration Of Susan R. Gittes in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF No. 26-2), their contents should not be accepted for the truth of the matters asserted therein or used to resolve disputes of fact against Plaintiff. *See Hall v. Johnson & Johnson*, 2019 WL 7207491, at *10-*11 (D.N.J. Dec. 27, 2019).

- 3 -

Defendants' Motion simply ignores powerful but inconvenient facts. For example, prior to the Class Period, Prudential published a sensitivity analysis for potential reserve charges in Individual Life during 2019. At the time of its publication, applying Defendants' own metrics, the likelihood of a reserve charge of $208 million was exceedingly small – less than 0.3% and highly statistically significant. A charge of this magnitude did not occur overnight or without Defendants' knowledge (or reckless disregard), but built over four quarters of consistent performance below expectations. The Motion also fails to address that the Company's own metrics directly contradicted Defendants' claim that volatility was in the range of "normal," in truth, it was highly abnormal. Moreover, Defendants admitted their own internal Class Period forecasts contradicted investor expectations set by the Company.

Finally, the Motion wholly ignores the reaction of analysts covering the Company who were floored by the incongruence between Defendants' Investor Day statements and the results announced just weeks later. For example, UBS stated that "[management] should have used its June investor day to lay out the new disclosure and reset the bar at that point." ¶61. And Wells Fargo expressed that "investors will most likely be surprised since this came so close to its investor day in June." ¶62. For the reasons set forth herein, the Motion should be denied.

- 4 -

## II.    STATEMENT OF FACTS

Prudential is the largest life insurer in the U.S. and has sold life insurance for 140 years.  ¶2.  In 2013, Prudential expanded Individual Life by acquiring 700,000 insurance policies (primarily Universal Life) with face amounts of $141 billion from The Hartford, giving Prudential the right to collect premiums and the obligation to pay claims from those policies.  ¶¶2-3.

The Hartford policies were not integrated into Individual Life until 2015, at which point the business segment started performing poorly.  ¶4.  In 2016 and 2017, the Company reported negative results for Individual Life in connection with its annual second quarter actuarial review.  *Id.*  Prudential attributed the charges to new modeling and accounting for the Hartford policies, but indicated they were one-time adjustments.  *Id.*  Internally, however, Prudential had determined that the Hartford policies were poorly underwritten, not priced to cover their true mortality risk (though Prudential was powerless to increase premiums) and that Hartford had poor actuarial and data administration systems, including mortality models.  ¶¶3, 53(b).  Because of these known shortcomings, Defendants carefully monitored the Hartford policies and tracked their performance separately from policies underwritten by Prudential.  ¶53(a).  Accordingly, Defendants knew that Hartford policies began experiencing extremely negative mortality development in July 2018 – *i.e.*, seven months prior to the Class Period.  ¶¶53(d), 84.

- 5 -

4822-3309-1790.v1-10/7/20

On December 6, 2018, two months prior to the Class Period, Prudential issued 2019 earnings guidance ($12.50-$13.00 EPS) and published a sensitivity analysis which informed investors of the relative likelihood of a reserve charge of a given magnitude occurring in Individual Life during the upcoming year. ¶¶5, 96. The expectation was that no reserve charge would be taken; a one standard deviation change in expected mortality would result in a $55-$80 million reserve charge (and would reduce income by the same amount). ¶5 n.1. From the sensitivity analysis investors were informed that only 32% of the time would a charge due to mortality be greater than $55-$80 million; only 5% of the time would it be greater than $110-$160 million; and less than 0.3% of the time would it be greater than $165-$240 million. ¶¶5 n.1, 60. Thus, the $208 million charge to earnings due to poor mortality experience announced on July 31, 2019, was 2.6 to 3.7 standard deviations from expectations, representing *extreme volatility* that would be expected to occur less than 1% of the time. In other words, Prudential's mortality experience was far outside normal expectations communicated to investors. ¶¶5 n.1, 53, 59, 60, 96.

On February 15, 2019, the start of the Class Period, Prudential filed its 2018 Form 10-K (for the period ended December 31, 2018) containing false financial results for 4Q18 and FY18, including EPS of $1.99 and $9.50, respectively. ¶35. As the Company's admission on July 31, 2019 would confirm, Defendants' failure to timely account for the negative mortality trend in Individual Life resulted in

- 6 -

4822-3309-1790.v1-10/7/20

Prudential overstating Individual Life adjusting operating income ("AOI") by 800% and EPS by 19.6% in 4Q18 and 93% in FY18.  ¶¶77, 97.  In addition, the 10-K falsely stated:

- "The assumptions used in establishing reserves are generally ***based on the Company's experience***" and complied with GAAP.  ¶37.

- There is a "likelihood" that their current reserves were "***greater than . . . net liabilities***," *i.e.,* that the Company is "over-reserved."  ¶39.

- "If" the risk of changes to "[m]ortality trend" were to emerge, the Company would update reserve assumptions.  ¶40.

- Reserve assumptions are "typically" updated annually, "***unless a material change is observed***" in which case reserves would be updated in an interim period.  ¶38.

These statements were materially false and misleading as they failed to account for at least half a year of material negative mortality development within Individual Life.  ¶53.  The Company's purported reserve methodology was not based on its current "experience" but ignored ongoing negative mortality development.  ¶84. Nor were reserves likely "greater than . . . net liabilities" but were materially insufficient in light of these known liabilities.  *Id.*; ¶39.  Following these misrepresentations, Prudential's stock traded at artificially inflated prices.  ¶41.

The false and misleading statements continued:  On March 31, 2019, Falzon told market analysts that there are no systemic issues with underwriting or mortality assumptions.  ¶43.  On May 1, 2019, Prudential reported false 1Q19 financial results, again overstating EPS and understating liabilities, asserting that Individual Life

- 7 -

results were "driven by a ***favorable impact from mortality experience***."  ¶¶45-46, 51.  Analysts reacted favorably to the results and Prudential's stock continued to trade at artificially inflated prices above $100.00 per share.  ¶¶48-50, 98.  The truth, which was concealed from investors, was in stark contrast to these claims:  As of May 2019, internal discussions were ongoing concerning the need to take a significant reserve charge in Individual Life because of persistent negative mortality experience.  ¶53(d).  Further, as Defendants would subsequently admit, their failure to timely account for this negative mortality trend overstated Individual Life AOI by nearly 200% and EPS by 18% in 1Q19.  ¶¶77, 97.

