<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re PRUDENTIAL FINANCIAL, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 2:19-cv-20839-SRC-CLW |
| _____ | ) ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) ) | **OPINION** |
| ALL ACTIONS. | ) ) ) ) | |

<u>**CHESLER**</u>, District Judge

This securities fraud action seeks to recover losses allegedly sustained as a result of an insurance company's failure to speak truthfully about the insufficiency of policy reserves. Lead Plaintiff City of Warren Police and Fire Retirement System ("Plaintiff") brings this putative class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), on behalf of all persons or entities who purchased the common stock of Prudential Financial, Inc. ("Prudential") between February 15, 2019 and August 2, 2019, inclusive (the "Class Period"). The Amended Complaint asserts two causes of action: (1) a claim for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, <u>et seq.</u> (the "Exchange Act") and (2) a control person claim pursuant to Section 20(a) of the Exchange Act.

In brief, Plaintiff contends that Prudential disregarded indications that certain policies in its life insurance business presented an increased mortality risk, which required that additional funds be set aside, or reserved, to cover the risk. Plaintiff alleges that, in spite of its awareness of

1

the negative mortality information, and contrary to the assurances provided to investors, Prudential failed, during the Class Period, to update mortality estimates and actuarial assumptions and to take what Plaintiff contends would have been a corresponding increase in reserves. The claimed securities fraud violation consists of allegedly misleading statements about the adequacy of reserves, the method for setting and updating reserves, and the overall strength of Prudential's earnings and income.

Presently before the Court is the motion filed by Defendant Prudential and individual co-Defendants Charles Lowrey, Kenneth Y. Tanji, and Robert M. Falzon (collectively, "Defendants") to dismiss the Amended Complaint.[1] Plaintiff has opposed the motion. The Court has considered the parties' written submissions and, for the reasons that follow, will grant Defendants' motion to dismiss the Amended Complaint.

## I.   BACKGROUND[2]

### A.   Prudential's Life Insurance Business

Prudential is a large and well-established company engaged in the sale of insurance and in the provision of other financial products and services, in the United States and internationally. Its principal business is comprised of five divisions, which together encompass seven segments. This suit arises out of Prudential's Individual Life segment, a portion of the division dedicated to

---

[1] At all relevant times, Lowrey served as Prudential's President and Chief Executive Officer, Tanji as its Chief Financial Officer, and Falzon as the Vice Chairman of Prudential Financial and Prudential Insurance.

[2] The background sets forth facts alleged in the Amended Complaint and contained in documents attached to or referenced in the Amended Complaint. The facts are taken as true for purposes of this motion to dismiss only.

individual annuity and life insurance policies for the United States market. The products in the Individual Life segment consist of term life, variable life, and universal life insurance policies.

Consistent with the nature of life insurance contracts, Prudential collects premiums from policyholders and, in return, assumes an obligation to make a payment to the policy beneficiaries upon the death of the insured policyholder. The Amended Complaint recognizes that life insurance policies are long-duration contracts. In other words, given the nature of life insurance, the insurer's obligation to pay a claim often is often not triggered for many years or even decades after the policy is issued. In preparation for payment of those future claims, which materialize upon the event of a policyholder's death, Prudential must set aside an amount of money in the present time. Assets which are set aside in the present time for the payment of claims anticipated in the future are known as reserves.

Because this securities fraud action revolves around the reserves maintained by Prudential for its Individual Life policies, a bit of background concerning this aspect of the life insurance industry is necessary to put the allegations of the Amended Complaint into context.[3] The process for setting aside assets, or reserves, to cover future death claims entails considering a number of relevant factors and making long-term predictions. Factors taken into consideration

---

[3] The information set forth in this paragraph of the Opinion is derived from both the allegations of the Amended Complaint as well as documents on which the Amended Complaint expressly relies, for example, Prudential's Form 10-K for the fiscal year ended December 31, 2018. (The documents are attached to the Declaration of Susan Gittes, submitted by Defendants with their motion to dismiss.) Although the Amended Complaint does not explain what reserves are or what purpose they serve in the insurance industry, the alleged securities fraud violations intrinsically relate to life insurance reserves. A basic understanding of this subject is essential to the Court's evaluation of the plausibility of claims. It is well-established that, in evaluating the sufficiency of a complaint, a court may consider information integral to the Amended Complaint and items subject to judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004)).

include mortality, policyholder behavior, premiums, interest rates, and investment income. Then, to predict what will happen in the future and how much money will be needed to meet its policy obligations, Prudential must develop actuarial assumptions about each of these inputs. Actuarial assumptions are based on Prudential's experience, the experience of the life insurance industry as a whole, and other factors, as applicable. Using these assumptions, Prudential exercises actuarial judgment and estimates the amount of money that it must reserve.

According to the Amended Complaint, Prudential conducts a comprehensive review of the actuarial assumptions it uses to set reserves in the second quarter of each year. This annual review may result in an update to the assumptions, and if necessary, an adjustment of reserves. Prudential may conduct an interim review of the assumptions under certain circumstances, which will be set forth more fully in Section D below. The Amended Complaint alleges that, as a matter of course, Prudential monitors data on the Individual Life policies' mortality experience, i.e., the death of insureds. It further alleges that reports on mortality experience are generated quarterly.

### B. The Hartford Block

In 2013, Prudential expanded its Individual Life business by acquiring 700,000 insurance policies, with a collective face amount of $141 billion, which had been issued by another insurance company known as The Hartford. (Hereinafter, the Court will refer to these acquired policies as the "Hartford block.") The quality of the Hartford block, and in particular its purportedly insufficient underwriting, forms the bedrock of Plaintiff's claim that Defendants misled investors about the soundness of its Individual Life reserves and related matters. Plaintiff bases its allegations concerning the overall weakness of the Hartford block mainly on information provided by three former employees of Prudential, identified in the Amended Complaint as FE1, FE2, and FE3. These individuals worked at Prudential's Newark, New Jersey

headquarters prior to, during, and/or after the Class Period. As the source of this key information, each former employee's respective role within the company bears mentioning. The Amended Complaint describes them as follows: FE1 was a financial analyst in Prudential's Life Insurance business, whose responsibilities included monitoring and compiling weekly sales updates during the integration of the Hartford block as well as creating quarterly sales forecasts for Individual Life. FE2 held various actuarial positions, and his/her duties included assessing the financial impact of quarterly mortality experience and respective changes in assumptions. FE3 held various positions in Individual Life, which included financial forecasting of Prudential's Individual Life business and creating quarterly forecasts for submission to executives of that business.