At the Company's June 5, 2019 Investor Day, investors eagerly sought information concerning the Company's nearly-complete actuarial assumption review.  ¶54.  Despite the poorly performing Hartford block of policies and known forthcoming mortality adjustment, Defendant Tanji falsely stated that no material changes to mortality had occurred since the prior year's update and that mortality experience over the preceding year was in the range of "normal volatility" and "***slightly*** negative."  *Id.*  Tanji's statements were directly contrary to the truth: mortality experience was three standard deviations from normal, *i.e.*, highly aberrant and demonstrably not normal.  ¶¶54, 58-60, 96.  Unsurprisingly, analysts were comforted by the misrepresentations.  ¶¶56-57.

- 8 -

On July 31, 2019, the Company reported 2Q19 financial results disclosing that the concealed adverse mortality in Individual Life would require a reserve charge of *$208 million* and reported EPS of $3.14 missed analyst consensus by *$0.09* per share. ¶60. Prudential admitted that the problem was in the longer-dated Universal Life policies, *i.e.*, the Hartford block. ¶¶66-67. Analysts criticized Defendants for not having "*used its June investor day to lay out the new disclosure and reset the bar at that point*." ¶¶17, 61. Another wrote: "*investors will most likely be surprised since this came so close to its investor day in June*." ¶¶17, 62.

On August 1, 2019, Defendants revealed that Individual Life earnings would also be reduced by *$25 million per quarter*: "*And it would be reoccurring for the foreseeable future*." ¶65. J.P. Morgan reported the going-forward cost would erase "*close to a third of our previously assumed earnings for the [Individual Life] business in 2020*" and described the outlook as "*Atrocious*." ¶67. Multiple analysts reduced their earnings estimates and stock price targets due to the "deterioration in mortality." ¶69. As a result of these disclosures, Prudential's stock price declined more than 10% from a close of $101.31 per share on July 31, 2019, to a close of $91.09 per share on August 1, 2019, on very high trading volume. ¶68.

## III.    LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the court accepts the allegations and construes them in the light most favorable for the plaintiff. *Tatis v. Allied Interstate,*

- 9 -

*LLC*, 882 F.3d 422, 426 (3d Cir. 2018).  "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000).  The PSLRA requires plaintiff to plead its claims with "particularity," which is nothing more than "'the who, what, when, where, and how: the first paragraph of any newspaper story.'"  *Institutional Invs. Grp. v Avaya Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).  Plaintiffs need only accompany their legal theory with factual allegations that make their claim plausible.  *Id.*  And, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   ARGUMENT

The Complaint sufficiently alleges each element required to plead a cause of action under Rule 10b-5 of the Exchange Act: (1) a material misrepresentation or omission (*i.e.*, falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

4822-3309-1790.v1-10/7/20

## A.    The Complaint Sufficiently Pleads Falsity

To adequately allege falsity, plaintiff need only "specify each statement alleged to have been misleading [and] the reason or reasons why the statement [was] misleading."  15 U.S.C. §78u-4(b)(1)(B).  An omission is actionable in the presence of a duty to disclose, which arises when there is "a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure."  *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007).  "Once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading."  *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017).

### 1.    The Complaint Sufficiently Alleges that Defendants Misrepresented the Methods Used to Set Reserves

The Complaint alleges with particularity that Defendants made false and misleading statements in the Company's 2018 Form 10-K concerning the methodology, inputs, adequacy and updates to the Company's reserves.  These misrepresentations included:

- "The assumptions used in establishing reserves are generally ***based on the Company's experience*** . . . ."  ¶37.

- "We typically update our actuarial assumptions, such as mortality . . . annually, ***unless a material change is observed in an interim period that we feel is indicative of a long-term trend***."  ¶38.

- "***[W]e do not expect trends to change significantly in the short-term*** and, to the extent these trends may change, we expect such changes to be gradual over the long-term."  ¶38.

- 11 -

4822-3309-1790.v1-10/7/20

- "In a sustained low interest rate environment, there is an ***increased likelihood*** that the reserves determined based on best estimate assumptions ***may be greater than the net liabilities***."  ¶39.

The Complaint details that, as of February 15, 2019, when these statements were made, the Company had already experienced more than two quarters of material undisclosed negative mortality development in Individual Life – specifically within the historically under-performing Hartford block – resulting in the Company's reserves being materially understated.  ¶¶53(a), (d)-(e), 84.  Thus, contrary to the representations in the Form 10-K, reserves were not based on the "Company's experience," or updated when a "material change [was] observed," because exactly such a "material change" had been ongoing for seven months but this "experience" was not accounted for in reserves.[4]  Likewise, because reported reserves were materially understated, Defendants' representation that there was a "likelihood" that reserves were "***greater than . . . net liabilities***" was directly contrary to the

---

[4]  Defendants do not challenge the materiality of the misrepresentations related to negative mortality development in Individual Life and the resulting financial misrepresentations.  Nor could they, as materiality is rarely appropriate resolution as a matter of law.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n. 11 (3d Cir. 1992) (citing *TSC Indus. V. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 n.9 (3d Cir. 1997) (reported earnings among the most important information for investors).

- 12 -

undisclosed truth.[5]   ¶¶39, 52-53.   Combined with allegations that the Hartford policies were poorly underwritten, not priced to cover their mortality risk, and previously caused significant reserve charges, the Complaint sufficiently alleges these statements to be false and misleading.[6]   *See* §IV.B.1; ¶¶3, 53(a)-(b), (d)-(f).

### 2.   The Complaint Sufficiently Alleges that Defendants Overstated Net Income and EPS and Understated Reserves

The Complaint alleges with the requisite particularity that the Company falsely overstated net income and EPS and understated liabilities during 4Q18, FY18 and 1Q19 because it failed to account for the negative mortality developments occurring since July 2018, and continuing throughout the Class Period.   ¶¶77, 53(d), 84, 97.   Indeed, by May 2019, it was recognized that Individual Life needed to take a significant reserve charge as a result of the negative mortality experience with the Hartford block.   ¶¶30(a), 53(d).   The Complaint quantifies the financial impact from the alleged failure to timely account the ever-growing negative mortality

---

[5]   Defendants' contention that the Company did not say it was "'likely'" over-reserved rests on a false linguistic distinction between "'likelihood'" and "'likely.'" MTD at 24 n.5.