The Amended Complaint alleges that, from its 2013 acquisition, the Hartford block "regularly missed internal performance expectations due to adverse mortality development," i.e, the death of insureds triggering payout of life insurance policy benefits. (Am. Compl. ¶ 53(a)). It further alleges that after the Hartford block was integrated into Prudential's Individual Life business segment in 2015, Prudential reported "adverse mortality developments . . . [which] were consistently traced back to the legacy Hartford policies." (Id.) According to FE1 and FE3, the Hartford block was, for purposes of forecasting, monitored and analyzed separately from the other Individual Life policies, that is, those policies underwritten by Prudential. Based on information provided by FE1 and FE3, the Amended Complaint avers that "the legacy Hartford policies were not priced to cover the adverse mortality trends being experienced, but Prudential was unable to increase the premiums to account for the increased claim costs." (Id. ¶ 53(b)). In addition, the former employees report that upon integration of the Hartford block into the Individual Life segment, the formerly profitable segment experienced poor results for two

consecutive years and took charges against operating income in both 2016 and 2017 to increase reserves. According to FE2, Hartford had poor actuarial and data administration systems, which Plaintiff alleges further compounded the problem of premiums insufficient to cover risk, including mortality, in the legacy Hartford policies.

According to FE1, Prudential was aware of adverse mortality experience in the Hartford block. FE1 reported that "from 3Q18 (i.e., July 2018) and continuing into and through 2019, the legacy Hartford block experienced consistently negative mortality experience quarter-over-quarter." (Id. ¶ 53(d)). Further, according to FE1, Prudential knew as early as May 2019 that the mortality experience would have a negative impact on the liabilities of Prudential's Individual Life business. The Amended Complaint alleges that FE1 "reported that as early as May 2019, it was discussed in forecast meetings that Individual Life was performing poorly due to negative mortality experience in the legacy Hartford block and that the Company [Prudential] would need to take a significant charge to Individual Life adjusted operating income." (Id.)

### C.     Earnings Guidance for 2019 and the Sensitivity Analysis

The Amended Complaint alleges that, shortly before the Class Period, Prudential published information concerning expectations for 2019. While statements in this pre-Class Period publication are not at issue in this securities fraud suit, Plaintiff maintains that the information contained therein reveals the magnitude of the negative mortality experience in the Individual Life segment. The Amended Complaint points to the Form 8-K filed with the Securities and Exchange Commission ("SEC") on December 6, 2018, in which Prudential

provided a full year earnings guidance for 2019 and published a sensitivity analysis informing investors of the likelihood of a reserve charge in Individual Life in 2019. The guidance forecasted earnings per share of $12.50 to $13.00, and the sensitivity analysis predicted that no reserve charge would be taken.

The sensitivity analysis also indicated the range of charges which could occur in the event of unexpected mortality experience. It indicated that, given normal distribution, Prudential would incur a charge of $55 to $80 million if there was a one standard deviation change in expected mortality. It also projected the likelihood of charges exceeding this range. According to the Amended Complaint, the sensitivity analysis advised that a charge greater than $110 to $160 million would occur only 5% of the time, and a charge greater than $165 to $240 million would occur less than .3% of the time. (Am. Compl. ¶ 5 n. 1.)

Ultimately, Prudential did take a reserve charge in 2019, which will be discussed below. The Amended Complaint alleges that, based on Prudential's own sensitivity analysis, the charge taken reflects that mortality experience was in the range of 2.6 to 3.7 standard deviations from expectations. According to Plaintiff, the magnitude of the charge, and its implications for mortality experience, "indicated that the Company experienced highly unusual and extremely aberrant mortality development in the Individual Life business that it concealed from investors throughout the Class Period." (Id. ¶ 60.)

### D.    The Allegedly Misleading Statements

The Amended Complaint avers that beginning on February 15, 2019, when Prudential's 2018 Form 10-K was filed, and throughout the first half of 2019, Defendants made a number of statements which were allegedly misleading due to their failure to account for the increased mortality experience in the Hartford block for the preceding seven-and-a-half months (i.e., since

July 2018). According to Plaintiff, the highly unusual mortality experience required updated

mortality assumptions and increased reserves for the Individual Life segment. Defendants,

Plaintiff maintains, communicated information about Prudential that was not consistent with this

evident shortfall in reserves. Principally, the alleged misrepresentations consist of the following:

> As opposed to a mere potential risk, negative mortality trends had already
> materialized as of the Class Period and the Company's [Prudential's]
> reserves were insufficient to meet known and expected policyholder
> obligations . . . By failing to adequately reserve for policyholder claims,
> the Company materially overstated its 4Q18, FY18 and 1Q19 financial
> results, placed in jeopardy the Company's FY19 guidance and undermined
> the purported strength of the Company's balance sheet and its ability to
> drive growth or reduce volatility going forward.

(Am. Compl. ¶ 53.) In other words, Plaintiff claims that Defendants overstated adjusted

operating income and earnings per share while understating liabilities based on Prudential's

"failure to timely account for the negative mortality trend in Individual Life." (Def. Br. at 6-7)

(citing Am. Compl. ¶¶ 77, 97.) Additionally, Plaintiff alleges that Defendants made misleading

statements about Prudential's methodology for setting and updating insurance reserves,

misrepresented Prudential's compliance with Generally Accepted Accounting Principles

("GAAP"), and failed to disclose information as required by SEC.

Below, the Court sets forth the statements at issue, in chronological order that they were

made during the Class Period.

### 1.   Form 10-K for Fiscal Year 2018

On February 15, 2019, Prudential filed its SEC Form 10-K for fiscal year 2018. The 2018

10-K was signed by, among others, Defendants Lowrey and Tanji. According the Amended

Complaint, the Form 10-K made the following misleading statements of material fact:

8

- It overstated the company's financial results (net income, earnings and earnings per share) for fiscal year 2018 and for the fourth quarter of 2018. Plaintiff alleges this information was misleading because "it did not rest on a meaningful inquiry and did not fairly align with known or recklessly disregarded facts including the failure to adequately account for known material adverse developments in mortality, in particular consistently adverse mortality experience in the legacy Hartford block prior to and during the Class Period." (Am. Compl. ¶¶ 35, 52.)

- It disclosed a $65 million reserve increase (and corresponding charge to adjusted operation income) for the Individual Life segment in 2018, explaining that it was taken as a result of the second quarter annual actuarial review and "mainly driven by unfavorable impacts related to lapse and mortality rate assumptions." Yet, the Form 10-K made no mention of the subsequent negative mortality developments of the third and fourth quarters of 2018, which the Amended Complaint avers was misleading. (Id. ¶ 36.)