[6]   The Motion is premised on the strawman argument that ***only*** the results of the 2Q19 actuarial review demonstrate the alleged misrepresentations to be false and misleading.   MTD at 3 (describing actuarial review results as "the information allegedly concealed").   However, as set forth herein, the 2Q19 actuarial review only confirmed the impact of the ongoing and undisclosed negative mortality in Individual Life and the previously concealed problems in the Hartford block.

- 13 -

development in Individual Life: AOI for Individual Life was overstated by 800% in 4Q18, 93% in FY18 and 198% in 1Q19.[7]  ¶97.  Because of the failure to accrue for liabilities stemming from the Hartford block's underperformance, the Company's Class Period financial results were materially overstated and actionably false.  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2016 WL 6652731, at *2 (S.D.N.Y. Nov. 10, 2016) ("If loss reserves are too low and later must be increased (resulting in a charge against income), earnings will have been overstated in SEC filings and financial statements.").

These true facts also illustrate the material falsity of statements related to the strength of the Company's balance sheet (*i.e.*, its current assets and liabilities) and growth prospects.  ¶¶45, 47.  Defendants seek to label this puffery (MTD at 27-28); but this veiled materiality argument is premature, as well as inapplicable given the importance of the balance sheet's strength in the context of Prudential's prior charges and earnings volatility.  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir. 1990); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274-75 (3d Cir. 2004).  And, even "'soft information' from high-ranking corporate officials can be actionable if they are made without a reasonable basis."  *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320 (3d Cir. 1997).  Here, Defendants touted the strength of the

---

[7]   Similarly, the Complaint alleges that Prudential falsely overstated EPS and net income by almost 20% in 4Q18 and approximately 18% in 1Q19.  *Id.*

- 14 -

balance sheet as a basis for future growth, when in truth, the Company materially understated liabilities, which, when revealed, resulted in an earnings miss and significant stock price decline. ¶¶45,47; *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 559 (D.N.J. 2002) ("strong customer acceptance" not puffery in context); *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("general labels" such as "strong" can constitute "actionable material misstatements").

### 3. The Complaint Sufficiently Alleges that the Company Materially Misrepresented Compliance with GAAP

The Complaint alleges that Defendants' claim to establishing "reserves for future policy benefits . . . using methodologies prescribed by U.S. GAAP" was false and misleading.[8]  ¶37.  First, ASC 944 required the Company to utilize its known, current experience in its reserve assumptions to ensure that reserves for future policy benefits were adequate:  "An insurance entity shall regularly evaluate estimates used" and must take an appropriate "charge" "if actual experience or other evidence suggests that earlier assumptions should be revised." ¶¶82-83.  The alleged negative mortality development from the Hartford block is exactly such "actual experience";

---

[8]  Defendants Lowrey and Tanji's Sarbanes-Oxley certifications misrepresented that Prudential's 2018 10-K and 1Q19 Form 10-Q fairly presented the Company's financial condition, that those filings did not contain a material misrepresentation or omission and that the financial statements complied with GAAP.  ¶40 n.5.

- 15 -

Defendants offer no response to this provision. Second, under ASC 450 and 944, Prudential was required to disclose that a significant reserve increase in Individual Life was likely because of the alleged extremely adverse mortality development in the Hartford block.[9] ¶¶87-91 (disclosure requires only that loss contingency be "reasonably possible"). *Id.* Thus, the Complaint sufficiently alleges that Defendants' claim of GAAP compliance was false due to their failure to either increase reserves or disclose the negative mortality trends.

### 4. The Complaint Sufficiently Alleges that Defendants Misrepresented Mortality Experience at Investor Day

On June 5, 2019, with just three weeks to go in 2Q19 (*i.e.*, the quarter in which the Company annually assessed its reserve assumptions) and more than 11 months of negative mortality development already in the books, the Company held its Investor Day. Defendant Tanji specifically addressed an "area of interest" to analysts and investors: the Company's "mortality experience" since the last assumption update that was announced in 2Q18. ¶54. As alleged, Tanji falsely told

---

[9]   Defendants incorrectly suggest that ASC 450 does not apply to life insurers. As alleged, life insurance claims and reserves are a type of "loss contingency" as defined in ASC 450. ¶87. Indeed, ASC 944, which defendants concede relates to insurance companies, refers to ASC 450 multiple times for assessing uncertainties (*e.g.* contingencies) with respect to insurance reserves. ASC 944-40-S99-1. Also, the SEC applies ASC 450 explicitly to insurance reserves under SEC's Staff Accounting Bulletin (SAB) Topic 5.W.

- 16 -

investors that the Company's Individual Life mortality experience was within "normal volatility" and nothing worse than "slightly negative." *Id.*

In truth, the Complaint alleges, the Company's mortality experience was not within "normal volatility" but in fact highly abnormal and far outside the bounds of volatility investors were told to expect. Applying the Company's own sensitivity analysis, the $208 million charge was 2.6 to 3.7 standard deviations from expectations – *i.e.*, highly statistically significant – and represented extreme volatility.[10] Falsity is corroborated by the allegations that in May 2019 Individual Life's poor performance and the need to take a significant charge stemming from the Hartford block was discussed at quarterly forecast meetings. ¶53(d). These facts are directly at odds with Tanji's representations that mortality was within the normal range of volatility. *See Avaya*, 564 F.3d at 264 (falsity alleged where anecdotal statements by former employees directly conflict with defendants' assurances).

The outrage from both analysts and investors confirms that the mortality experience of Individual Life was not "normal volatility" or just "slightly negative." For example, UBS admonished Prudential, stating "we think mgmt should have used its June investor day to lay out the new disclosure and reset the bar at that point."

---

[10] As alleged, Prudential had disclosed that a one standard deviation change from expected mortality in Individual Life would impact income by $55 million to $80 million. ¶5. Typically, events which are two or more standard deviations from the mean are considered statistically significant. ¶5 n.1.