- It stated that Prudential "establish[es] reserves for future policy benefits . . . using methodologies prescribed by U.S. GAAP" and that the "assumptions used in establishing reserves are generally based on the Company's experience, industry experience and/or other factors, as applicable." (Id. ¶ 37.)

- It assured investors that an update to actuarial assumptions and reserves was not

  needed, providing this statement concerning its method:

  > We typically update our actuarial assumptions, such as mortality, morbidity, retirement and policyholder behavior assumptions, annually, unless a material change is observed in an interim period that we feel is indicative of a long-term trend. Generally, we do not expect trends to change significantly in the short-term and, to the extent these trends may change, we expect such changes to be gradual over the long-term. (Id. ¶ 38.)

- Relatedly, the Form 10-K assured investors that if mortality trends changed,

  Prudential would update assumptions, stating:

  > Mortality trend is the risk that mortality improvements in the future deviate adversely from what is expected. Mortality trend is a long-term risk in [sic] that can emerge gradually over time . . . If this risk were to emerge, the Company would update assumptions used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier life claims.

  (Id. ¶ 40.)

- According to the Amended Complaint, the Form 10-K advised investors of the

  "likelihood" that Prudential was, as of the close of 2018, in fact "over-reserved."

  (Id. ¶ 39.) The quoted portion of the SEC disclosure stated as follows:

  > In a sustained low interest rate environment, there is an increased likelihood that the reserves determined based on best estimate assumptions may be greater than the net liabilities.

  (Id.)

2. <u>Analyst Reports</u>

The Amended Complaint identifies two analyst reports that contained alleged misrepresentations by Defendants.

On February 20, 2019, Sandler O'Neill & Partners published a report following a meeting with members of Prudential management, including Lowrey and Falzon. The Sandler O'Neill report stated that Prudential "believes that various initiatives being pursued should lead—over time—to valuation improvement in the stock . . . from consistency of earnings . . .." (Am. Compl. ¶ 42.)

On March 31, 2019, Credit Suisse published a report concerning its March 28 meeting with Prudential management. The Credit Suisse report stated that "Mr. Falzon was optimistic about growth prospects at PRU . . . Mr. Falzon noted that there are no systemic issues with underwriting or mortality assumption, and that results should stabilize." (<u>Id.</u> ¶ 43.)

3. <u>Announcement of First Quarter 2019 Results</u>

On May 1, 2019, Prudential issued a press release to announce its financial results for the first quarter of 2019. It quoted Lowrey's description of Prudential's balance sheet as "rock-solid." (Am. Compl. ¶ 45.)  Likewise, Prudential's May 2, 2019 conference call with investors and analysts, described the balance sheet as "strong." (<u>Id.</u> ¶ 47.) These statements were misleading, Plaintiff contends, because the balance sheet presented an inaccurate mix of assets and liabilities that understated reserves.

The first quarter 2019 Form 10-Q, filed with the SEC on May 3, 2019, made similar claims about the company's financial strength and, like the Form 10-K, allegedly misrepresented net income and earnings per share by failing to account for what Plaintiff contends was the

inevitable and necessary reserve charge. The Amended Complaint alleges that the 10-Q misrepresented the "the Company's assets and liabilities, i.e., reserves to pay life insurance claims." (Id. ¶ 45). The 10-Q was further misleading, the Amended Complaint alleges, by attributing increased adjusted operating income in the Individual Life segment to "higher underwriting results driven by a favorable impact from mortality experience" while failing to disclose that the Hartford block's mortality experience had been negative. (Id. ¶ 51).

### 4. Investor Day Conference

On June 5, 2019, Prudential held an Investor Day conference, during which Lowrey, Tanji, and Falzon made multiple presentations. Plaintiff emphasizes that, by this point, the annual assumptions review, typically conducted in the second quarter of each year, was presumably in progress and possibly nearing completion. The Amended Complaint alleges that, at the Investor Day conference, Tanji misrepresented the mortality experience in Prudential's Individual Life business and gave the misleading impression that no material reserve change was imminent, even though the results of the actuarial review would only weeks later prove otherwise. The Amended Complaint quotes Tanji as follows:

> And then the third area of interest is [sic] involves our individual life business in our mortality experience. And our recent experience has been in between range of what we'd expect normal volatility, but net it has been below our experience.

(Am. Compl. ¶ 54.) Further, a question-and-answer exchange between Tanji and an analyst is quoted as follows:

> [Analyst:] And then when you're going to the assumption review . . . I just wondered, I missed what you've said. Has mortality been more favorable is that relative to what your expectations are or . . . ?
>
> [Tanji:] No. It's very quarter-to-quarter, both positive and negative. If you looked at it, it has been slightly negative and we're taking a look at that.

(Id.) (alterations in Am. Compl.)

### E.  The Reserve Charge Disclosure and Market Drop

On July 31, 2019, Prudential announced its financial results for the second quarter of 2019, reporting lower-than-expected earnings. In relevant part, although the Individual Life business had expected income in the amount of $108 million, it actually experienced a loss of $135 million for the quarter. According to Plaintiff, "[d]riving this miss was a pre-tax charge of $208 million due to unfavorable updates to the Company's mortality assumptions." (Am. Compl. ¶ 60.) The quoted press release announcing the loss attributed the results in large part to the impact of the annual second quarter review and "an update of assumptions and other refinements of $153 million" to supplement Individual Life reserves. (Id.) Then, in an August 1, 2019 conference call to discuss the second quarter results, Prudential further announced that Individual Life would have to take a recurring reserve charge of $25 million per quarter "for the foreseeable future." (Am. Compl. ¶ 65.) As to the Individual Life losses and its reserve charges, Tanji explained that Prudential had "updated this quarter our mortality assumptions in Individual Life, and that will have an ongoing impact into the second quarter." (Id. ¶ 65) Prudential also stated that "the updates really related to the longer-dated vintages, earlier in our book of business. In regard to looking at specific categories, the onetime impact is largely experienced in the Universal Life block." (Id. ¶ 66.)

These disclosures, the Amended Complaint alleges, essentially revealed that it was the legacy Hartford block which drove the update to mortality assumptions and the corresponding need for reserve charges, "corroborating the account of multiple former employees." (Id.) Further, Plaintiff avers, the announcement revealed that "the underwriting of these policies was not up to current standards." (Id.) Moreover, the Amended Complaint alleges that analysts expressed surprise and disappointment at the negative information announced on July 31 and August 1, especially as it had not been disclosed or previewed during the Investor Day conference of June 5.