- 17 -

4822-3309-1790.v1-10/7/20

¶61.  And Wells Fargo reported that the results were "below expectations and investors will most likely be surprised since this came so close to its investor day in June."  ¶62.

Defendants' suggestion that Tanji accurately described mortality experience within Individual Life "as a whole" (as opposed to just within the Hartford block) is an improper fact dispute and irreconcilable with the well-pleaded allegations.  MTD at 23-25; *Tatis*, 882 F.3d at 426.  Indeed, the negative mortality development from the Hartford block impacted Individual Life ***as a whole***, resulting in a $208 million reserve charge.[11]  ¶¶66-67.  Further, the Complaint alleges that mortality experience in the Hartford block materially impacted Individual Life ***as a whole*** in 3Q18, 4Q18 and 1Q19, and the Company confirmed as much.  ¶65.  By May 2019, the Complaint alleges the Company was already discussing a significant reserve charge in Individual Life because of the known mortality problems with the policies acquired from Hartford.  ¶¶53(d), 59.

---

[11]  Defendants note that Individual Life reserves were just "5% of our total future policy benefit reserves" (MTD at 4 n.2) which underscores the depth of the mortality problem within this portion of their business as it caused the Company – as a whole – to miss earnings by $0.09.

- 18 -

**5.     The Complaint Sufficiently Alleges that Defendants Falsely Assured Investors There Were No Systemic Issues with Underwriting or Mortality Assumptions**

On March 31, 2019, in an attempt to assuage investor concerns over prior reserve charges, Mr. Falzon conveyed to investors that "***there are no systemic issues with underwriting or mortality assumptions***, and that results should stabilize."[12] ¶43. The Complaint details that the Company omitted the true facts that Prudential had been, and was currently, experiencing longstanding problems with underwriting and mortality within Individual Life.  ¶¶52-53.  Specifically, the Complaint alleges that the Hartford block: (i) was poorly underwritten with very different assumptions and not priced to cover its mortality risk (and could not be adjusted) (¶¶53(b), 66, 85); (ii) suffered from poor actuarial and data administration, including the mortality models (¶53(b)); (iii) regularly missed internal performance expectations due to adverse mortality development (¶53(a)); (iv) was responsible for the publicly reported charges in Individual Life in 2016 and 2017 (¶¶4, 16(a), 66-67); and (v) years after the acquisition and integration was still presented separately in Individual Life forecasts, including its mortality development (¶53(a)).  And, these problems

---

[12]  Plaintiff is not basing its allegations on "false deducements," opinions or analysis made by analysts rendering *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 403 (D.N.J. 2010) inapt. And although the analyst reports did not use quotation marks, Plaintiff has particularly pled "specific, factual statements that are unambiguously attributed by analysts to defendants." *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1106 (N.D. Cal. 2013).

4822-3309-1790.v1-10/7/20

were present prior to and manifested throughout the Class Period, growing in significance and severity quarter over quarter, culminating in a $208 million reserve charge (and wiping out one third of Individual Life income going forward).[13]  ¶53.

Finally, Defendants admitted that older policies within Individual Life suffered from the very systemic problems and unreliable assumptions which they previously denied:

> ***The new business that we've been writing over the last few years,*** I should point out***, has been priced using much more current assumptions that are very different from the assumptions used to price the legacy products that have generated some of the recent charges we've taken***.

¶66.  This is more than sufficient to plead falsity.  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) ("Notably, the statement would have been just as false when defendant uttered it as when plaintiff discovered the truth.  The house was always defective because it was always built on landfill.").

---

[13]  The Complaint also alleges that when announcing quarterly results for 1Q19, the Company falsely claimed to experience "***complementary mortality***."  ¶47.  Whether deliberate or erroneous, Defendants contradict the well-pled allegations of the Complaint by suggesting that Plaintiff "concedes" that mortality experience was positive during the Class Period – this is manifestly wrong.  MTD at 13.  The Complaint alleges this as a fraudulent misrepresentation for the same reasons.  ¶53.

### 6. The Complaint Sufficiently Alleges that Defendants' Risk Warnings Were False and Misleading

The Company's 2018 Form 10-K falsely warned of mortality trends as a *potential future risk* that could arise gradually when in fact the complaint alleges that the Company had already been experiencing and was *currently being impacted* by material negative mortality development in Individual Life. ¶40. The Third Circuit has recognized it is misleading to describe a risk as hypothetical when it has come to fruition. *Williams*, 869 F.3d at 242; *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (same); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) ("'"to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"'"). Contrary to the Form 10-K's description of "mortality trend" as a potential risk that could "emerge gradually over time," the Complaint alleges that, at the time the Form 10-K was issued, the Company had already experienced seven months of extremely adverse mortality experience. ¶¶40, 53. In other words, these risks were no longer hypothetical contingencies but had already materialized. *Id.*

### 7. The Complaint Sufficiently Alleges that Defendants Omitted Required SEC Disclosures

Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303") requires the disclosure in certain SEC filings of known unfavorable material trends or uncertainties affecting the company's revenues or income. 17 C.F.R.

- 21 -

§229.303(a)(3)(ii); ¶92.  The Complaint alleges that Defendants' Class Period Forms 10-K and 10-Q violated Item 303 by not disclosing that it was experiencing negative mortality within Individual Life, which was known to Defendants via regular monitoring, tracking and forecasting, and which would materially impact income as the Company's reserves were insufficient to cover known mortality.[14]

Defendants do not dispute that they did not make an Item 303 disclosure, instead they assert that Item 303 cannot give rise to a Rule 10b-5 violation.  MTD at 25-26.  However, "[t]he SEC's longstanding and consistent position is that a violation of Item 303 . . . can be the predicate for a Rule 10b-5 claim."  Brief for the United States as Amicus Curiae Supporting Respondents, *Leidos, Inc., fka SAIC, Inc. v. Ind. Pub. Ret. Sys.*, No. 16-581, at 22 (U.S. Sept. 7, 2017); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015) ("At a minimum, *Oran* is consistent with our decision that failure to comply with Item 303 in a Form 10-Q can give rise to liability under Rule 10b-5 so long as the omission is material under *Basic* . . . .").[15]  Here, the violation of Item 303 is actionable because the

---

[14]  Defendants do not dispute the accuracy of the facts which support knowledge of the material negative mortality experience within Individual Life.  MTD at 26 n.6. Yet, Defendants chose to ignore facts establishing that the true, concealed mortality trends were known to Defendants.  ¶¶53(f), 93.