According to the Amended Complaint, the market reacted poorly and drastically to the news of the second quarter reserve charges and related negative news. It avers: "Prudential's stock price decline more than 10%, from a close of $101.31 per share on July 31, 2019 to a close of $91.09 per share on August 1, 2019, on massive, abnormally high volume of over than 7.6 million shares traded." (Id. ¶ 68.)

## II.  DISCUSSION

### A.  Legal Standard

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must apply the standard of review articulated by the Supreme Court in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal. Under this standard, a complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). A complaint states a plausible claim if it "pleads factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556.) While the complaint need not demonstrate that a defendant is probably liable for the wrongdoing, allegations that give rise to the mere possibility of unlawful conduct will not do. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 557.

Claims brought pursuant to Section 10(b) of Exchange Act and the statute's implementing regulation Rule 10b-5 are subject to certain heightened pleading requirements under the PSLRA. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320-21 (2007) (noting that prior to the enactment of the PSLRA, the pleading standard of Rule 9(b) governed the sufficiency of a complaint for securities fraud). The PSLRA mandates that, to survive a motion to dismiss, a complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1) & (2); 15 U.S.C. § 78u-4(b)(3)(2) ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of [15 U.S.C. §§ 78u-4(b)(1) & (2)] are not met."). The PLSRA's particularity requirement echoes the heightened standard set forth in Federal Rule of Civil Procedure 9(b), applicable to general claims of fraud. Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009). It means that plaintiffs must set for facts concerning "the who, what, when, where and how: the first paragraph of any newspaper story." Id.

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint

by reference, and matters of which the court may take judicial notice." Tellabs, 551 U.S. at 322. In that regard, the Third Circuit has held that a district court may take judicial notice of documents "integral to or explicitly relied upon in the complaint," SEC filings, and stock price data. In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).

   B.   **Securities Fraud Claim Under § 10(b) of the Exchange Act**

   Section 10(b) of the Exchange Act provides that a person or entity may not "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5(b), in turn, makes it unlawful to "make any untrue statement of material fact or to omit to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b)(2). The Supreme Court has recognized a private cause of action for damages sustained as the result of a violation of Section 10(b) and Rule 10b-5. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). To state a claim under Rule 10b-5, a plaintiff must allege facts establishing each of the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Id.; City of Edinburgh Council v. Pfizer, Inc, 754 F.3d 159, 167 (3d Cir. 2014). A failure to plead any one of these elements in accordance with the pleading standard applicable to a securities fraud claim prevents a plaintiff from stating a legally sufficient claim. Dura, 544 U.S. at 346-47.

   Defendants challenge the sufficiency of the Rule 10b-5 claim on several grounds. Among other deficiencies, they argue, the Amended Complaint fails to set forth particularized facts

indicating why the alleged actionable statements and omissions were misleading. Defendants further argue that the Rule 10b-5 claim fails for two additional reasons: failure to plead scienter with the requisite particularity and failure to plead loss causation.

For purposes of analysis, the Court has divided the claims into two groups: statements allegedly misrepresenting the adequacy of reserves and statements allegedly misrepresenting facts related to the process for setting and updating reserves. The Court finds that all of these statements and omissions, whether they express statements of belief or statements of fact, fail to support a plausible securities fraud claim for failure to plead falsity as required by the PSLRA.[4] Following its analysis of the allegations pertaining to the allegedly fraudulent nature of the representations, the Court will also note additional bases on which certain statements do not constitute actionable securities fraud.

1.   Statements Concerning Adequacy of Reserves

Reserves reflect a company's judgment of the estimated amount required to pay future claims. Thus, statements concerning reserves have been treated by courts as opinion statements for purposes of evaluating securities fraud violations. See Sjunde AP-Fonden v. Gen. Elec. Co., 417 F. Supp. 3d 379, 395 (S.D.N.Y. 2019); City of Westland Police and Fire Retirement Sys. v. MetLife, Inc., 928 F. Supp. 2d 705, 716-17 (S.D.N.Y. 2013). In Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, the Supreme Court held that an opinion statement may give rise to liability under the securities laws if it is not believed by the speaker and contains an embedded assertion of incorrect facts. 575 U.S. 175, 185-86 (2015). Alternatively, an opinion statement may be actionable if the speaker omits facts concerning the basis for the opinion and

---

[4] As the failure of this element by itself warrants dismissal of the Rule 10b-5 claim, the Court does not reach the sufficiency of the other elements challenged by Defendants in this motion.

"those facts conflict with what a reasonable investor would take from the statement itself." Id. at 189. Accordingly, in actions pleading violations of Exchange Act Section 10(b), "[o]pinions are only actionable . . . if they are not honestly believed and lack a reasonable basis." City of Edinburgh, 754 F.3d at 170 (citing In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 543 F.3d 150, 166 (3d Cir. 2008)); In re Hertz Global Holdings, Inc. Sec. Litig., 2017 WL 2017 2017 WL 1536223 at *12 (D.N.J. Apr. 27, 2017) (summarizing Omnicare's holding regarding circumstances in which an opinion may be actionable under securities laws).

The applicability of the Omnicare standard to Plaintiff's Rule 10b-5 claim is a matter requiring clarification. Defendants argue that many of the alleged misrepresentations fail to state an actionable fraud claim because Plaintiff alleges no facts that satisfy either of Omnicare's essential prongs, i.e., lack of both subjective belief and objective reasonable basis. Plaintiff counters that this action not only involves Defendants' statements about reserves but also statements of verifiable fact, specifically, Defendants' false representations to investors that Prudential had followed its methodology for setting and adjusting reserves, based on available data and experience. While reserve statements themselves may be subjective evaluations, Plaintiff argues, statements on matters which merely touch upon reserves are not. Thus, Plaintiffs maintain, because the misleading statements about reserves are based on misrepresentations about Prudential's methodology, the Section 10(b) claim in this action should not be subject to the Omnicare standard. See, e.g., Underland v. Alter, 2011 WL 4017908, at *9 (E.D.Pa. Sept. 9, 2011) (holding that unlike reserves, which express subjective estimates of future liabilities, a representation that defendant adhered to the method for setting those reserves concerns "a measurable objective fact" and should not be treated as a statement of opinion).