[15]  The SEC's interpretation of Item 303 in an *amicus* brief "is entitled to considerable deference."  *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000); *see also Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 871 (2d Cir. 2014) (same).

4822-3309-1790.v1-10/7/20

omitted information meets the materiality standard for Rule 10b-5 (*see, supra* §IV.A.1 & n.5), and because the omission renders the statements made in required SEC filings materially misleading, including Defendants' SOX certifications claiming compliance with SEC regulations (*see* §IV.A); *In re Galena Biopharma, Inc. Sec. Litig*., 336 F. Supp. 3d 378, 391 (D.N.J. 2018).  Thus, the Item 303 violation here is sufficiently pled.[16]

### 8. *Omnicare* Does Not Shield Defendants' Misrepresentations

The Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) clarified that opinions are actionable false statements of fact if they are subjectively disbelieved or if false factual statements are embedded within an opinion.  *Id*. at 184-87.  Opinions are also actionable as omissions where defendant conceals facts "about the issuer's inquiry into or knowledge" where "those facts conflict with what a reasonable investor would take from the statement itself."  *Id*. at 189, 194; *see also id.* at 199 (lack of "reasonable basis" renders opinions actionable) (Scalia, J. concurring).  Defendants improperly

---

[16] Item 303 requires a lesser showing of knowledge than does Rule 10b-5 for scienter.  *See Panther Partners Inc. v. Jianpu Tech. Inc., et al.*, 2020 WL 5757628, at *8 (S.D.N.Y. Sept. 27, 2020) (for an Item 303 claim, plaintiff must "'plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable'").  Because the Complaint sufficiently alleges scienter, *see* §IV.B, *infra*, it adequately alleges the requisite knowledge under Item 303.

- 23 -

attempt to shoehorn the *entirety* of the alleged misrepresentations into *Omnicare* by claiming that *any* statement touching upon reserves is an opinion.  MTD at 3, 20-23. But, courts reject "the broad proposition that *all* statements pertaining to loan loss reserves are opinions."  *Underland*, 2011 WL 4017908, at \*9 (emphasis in original). As the court in *Underland* explained:

> Because Plaintiffs have sufficiently alleged that Defendants *departed from their claimed methodology to calculate the loan loss reserve*, they have sufficiently alleged that Advanta's net income and loan loss reserves were misstated.  Unlike a subjective evaluation that a loan reserve is adequate or not, *nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact*.

*Id.* at \*9.[17]  The Court should reach the same conclusion here with respect to the allegations that Defendants disregarded ongoing negative mortality experience and failed to follow its stated reserve methodology, including that reserves were "based on the Company's experience" and would be updated if a "material change" in mortality emerged.  ¶¶37-38; *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015) (use of outdated data to set reserves undermined the basis a reasonable investor would expect from a company's reserve calculations). Similarly, other statements like whether mortality volatility was normal are statements of fact verifiable by the Company's own sensitivity analysis, not

---

[17] This approach remains applicable post-*Omnicare*.  *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at \*12 (D.N.J. Apr. 27, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018) (analyzing *Underland*).

4822-3309-1790.v1-10/7/20

opinions. Courts that have applied *Omnicare* to alleged false statements regarding life insurance reserves recognize that such statements are actionable where defendants are alleged to have failed to account for known mortality:

> "It is plausible . . . to infer that MetLife knew that its method for setting IBNR reserves . . . had not accounted adequately for all deceased policy holders and, in consequence, that MetLife knew that its estimated IBNR reserves were insufficient to meet its life insurance policy obligations."

*MetLife*, 2016 WL 6652731, at *10.

Even if this Court were to apply *Omnicare*, "an opinion could constitute a misrepresentation of fact or misleading omission if . . . the speaker omits facts concerning the basis for the opinion" and "'those facts conflict with what a reasonable investor would take from the statement itself.'" *Goldsmith v. Weibo Corp.*, 2018 WL 2733694, at *12 (D.N.J. June 7, 2018) (quoting *Omnicare*, 575 U.S. at 183-84, 189). Here, the Complaint alleges in detail that Defendants knew the Company was experiencing ***extremely negative***, and statistically significant, mortality development prior to and during the Class Period. *See* §IV.C. Thus, the Company's claims that reserves were likely overstated, that its balance sheet was strong, and it complied with GAAP, as well as its financial results, are adequately alleged to lack a reasonable basis and not "fairly align . . . with the information in [its] possession at the time," *i.e.*, the negative mortality experience stemming from Hartford and its severe economic impact on Individual Life. ¶52; *Omnicare*, 575 U.S. at 189.

- 25 -

**B.      The Complaint Sufficiently Pleads a Strong Inference of Scienter**

Plaintiffs may establish scienter by alleging facts that constitute circumstantial evidence of reckless or conscious misbehavior.  *In re Great Atl. & Pac. Tea Co., Sec. Litig.*, 103 Fed. App'x 465, 468-69 (3d Cir. 2004).  Scienter is pled by allegations of "defendants' knowledge of facts or access to information contradicting their public statements."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  Recklessness involves "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to defendant or is so obvious that the actor must have been aware of it."  *In re Digit. Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004).  The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences," but must merely be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  This element is sufficiently pleaded when "it is at least likely as not that defendants acted with scienter."  *Avaya*, 564 F.3d at 269.  The question is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Id*. (emphasis in original).[18]

---

[18]  Defendants wrongly suggest that the Third Circuit has rejected corporate scienter. MTD at 19.  But, as this Court has found, "Defendants have provided no binding authority holding that a corporation's liability under §10(b) for its alleged false statements and omissions is circumscribed by the imputed scienter of identifiable

- 26 -

### 1.    Defendants' Close Monitoring of Mortality Experience Supports a Strong Inference of Scienter

Prudential's close monitoring of mortality results within Individual Life and separate tracking of the poorly-underwritten Hartford policies supports a strong inference of scienter. *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *8 (D.N.J. Apr. 28,  2017) (inference of scienter supported by monitoring of captive business); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 905-06 (E.D. Pa. 2018) (scienter pled where defendants "regularly review[ed] the . . . data which contradicted their public statements").  Here, the Complaint alleges that the Company regularly tracked, forecasted and analyzed mortality development within Individual Life, including the ***extremely negative*** mortality development within the Hartford block beginning ***more than seven months prior*** to the Class Period, and continuing ***undisclosed*** throughout it.  ¶¶53(a)-(d), 84.