Plaintiff's argument that purely factual statements, though tangentially related to reserves, should not be subjected to the <u>Omnicare</u> standard holds little sway in this action. Reading the Amended Complaint as a whole leaves no doubt that the gravamen of the instant action is that Defendants understated reserves for its Individual Life segment. Plaintiff maintains that by the time Prudential filed its SEC Form 10-K for 2018, the Hartford block, a line of policies within Prudential's Individual Life business, had experienced two quarters of highly unusual increased mortality. This development, Plaintiff contends, along with the overall alleged weakness of the Hartford block, signaled that Individual Life's assumptions required review and updating, which Plaintiff further contends would have led Prudential to take a necessary reserves increase. Instead of adjusting the reserve's mortality assumptions to incorporate the negative mortality experience, the Amended Complaint alleges, Defendants chose to make statements about the performance of the Individual Life business, Prudential's earnings and liabilities, and sufficiency of reserves that they knew did not align with the mortality data available and known to Prudential. The alleged fraud revolves around statements made throughout the Class Period which explicitly or implicitly communicated that Prudential maintained reserves sufficient to cover its future estimated Individual Life claims. Expressions of Prudential's actuarial judgment concerning its projected policy liabilities are at the root of the bulk of the allegedly misleading statements in this action. As opinions, they must meet the <u>Omnicare</u> standard to constitute actionable fraudulent statements.

As to the substance of the claims, Defendants argue the entire predicate for pleading that the Class Period reserves statements constitute actionable misrepresentations suffers from a fundamental flaw. They contend that Plaintiff extrapolates conclusions concerning the soundness of Prudential's actuarial judgments from the purported underperformance of one group of its

policies. Defendants point out that Plaintiffs conflate mortality experience, the actual number of policyholder deaths which have already occurred in some past period of time, with mortality assumptions, which are forward-looking actuarial judgments used to project anticipated mortality. No factual allegations, Defendants argue, tie together Plaintiff's premise that negative mortality experience in the Hartford Block would have warranted revising the mortality assumptions and, moreover, would have warranted increasing reserves. And, to the extent Plaintiff relies on the fact that a reserve charge was ultimately taken after the 2019 annual assumptions review, Defendant maintains that this amounts to fraud by hindsight, imputing the outcome of a future event to the Class Period statements, in an improper attempt to demonstrate that the statements lacked a reasonable basis at the time they were made.

The entire action is, indeed, premised on a sliver of information reported by FE1: that the legacy Hartford block policies, one portion of Prudential's Individual Life business, experienced negative mortality (policyholder deaths) quarter-over-quarter beginning in July 2018. From that jumping-off point, Plaintiff alleges that Prudential's mortality assumptions did not accurately project future liabilities, resulting in Defendants' knowingly overstating Prudential's income (by avoiding the needed charge to increase reserves appropriately). The Court finds that the Amended Complaint's allegations of fraud are simply conclusory.

To begin, Plaintiff acknowledges that Prudential, in the ordinary course of business, conducts an actuarial review on annual basis, in the second quarter of each year, at which time it updates assumptions and adjusts reserves estimates as needed. The Amended Complaint supports the reasonable inference that the Class Period statements related to Individual Life reserves were based on the results of the 2018 actuarial review, with which Plaintiff does not take issue. But, according to the Amended Complaint, "[f]ollowing the 2Q actuarial update, from 3Q18 (i.e., July

2018) and continuing throughout the Class Period, the legacy Hartford block experienced consistently negative mortality quarter-over-quarter." (Am. Compl. ¶ 16.) According to the Amended Complaint, this negative mortality development deviated so far from expectations as to indicate that Individual Life's reserves were insufficient and an interim review and adjustment of actuarial assumptions was necessary.

Essentially, Plaintiff's theory of fraud maintains that Prudential's failure to undertake an interim actuarial review, in the face of overwhelming evidence of extremely negative performance in the Hartford block, rendered its statements about Individual Life's adjusted operating income, its liabilities versus assets, and its compliance with reserve setting process false and/or misleading. This is the lynchpin of the Rule 10b-5 claim. In place of setting forth facts plausibly establishing that Defendants' statements were false, misleading, or lacked a reasonable basis, however, Plaintiff strings together several conclusions drawn, initially, from Prudential's decision to break out the Hartford block for purposes of tracking and measuring performance.

Plaintiff indeed draws significant inferences from the monitoring of the Hartford block separately from the Individual Life policies underwritten by Prudential. It characterizes this special treatment as stemming from the Hartford Block's overall weakness. Further, from the data collected about this one group of policies, Plaintiff concludes that there were severely negative developments in mortality impacting Individual Life as a whole. Plaintiff fails, however, to connect the mere fact of separate monitoring to these conclusions; in other words, these alleged facts are merely conclusory.

Plaintiff argues in its brief that the Hartford policies were tracked carefully because they were "poorly underwritten, not priced to cover their true mortality risk (though Prudential was powerless to increase premiums) and . . . [based on] poor actuarial and data administration systems, including mortality models." (Def. Br. at 5.) This argument distorts the facts alleged in the Amended Complaint, which in reality contains no well-pleaded facts stating Hartford block was monitored separately due to the policies' poor underwriting and/or faulty actuarial assumptions concerning, specifically, mortality. Instead, it relies on the bald assertion by two former employees, with no professed knowledge of an actuarial analysis of the Hartford block, that the policy premiums did not cover "the adverse mortality trends being experienced." (Am. Compl. ¶ 53(b)).

Additionally, the Amended Complaint repeatedly treats the Hartford block as interchangeable with Individual Life, casting its purported negative mortality experience as indicative of the entire segment's performance. The Hartford block admittedly represents only a portion of the Individual Life policies, yet Plaintiff provides no indication of what percentage of the business was comprised of the Hartford block. There is no indication, in other words, of the impact that the poor performance in this one book of business might have on the entire business segment. In fact, although the Amended Complaint alleges that the Hartford Block experienced negative mortality beginning in July 2018, it recognizes that Individual Life had an overall favorable mortality experience in the first quarter of 2019.