These allegations are supported by accounts of former Prudential employees: According to FE1 (a former Associate Manager in the Planning & Analysis group) and FE3 (a former Associate Manager in Individual Life Insurance Financial Planning and Analysis), due to its importance to Prudential's performance,

---

corporate agents."  *In re Merck & Co., Sec. Derivative & ERISA Litig.*, 2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 13, 2013); *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018) (the Third Circuit has "neither accepted nor rejected" the corporate scienter doctrine.).

4822-3309-1790.v1-10/7/20

Defendants evaluated mortality experience ***monthly*** and ***quarterly***, and incorporated the results into quarterly Individual Life forecasts.  ¶53(c).  According to FE2 (a former Manager, Business Risk Management), and corroborated by FE3, Defendants knew that substandard underwriting, antiquated systems and inaccurate mortality data afflicted the Hartford insurance policies.  ¶¶30(b)-(c), 53(b).  According to FE1, once integrated, Individual Life consistently suffered from negative mortality developments stemming from the legacy Hartford policies.  ¶53(a).  Additionally, Prudential separately monitored the mortality experience of the Hartford block, apart from the policies underwritten by Prudential, and the Hartford block was the cause of the large reserve charges in 2016 and 2017.  ¶4.

Defendants improperly attack these allegations in isolation instead of heeding the Supreme Court's directive to review facts "holistically."  MTD at 16; *Tellabs*, 551 U.S. at 326.  The allegations attributed to Prudential's former employees must be viewed in totality with the remaining allegations.  *Id.*  Further, Defendants' criticism that the Complaint lacks a conversation directly linking a former employee witness to an Individual Defendant is precisely the type of "'smoking-gun'" evidence that *Tellabs* made clear is ***not required*** for scienter.  *Avaya*, 564 F.3d at 269.  And, Defendants completely ignore that Prudential confirmed the key allegations attributed to former employees: For example, the Form 10-K, stated that Defendants used the Company's mortality "experience" to set reserves and would

- 28 -

update assumptions in interim period (not annually) where "a material change is observed," corroborating that mortality was closely tracked.[19] ¶¶37-38. In addition, when explaining the massive charge to earnings on August 1, 2019, Defendants attributed the negative mortality development to the older-vintage universal life policies acquired from Hartford referred to by former employees, thus confirming allegations they were monitored separately. ¶¶66-67. Finally, on August 1, 2019, Defendants also admitted that the underwriting and assumptions used for these Hartford policies was not up to Prudential's current standards but pricing for these Hartford policies was "very different" virtually mirroring the reports of the former employees. ¶66. Indeed, the magnitude of the 2Q19 reserve charge from the Hartford policies, which could only stem from longstanding mortality development, is entirely consistent with the accounts of the former employees. These facts are more than sufficient to support allegations of a strong inference of scienter.

Defendants' attacks on the reliability of allegations attributed to the former employees are meritless. MTD at 14-16. Plaintiff has identified their work history, professional roles and backgrounds and the bases of their information, thus

---

[19] To the extent the Motion argues that the actuaries only "annually revisit the assumptions," this demonstrates that: (i) the representations in the 10-K material changes would be timely accounted for were knowingly false and misleading; and (ii) Defendants were deliberately reckless because they "failed to review or check information that they had a duty to monitor." *Novak*, 216 F.3d at 308.

4822-3309-1790.v1-10/7/20

establishing the sources and reliability of the information attributed to them – this is sufficient. ¶30(a)-(c); *see Avaya*, 564 F.3d at 263 ("'[p]laintiffs have appropriately described the positions formerly held by each of [the confidential] sources as well as the basis of the sources' personal knowledge'"). And, in addition to corroboration by public events and Defendants' statements, the former employees' accounts are corroborated by each other, as well. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) ("consistent accounts" from various sources "reinforce one another"); *see, e.g.*, ¶53(a) (close monitoring of Hartford block corroborated by FE1 and FE3); ¶53(b) (Hartford block's underlying problems corroborated by FE1, FE2, FE3); ¶53(c) (regular evaluation of mortality corroborated by FE1, FE3). Defendants' criticism of FE3 for leaving the Company prior to the Class Period is unavailing because the allegations drawn from them support Defendants' knowledge ***prior to*** the outset of the Class Period. ¶¶30(c), 53(b)-(c).[20] *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("pre-class data was relevant to show defendants' knowledge at the start of the class period").

---

[20] Unlike *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013), the Complaint relies on former employees' factual observations (not mere opinions) made during their tenure at Prudential. *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *20 (D.N.J. Jul. 22, 2015).

- 30 -

4822-3309-1790.v1-10/7/20

### 2.    Defendants' Access to Negative Mortality Experience Supports a Strong Inference of Scienter

The Complaint pleads a strong inference of scienter by alleging that Defendants had "access" to information showing the ***extremely negative*** mortality development in the Hartford block beginning ***over seven months prior*** to the Class Period, and continuing ***undisclosed*** throughout it, which "contradict[ed] their public statements" to investors.  ¶¶53(a)-(d), 84; *In re Elecs. for Imaging, Inc. Sec. Litig.*, 2019 WL 397981, at *6 (D.N.J. 2019) (scienter pled where defendants had "'access to information contradicting their public statements'"); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (same).  As alleged, FE1 attended a May 2019 Individual Life quarterly forecast meeting (attended by actuarial, capital and financial planning and analysis teams) which included discussion of Individual Life's poor performance and the need to take a significant reserve charge.[21]  ¶¶30(a), 53(d).  This was confirmed by FE1's review of a year end "results package" showing that the separately-tracked Hartford block had suffered from negative mortality development for six consecutive quarters (*i.e.*, from 2Q18 through 4Q19).[22]  ¶53(e).  And, these allegations are corroborated by the $208 million charge.  ¶60.