Next, from its focus on the Hartford block's policyholder deaths, Plaintiff calls into question the actuarial assumptions for mortality. Plaintiff asserts that, by the beginning of the Class Period, mortality experience in the Hartford block had deteriorated to such a great extent that the mortality assumptions for Individual Life should have been revised, long before the

ordinary once-annual review, to take that data into account. Moreover, because of the separate tracking of the Hartford block, Plaintiff posits, Defendants were aware that the actuarial assumptions used to set reserves did not align with the information known to Prudential. Again, where are the facts demonstrating, or even giving rise to an inference, that Defendants disregarded evident flaws in the actuarial projections? Plaintiff at no point quantifies the Hartford block's increased mortality experience leading up to and during the Class Period. Instead, it relies on a combination of the reserve charge ultimately taken in or about July 2019 and the sensitivity analysis to conclude that the mortality experience had significantly deviated from expectations and thus the data clearly put Defendants on notice the assumptions underlying the Individual Life reserves estimates lacked validity. Plaintiff constructs a "must-have-known" theory of fraud, but there is simply no plausible basis to infer that, contemporaneous with the Class Period statements, Defendants' statements lacked a reasonable basis.[5]

Then, based on the foregoing, the Amended Complaint asserts that had the assumptions regarding mortality been updated when the Hartford block's increased risk materialized, the revision would have resulted in a reserves increase. In other words, the update would have exposed the alleged fallacy on which Defendants' reserves-related statements during the Class Period were based. This conclusion is unfounded. Absent from the Amended Complaint are any factual allegations concerning the process for setting life insurance policy reserves. It suggests

---

[5] Indeed, the Amended Complaint itself states Prudential fully disclosed to investors that interim updates to actuarial assumptions, including mortality, only occur if "a material change is observed . . . that we feel is indicative of a long-term trend." (Am. Compl. ¶ 7.) This is an inherently subjective standard, and nothing in the Amended Complaint indicates that Defendants acted or spoke contrary to Prudential's subjective belief about the data available to it during the Class Period. Even if, for the sake of argument, the Court assumes that, due to the Hartford block's performance, the Individual Life segment overall exhibited a "material change" in mortality experience, the Amended Complaint pleads no facts that would link that purported fact to a patent need to revise assumption sooner than the second quarter review.

that the process is a simple matter of incorporating short-term mortality data into the actuarial assumptions, leading to the foregone conclusion that such an update would result in an assessment that reserves must be increased. In reality, reserves reflect actuarial predictions about future financial obligations based not only on current data and experience but also on projections of long-term risks. Moreover, predicting reserves needed to cover life insurance liabilities is not limited to an analysis of mortality but must consider a number of factors, including policyholder behavior, morbidity, interest rates, and others.

Each conclusion Plaintiff draws about Individual Life's reserves becomes ever more attenuated from the allegation that, for approximately seven months before the Class Period, a separately tracked group of policies experienced adverse mortality of the policyholders. The facts alleged simply do not add up to establish or give rise to the plausible inference that before the conclusion of the annual assumptions review for 2019, Defendants knew that a reserves increase was necessary and thus spoke falsely about Prudential's financial performance. Indeed, at the June 5, 2019 Investor Day conference, Defendant Tanji responded to an analyst's question about mortality experience and made clear that the potential repercussions of the company's mortality experience could not be known until the second-quarter review process had been completed. Plaintiff's selective quotation of Tanji's remark eliminates this warning to investors, but in full the relevant statement reads as follows:

> And then the third area of interest is [sic] involves our individual life
> business in our mortality experience. And our recent experience has been
> in between range of what we'd expect normal volatility, but net it has been
> below our experience. So, in ordinary course in our rigorous process, we
> will factor that into our study and we'll take a closer look at that. **So I
> know these are areas of current topical interest, our process is very
> comprehensive and that work is underway and we cannot comment
> yet because the work's not complete on the potential outcome**.

(Am. Compl. ¶ 54; Gittes Decl. Ex. H at 56.) (emphasis added.)[6]

Plaintiff nevertheless contends that information provided by certain former employees of Prudential connects the dots between the Hartford block and the reserves deficiencies and corroborates what the data available to Prudential as of the beginning of the Class Period made clear. Plaintiff argues in its brief that, based on the reports of FE1, FE2 and FE3, Prudential was well aware of the Hartford block's poor underwriting and, per FE1, well aware as early as May 2019 that a significant reserve increase for Individual Life would be necessary due to the Hartford block's negative mortality experience. However, the allegations as to the information supplied by the former employees are purely conclusory and shed no light on the purportedly fraudulent nature of Defendants' reserves statements. None of the former employees were involved in actuarial analysis of the Individual Life policies. None are alleged to have reported that the Hartford block was "poorly underwritten" – an interpretation applied by Plaintiff – and there is no basis given for their alleged assertions that the Hartford policies were not priced to cover risk. Even if accurate, poor pricing of the Hartford policies, acquired in 2013, does not lead to the conclusion that Prudential was on notice of a reserves deficiency in Individual Life during

---

[6] Plaintiff also tries to distort Tanji's Investor Day remarks into a misrepresentation about the Hartford block's mortality experience. He in fact stated that mortality experience in Individual Life had been "both positive and negative" and also suggested that overall numbers had been overall "slightly negative." (Am. Compl. ¶ 54.) His remarks do not address the Hartford block in any way, nor do they obfuscate or conceal information about that group of policies.

the Class Period. Moreover, FE1's report that Prudential knew, well before the annual

assumptions review had concluded, that Individual Life would need to take a charge to income is

completely unreliable. Defendants point out that there is no indication in the Amended

Complaint that FE1 bases this report on firsthand knowledge, and Plaintiff does not dispute this

contention.

As Defendants argue, the Amended Complaint also appears to rely heavily, and

improperly, on the fact that Prudential ultimately took a reserve charge after the annual review.

Plaintiff uses this result as a basis for asserting the representations made during the Class Period

relating to reserves were fraudulent. Plaintiff presupposes, without plausible basis, that

Defendants should have anticipated not one, but two things: one, that Prudential's actuaries

would update mortality assumptions and two, that these updates would necessitate an increase in

reserves. This amounts to a quintessential "fraud by hindsight" allegation, which has been

squarely rejected as a basis for a securities fraud claim under Rule 10b-5. OFI Asset Mgmt. v.

Cooper Tire & Rubber, 834 F.3d 481, 497 (3d Cir. 2016); see also Novak v. Kasaks, 216 F.3d

300, 309 (2d Cir. 2000) (holding that a securities fraud claim cannot be based on information that

later becomes available to the defendants); In re Hertz, 2017 WL 1536223 at *17 n.6 (noting that

a Rule 10b-5 claim will not survive where "the only support for that allegation [that the

defendant misrepresented the extent of certain errors] is the fact that the statement turned out to

be untrue."). As the Second Circuit reasoned:

> Corporate officials need not be clairvoyant; they are only responsible for
> revealing those material facts reasonably available to them. Thus,
> allegations that defendants should have anticipated future events and
> made certain disclosures earlier than they actually did do not suffice to
> make out a claim of securities fraud.