---

[21]  The Motion contends that it is an "unsupported assumption[]" that the Company monitored mortality in the Hartford block.  MTD at 11.  This is a premature fact dispute that contradicts multiple well-pled allegations in the Complaint.

[22]  That FE1 did not quantify the exact amount of that negative mortality experience does not negate the reliability of the information that a significant charge would be

Scienter is strongly supported by allegations that this negative undisclosed information concerning adverse mortality development, and its impact, was known to (or recklessly disregarded by) Defendants. *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *33 (D.N.J. Dec. 31, 2018) ("Scienter generally exists where a plaintiff alleges that a defendant in fact possessed the additional information which, if withheld, would make a public statement misleading or inaccurate."). Indeed, Defendant Lowrey admitted that internal forecasts contradicted the representations made to investors. ¶64 (We need "to better align[] external expectations with [the Company's] internal forecast.") And Prudential confirmed its awareness of the poor underwriting in the Hartford block when it indicated that it implemented "more current assumptions" a "few years" before. ¶66. "To the extent that Defendants failed to access such important data, that failure demonstrates recklessness . . . . The alternative inference is that Defendants were aware of the data and failed to disclose it when reassuring investors and analysts. Either scenario demonstrates scienter." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *17 (D.N.J., July 31, 2019).[23]

---

taken and contradicts Tanji's Investor Day statement that mortality was within the range of normal. ¶60.

[23] The alleged GAAP violations only further strengthen the inference of scienter. As detailed in §IV.A.3, Defendants violated ASC 944 and ASC 450 by failing to timely increase reserves or disclosing negative mortality trends. Given this knowledge, "defendants had clear reasons to doubt the validity of the issuer's

- 32 -

### 3. Defendants Knew that Mortality Experience Was Materially Negative and Knowingly Concealed Its Magnitude

The inference of scienter as to Defendant Tanji's misrepresentations at Prudential's Investor Day is particularly strong. "[T]he most powerful evidence of scienter is the content and context" of the statements made by Defendant Tanji "in response to repeated questions . . . by analysts." *See Avaya*, 564 F.3d at 269; *see also Campbell Soup*, 145 F. Supp. 2d at 599; *Perrigo*, 2019 WL 3451523, at \*17. Courts presume that an executive speaking to investors on a matter of importance does so with knowledge of the truth, or is deliberately reckless in now knowing the truth. *See In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*17 (D.N.J. Aug. 28, 2017) ("statements to investors during earnings calls . . . implied that they had first-hand knowledge" provides support for scienter).

Here, Plaintiff alleges that during Tanji's presentation, he: (i) volunteered, albeit falsely, that Prudential's "recent [mortality] experience has been in between range of what we'd expect normal volatility"; (ii) stated that Prudential's assumption review "If you looked at it, has been slightly negative"; and (iii) mortality was something that defendants were "taking a look at." ¶54. Tanji's remarks support a

---

financials, but nonetheless, kept turning a blind eye to all such factual 'red flags.'" *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 287 (D.N.J. 2007) (quoting *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999).

4822-3309-1790.v1-10/7/20

strong inference that he had personal knowledge of the ongoing actuarial review and current mortality experience.  ¶54; *see also* ¶38; *Novak*, 216 F.3d at 308.

Tanji's responses were not just inaccurate but directly contrary to the truth: Mortality experience was not within the range of "normal volatility," but an extreme outlier based on the Company's sensitivity analysis, which indicated that the chance of such a charge was less than 1%.  ¶¶5 n.1, 53-54, 59-60, 96.  Additionally, Prudential's Planning & Analysis group had already determined that negative mortality experience in Individual Life would likely require a significant reserve charge.  ¶¶30(a), 53(d).  And the $208 million reserve charge ultimately taken (and its going-forward impact of $25 million per quarter) was not "slightly negative" but large enough to wipe out all earnings for Individual Life for the year, causing the Company to miss EPS guidance by $0.09 and reduce going forward earnings for Individual Life by a third.  ¶¶54, 60, 65, 67, 104.

The temporal proximity between Tanji's statements and the revelation of the truth further supports an inference of scienter.  *See Avaya*, 564 F.3d at 271 ("Just as the magnitude of the alleged discounting and margin contraction strengthens the inference of scienter, so does the temporal proximity of McGuire's March denials to the end of the quarter.").  Indeed, Tanji's false statement that mortality volatility was in the range of "normal" occurred just three weeks before the actuarial review was purportedly completed, and seven weeks before the truth was disclosed that

- 34 -

4822-3309-1790.v1-10/7/20

mortality was extremely ***abnormal*** and would cost the Company $208 million in reserve charges, plus the going-forward cost of $25 million per quarter, or as an analyst characterized it: "***Atrocious***."[24]  ¶67; *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 988 n.5 (9th Cir. 2008) ("'temporal proximity' of the misleading statement and the subsequent disclosure 'bolster[s]' the inference that defendants knew about the order when they made the statement").

### 4.    Defendants' Admission that Individual Life Suffered from Sub-Standard Underwriting Supports a Strong Inference of Scienter

On August 1, 2019, Defendants admitted that they had known ***for years*** that Individual Life was saddled with poorly underwritten policies in the "longer dated vintages" within the "Universal Life block" and they had since made efforts to improve underwriting in Individual Life:

> The new business that we've been writing ***over the last few years*** . . . has been priced using much more current assumptions that are ***very different from the assumptions used to price the legacy products*** that have generated some of the recent charges we've taken.

¶66. Most clearly, this admission establishes scienter with respect to Falzon's prior misrepresentation that there were no "***no systemic issues with underwriting***," as it

---

[24] Defendants argue that Tanji's statement was made based on an incomplete assumption review, inferring that his statement was either truthful or non-actionable. MTD at 17.  But this only further supports Tanji's access to the concealed information and underscores that this is a premature fact dispute.

- 35 -

was diametrically opposed to the known truth within the Company.  ¶43; *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) ("stark" "discrepancies between the admissions" and prior representations support scienter).  But the failure to disclose that Individual Life contained legacy products which presented a clear liability risk also supports an inference of scienter as to Defendants' false and misleading statements concerning the sufficiency of reserves, the likelihood of being over-reserved, and earnings volatility.  ¶¶52-53.