Novak, 216 F.3d at 309 (internal citations omitted). This Court agrees.

Plaintiff's attempt to frame the securities fraud claim on Defendants' alleged omissions of material fact fares no better. The Amended Complaint points principally to three allegedly actionable omissions: One, it asserts that Defendants violated Rule 10b-5 when they announced in Prudential's 10-Q filing for the first quarter of 2019 that underwriting results were due to "favorable impact from mortality experience" while failing to disclose that the Hartford block's mortality experience had been negative. (Am. Compl. ¶ 51.) Two, it alleges that Prudential failed to disclose that a significant reserve increase in Individual Life was likely, which Plaintiff claims was a required disclosure under GAAP standards ASC 450 and 944. (Id. ¶¶ 90-91.) Three, Plaintiff avers that an actionable omission occurred by virtue of Prudential's failure to comply with Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), which requires SEC filing to include a discussion of "any known trends or uncertainties that [a company] . . . expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). (Am. Compl. ¶ 92.) None of these give rise to an actionable securities fraud claim. It is well-established that "[a]bsent a duty to disclose, silence is not fraudulent or 'misleading under Rule 10b–5.' " United States v. Schiff, 602 F.3d 152, 162 (3d Cir. 2010) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)); see also Burlington Coat Factory, 114 F.3d at 1432 ("Except for specific periodic reporting requirements[,] ... there is no general duty on the part of a company to provide the public with all material information."). A duty to disclose under Rule 10b-5 may arise in three circumstances: "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285–286, (2000). The first two categories clearly do not apply in this case. As for the third, the Amended Complaint fails to establish the necessary factual predicate, that is, that Defendants spoke on the subject of

27

mortality or reserves in Individual Life in a way that was inaccurate or incomplete. Once again, Plaintiff conflates the Hartford block with the entire Individual Life segment and makes the conclusory assertion that the Hartford block's allegedly adverse mortality experience materially impacted Individual Life's reserves. There is no factual allegation that Defendants were in possession of information indicating that a reserves increase was likely or that an adverse mortality trend had emerged in Individual Life.[7] The core problem with the omission-based Rule 10b-5 claim is that it circles back to the same flaw: that some unspecified amount of increased policyholder deaths in the present time in a group of policies meant that Individual Life as a whole faced either significantly greater mortality experience or, more to the point, unreliable actuarial assumptions and deficient reserves.

Therefore, insofar as the Amended Complaint alleges that Defendants materially overstated financial results and understated reserves during the Class Period, misled investors as to Prudential's assets and liabilities, misrepresented mortality risks and trends affecting actuarial assumptions, or failed to disclose any material fact related to these topics, the Rule 10b-5 claim must be dismissed. For the reasons discussed, the Amended Complaint fails to plead the falsity of those statements with particularity, much less even approximates the more difficult standard under Omnicare.

2. Statements Concerning Reserves Methodology

Plaintiff claims that Prudential misrepresented not only the sufficiency of the reserves but also falsely represented that it would employ certain processes and methods to set and update the reserves. It alleges that Prudential departed from the methodology it assured investors that it

---

[7] Moreover, the Third Circuit has rejected noncompliance with Item 303 as a basis for a private cause of action under Rule 10b-5. Oran, 226 F.3d at 287.

would follow, resulting in unreliable assumptions and inadequate reserves. The Amended Complaint asserts that contrary to Defendants' representations in the 2018 Form 10-K, reserves were not based on Prudential's experience or updated when changed mortality trends or risks materialized. Plaintiff alleges that these representations were false or misleading because the reserves, and the assumptions used to set them, failed to recognize and account for the adverse mortality experience which had been ongoing for seven months prior to the February 15, 2019 SEC filing. The failure to account for mortality experience also forms the basis for Plaintiff's claims that Prudential did not establish reserves in compliance with GAAP, in particular standard ASC 944, which provides that "[a]n insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggest that earlier assumptions should be revised." (Am. Compl. ¶ 83) (citing ASC-944-40-35-9.)

At bottom, the methods which Plaintiff claims as a basis for a misrepresentation of material fact involves subjective judgment, which must be exercised in the actuarial process of setting and updating reserves. In questioning the veracity of the methodology statements, Plaintiffs in reality second-guesses the reliability of the actuarial assumptions and Defendants' belief in their projections. Indeed, the cited GAAP provision requiring regular evaluation of reserve estimates is inherently subjective, stating that adjustments be made if experience "suggests" assumptions "should" be revised. See In re Hertz, 2017 WL 1536223, at *11 (noting the statements about GAAP compliance are often deemed opinions because GAAP "involve[s] a range of possible treatments instead of a single objective set of calculations.") For the same reasons set forth above in Section B.1 of this analysis, the alleged misrepresentations regarding compliance with methodology fail to state a securities fraud claim.

The Court adds that even if taking this tack for asserting that Defendants committed a Rule 10b-5 violation circumvents the <u>Omnicare</u> standard, it is nevertheless unavailing. Plaintiff's contention that Defendants failed to act in accordance with their disclosed methodology does not satisfy the falsity element of a Rule 10b-5 claim. Nothing in the Amended Complaint demonstrates that Prudential ignored its experience in devising actuarial assumptions about mortality; indeed, no facts at all are alleged concerning the process employed by Prudential's actuaries in making predictions about future mortality risks. Again, Plaintiff characterizes, without factual basis, some alleged adverse mortality experience in one group of policies as the equivalent of a pervasive and extreme downturn throughout the Individual Life segment. Similarly, nothing in the Amended Complaint demonstrates that Prudential failed to act in accordance with its statements concerning updates to actuarial assumptions. Prudential's disclosure on this subject clearly sets forth that it updates assumptions if "mortality trend" risk emerges and further makes clear that it only reviews assumptions annually "unless a material change is observed in an interim period that we feel is indicative of a long-term trend." (Am. Compl. ¶ 38.) Apart from failing to address the inherent subjectivity in this statement, Plaintiff also elides the difference between short-term mortality experience in one group of policies and long-term trends for Individual Life as a whole. The lack of connection between the alleged facts concerning the Hartford block's performance and any emerging risk warranting an assumptions update becomes all the more jarring when, as Defendants note, the definition of mortality trend, clearly disclosed in Prudential's SEC filing, is considered. The term expressly refers to "the risk that mortality improvements in the *future* deviate adversely from what is expected," whereas mortality experience tracks past activity. (2018 Form 10-K at 34, attached to Gittes Decl. at Ex. D.)