### 5.    Holistically Considered, the Complaint Plausibly Alleges a Strong Inference of Scienter

Considered "holistically," Defendants cannot dispute the compelling facts underpinning the alleged fraud.  *Tellabs*, 551 U.S. at 326.  The Hartford block experienced ***extremely negative*** mortality for four consecutive quarters, from July 2018 through July 2019, yet Defendants took no remedial action as this known liability grew in magnitude.  Given that Prudential knew that the pricing and underwriting of these older policies were sub-standard and had required prior reserve charges, the opposing inferences Defendants urge lack credibility.

Defendants' contention that they did not know of the impact of negative mortality developments on actuarial assumptions is meritless.  MTD at 12. Knowledge of the precise outcome of the actuarial review was not a prerequisite to knowledge that the Company faced a material undisclosed liability.  And, the Form 10-K stated that Prudential would update its assumptions in the event of a material

- 36 -

change in an interim period – thus refuting its own claim that it could only act on its annual update. And, Defendants were on notice that a reserve charge was likely as the Hartford block had incurred such charges in two of the prior three years.

Defendants' claim that this is fraud by hindsight also rings hollow. MTD at 13-14. Like any fraud, Plaintiff and the proposed class were kept in the dark as Defendants concealed material negative information only to blind-side investors with an extraordinarily large reserve charge and a drag on earnings going forward. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (use of post-class period statements to demonstrate falsity does not transform case into fraud by hindsight). Indeed, Defendants knew about these negative developments within Individual Life for seven months before the Class Period even began. And with every passing month and quarter the issue only became worse.[25] Indeed, analysts asked why the Company failed to reset expectations in June at the Investor Day.

---

[25] The cases on which Defendants rely on are inapposite. In *Williams*, the allegations did not suggests a sales slowdown before the allegedly false risk warnings about the loss of a distributor on sales. 869 F.3d at 242. Further, the misrepresentations were forward-looking and projections unlike those here; indeed, defendants in *Williams* basically met projections, and beat EPS guidance. *Id.* at 244-46. *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 497 (3d Cir. 2016) is also inapt because plaintiff had not alleged any facts that showed a strike was threatened or likely. *Id.* at 496. And unlike *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), Plaintiff has alleged a direct connection between Defendants' misleading statements and knowledge.

- 37 -

C.     The Complaint Sufficiently Pleads Loss Causation

To plead loss causation, the Complaint must provide Defendants notice of what "the causal connection might be between [plaintiff's] loss and the misrepresentation." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "[S]o long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled." *Hull v. Glob. Digit. Sols., Inc.*, 2017 WL 6493148, at *15 (D.N.J. Dec. 19., 2017). Here, after market close on July 31, 2019, the truth about Prudential's financial condition began to emerge when the Company reported 2Q19 earnings, which were $0.09 below guidance, and disclosed a pre-tax charge of $208 million to increase reserves in Individual Life as a result of changes in "mortality assumptions." ¶¶98-102. On August 1, 2019, during the Company's conference call, Defendants revealed there would be a $25 million per quarter going-forward charge, as well. ¶103. These disclosures revealed, among other things, that the Company's reserves were insufficient during the Class Period and its prior reported financial results were overstated. ¶¶98-106. Prudential's stock price reacted accordingly to these negative revelations of the truth and declined over 10% from a close of $101.31 per share on

- 38 -

July 31, 2019, to a close of $91.09 per share on August 1, 2019. *See, e.g.*, ¶105.

These allegations are sufficient at this stage.[26]

### D.      The Safe Harbor Does Not Immunize Defendants' Knowing Misrepresentations

The alleged false statements are not subject to the PSLRA safe harbor. MTD at 28-29. First, "Plaintiff does not allege that [Defendants'] statements were misleading because they described a future that did not come to pass, but instead because they misrepresented present facts." *City of Warren Police and Fire Ret. Sys. v. World Wrestling Ent., Inc.*, 2020 WL 4547217, at *8 (S.D.N.Y. Aug. 6, 2020). For example, Defendants' February 19, 2019, statement that current "initiatives being pursued should lead" to "less earnings volatility" is alleged to be false because Defendants omitted current material negative information – not because they ultimately proved incorrect. Moreover, the Third Circuit has addressed precisely the insufficiency of Defendants' purportedly cautionary language, which did not disclose its current liabilities:

> A reasonable investor might well be willing to take some chances with regard to the future of the economy, ***but might be quite unwilling to invest in a company that knew that its reserves were insufficient***

---

[26]  Defendants' challenge to loss causation rests on the flawed premise that the only omitted information was the final result of the actuarial review. MTD at 29. But the Complaint is much more expansive, alleging that Prudential concealed ongoing negative mortality development in the poorly-underwritten Hartford block which rendered its statements concerning, among other things, mortality trends, reserve methodology, and the risks facing the Company, false and misleading.

- 39 -

***under current conditions and knew it would be taking another major write-down in the near future*** (as plaintiffs allege).

*Westinghouse*, 90 F.3d 709-10.

### E. The Complaint Sufficiently Pleads Control Person Liability

Defendants baselessly contest liability under 20(a) on grounds that no primary violation has been pleaded and seek to advance a repeatedly-rejected standard. MTD at 30; *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003) ("'overwhelming trend'" rejects pleading requirement of culpable participation). But, as detailed throughout, the Complaint adequately alleges a primary violation. The Complaint sufficiently alleges Defendants' control via their positions as the three highest-ranking executives at the Company responsible for communicating with investors. ¶¶26-28. This is sufficient.

### V. CONCLUSION

For all of the reasons set forth above, Plaintiff respectfully requests the Court deny the Motion in full. In the event the Court finds the alleged facts insufficient, Plaintiff requests leave to amend to address any deficiencies the Court might identify. Fed. R. Civ. P. 15; *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DATED: October 7, 2020

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN


/s/Peter S. Pearlman
Peter S. Pearlman


- 40 -

4822-3309-1790.v1-10/7/20

Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com

Local Counsel for Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
DANIEL J. PFEFFERBAUM
ARMEN ZOHRABIAN
HADIYA K. DESHMUKH
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
azohrabian@rgrdlaw.com
hdeshmukh@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 41 -

- 42 -

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

4822-3309-1790.v1-10/7/20