Thus, insofar as the Amended Complaint alleges that the actionable statements made during the Class Period consisted of misrepresentations about the methods used to set reserves, the Amended Complaint fails to allege facts demonstrating that the statements were fraudulent or misleading. A Rule 10b-5 claim on this basis does not satisfy the PSLRA's pleading requirements.

   3. <u>Statements Not Made by Defendants, Puffery, and Forward-Looking Statements</u>

Apart from the overall failure to set forth facts demonstrating falsity, the Amended Complaint identifies some statements which do not set forth actionable Section 10(b) violations for a variety of other reasons.

Statements not "made" by Defendants: A securities fraud claim based on purported statements that a defendant did not actually make necessarily fails to state a claim upon which relief can be granted. <u>City of Edinburgh</u>, 754 F.3d at 172 (affirming dismissal of a Rule 10b–5 claim based on statements that were not made by defendants because "[d]efendants cannot be held responsible for statements they did not make.") Plaintiff alleges that information which was disseminated by Prudential management in certain analyst reports was misleading. According to the Complaint, Prudential "believes that various initiatives being pursued should lead—over time—to valuation improvement in the stock  . . ." (February 20, 2019 Sandler O'Neill report) and Falzon expressed that "there are no systemic issues with underwriting or mortality assumptions" (March 31, 2019 Credit Suisse report). However, no facts alleged in the Amended Complaint support Plaintiff's assertion that any Defendant made these alleged misrepresentations. The Supreme Court has held that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely

suggest what to say, not 'make' a statement in its own right." See Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011).While the reports claim to address matters discussed in the analysts' respective meetings with Prudential management, neither sets forth a quoted statement given by an Individual Defendant to the analyst. Nor has Plaintiff alleged any facts showing that Prudential or any Individual Defendant otherwise controlled the content of the report. Id.; see also In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 403 (D.N.J. 2010) (holding that, even where an analyst report is based on information supplied by a company's management, facts demonstrating control by the company over the statement must be pled to consider the statement actionable under Rule 10b-5). The statements appearing in the Sandler O'Neill report and in the Credit Suisse report cannot be attributed to Prudential or any Individual Defendant and are therefore fail to support a Rule 10b-5 claim against them.

Puffery: The Amended Complaint also claims that, in light of the known insufficiency of reserves, it was misleading for Prudential to describe reserves in Individual Life as "rock-solid," and to tout the company's balance sheet as "strong." These statements amount to no more than inactionable puffery. Advanta, 180 F.3d at 538 (holding that "general statements of optimism" are mere puffery, which would not be understood as reliable information by a reasonable investor and cannot therefore amount to fraudulent information. For this same reason, the Sandler O'Neill statement discussed above fails to convey fraudulent information. Indeed, the Third Circuit has made clear that "[c]laims that . . . expressions of hope by corporate managers could dupe the market have been ... uniformly rejected by the courts." Burlington Coat Factory, 114 F.3d at 1427.

Forward-looking statements: Some alleged misrepresentations clearly fall into the PSLRA's Safe Harbor provision which "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." Avaya, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)). For example, Plaintiff claims, based on the Credit Suisse report, that Falzon stated that given the lack of systemic issues with mortality assumptions, Individual Life "results should stabilize." (Am. Compl. ¶ 43.) It also claims that Lowrey misled investors during the May 2, 2019 earnings call by stating that Prudential's activities "should lead to growth." (Id. ¶ 47.) These statements clearly express projections about future financial performance and thus fall within the statute's definition of forward-looking statement. See 15 U.S.C. § 78u-5(i)(1)(C). In addition, as amply set forth above, the Amended Complaint provides no indication that either Lowrey or Falzon (assuming, for the moment, that Falzon made the statement reported by Credit Suisse) possessed actual knowledge that Individual Life was significantly under-reserved, such that these statements predicting positive financial results were knowingly false.

### B.  Section 20(a) Control Person Claim

Section 20(a) of the Exchange Act "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of § 10(b)." Avaya, 564 F.3d at 252; see also 15 U.S.C. § 78t(a). A Section 20(a) claim thus imposes secondary liability on the controlling person for the wrong committed by the one who is controlled. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284–85 (3d Cir. 2006). In this case, Plaintiff's control person claim against Lowrey, Tanji and Falzon is predicated upon the primary liability of Defendant Prudential under Exchange Act Section 10(b).

Defendants correctly argue that because the Amended Complaint fails to state an actionable Section 10(b) and Rule 10b-5 violation, the control person claim necessarily fails to state a claim upon which relief may be granted. Id. at 285; Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir.1992) (holding that "once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based."). Accordingly, the control person claim will also be dismissed for failure to state a claim upon which relief may be granted.

### III.   CONCLUSION

In sum, the Amended Complaint as a whole rests on a shaky and ultimately unsound foundation. As discussed above, it leaps from reports of two quarters of adverse mortality experience in certain life insurance policies to the claim that Defendants knowingly understated the company's reserves. Missing, however, are facts which plausibly connect the Hartford block's allegedly poor performance beginning in July 2018 and some known deficiency in reserves or even a detected need to update assumptions sooner than the 2019 annual review process. Also missing are any facts indicating that, from mid-February 2019 through July 2019, Defendants knew or disregarded that the reserves were insufficient. Even assuming the well-pleaded facts of the Amended Complaint are true, and one line of insurance policies experienced greater-than-expected policyholder deaths, there is simply no plausible demonstration that Defendants made misleading statements about reserves during the Class Period. At most, and drawing all inferences in favor of Plaintiffs, it appears that Prudential may have incorrectly

predicted the reserves needed to meet its future obligations in the Individual Life business. An error does not, however, constitute fraud, and as previously noted, clairvoyance as to future developments—in this case, the reserve charge taken as a result of the 2019 annual assumptions review—is not the standard applied to securities fraud actions.

For the reasons discussed in this Opinion, the Court will grant Defendants' motion and will dismiss the Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Moreover, because there is no indication that Plaintiff could allege facts curing the deficiencies in the Amended Complaint, leave to further amend will not be granted. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (holding that upon granting a defendant's motion to dismiss a deficient complaint, a district court should grant the plaintiff leave to amend within a set period of time, unless amendment of the complaint would be inequitable or futile).

An appropriate Order will be filed.

        s/ Stanley R. Chesler
        STANLEY R. CHESLER
        United States District Judge

Dated: December 29, 2020