SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
E-mail: cseeger@seegerweiss.com

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)
E-mail: psp@njlawfirm.com

Local Counsel for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re PRUDENTIAL FINANCIAL, INC. SECURITIES LITIGATION | ) Civil Action No. 2:19-cv-20839-SRC-CLW |
| | ) |
| | ) <u>CLASS ACTION</u> |
| This Document Relates To: | ) |
| | ) DECLARATION OF DANIEL J. |
| ALL ACTIONS. | ) PFEFFERBAUM IN SUPPORT OF: |
| | ) (1) FINAL APPROVAL OF CLASS |
| | ) ACTION SETTLEMENT; (2) APPROVAL |
| | ) OF PLAN OF ALLOCATION; AND |
| | ) (3) AN AWARD OF ATTORNEYS' FEES |
| | AND EXPENSES |

4882-5686-1111.v1

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   RELEVANT PROCEDURAL HISTORY AND FACTUAL
      SUMMARY ..................................................................................................7

      A.    The Complaint ....................................................................................7

      B.    The Motion to Dismiss .....................................................................11

      C.    Third Circuit Appeal ........................................................................13

      D.    Procedure Following Remand ...........................................................15

III.  EXPERT WITNESSES AND CONSULTANTS .........................................15

      A.    Gryphon Strategies ...........................................................................15

      B.    In-House Forensic Accountants ........................................................16

      C.    Crowninshield Financial Research ...................................................17

IV.   THE SETTLEMENT ...................................................................................17

      A.    The Strengths and Weaknesses of the Case Favor Settlement ...........18

      B.    The Plan of Allocation ......................................................................22

      C.    Plaintiff's Counsel's Motion for Attorneys' Fees and Expenses
            Is Reasonable ...................................................................................24

V.    CONCLUSION............................................................................................26

4882-5686-1111.v1

I, DANIEL J. PFEFFERBAUM, declare as follows:

1.     I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), the Court-appointed Lead Counsel for Lead Plaintiff City of Warren Police and Fire Retirement System ("Lead Plaintiff") in this action.  I was actively involved in the prosecution of this action (hereinafter, the "Litigation"), am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Litigation.

2.     I submit this declaration in support of Lead Plaintiff's application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for final approval of: (a) the proposed $35 million settlement on behalf of the Settlement Class (the "Settlement Amount"); (b) the proposed Plan of Allocation; and (c) the application for attorneys' fees and expenses.

## I.    PRELIMINARY STATEMENT

3.     This Litigation against Prudential Financial, Inc. ("Prudential" or the "Company") and the Individual Defendants, Chief Executive Officer Charles F. Lowrey, former Chief Financial Officer Kenneth Y. Tanji, and Vice Chairman of Prudential, Robert M. Falzon (collectively, "Defendants"), was brought on behalf of the Settlement Class for alleged violations of §§10(b) and 20(a) of the Securities

- 1 -

4882-5686-1111.v1

Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).[1]

4.   This Litigation was vigorously litigated from commencement to resolution with strong advocacy from all sides, including on the motion to dismiss the Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") and subsequent appeal to the Court of Appeals for the Third Circuit. The Litigation has generated a precedential opinion issued by the Third Circuit.  In summary, the Settlement was only reached after the Lead Plaintiff and Lead Counsel:

(a)   Conducted a thorough investigation into the facts giving rise to this Litigation, including obtaining information from former Prudential employees that supported Lead Plaintiff's allegations;

(b)   Drafted the Amended Complaint which Lead Plaintiff believed was sufficient to comply with the Private Securities Litigation Reform Act of 1995's ("PSLRA") heightened pleading standards;

(c)   Successfully appealed the District Court's dismissal of the Amended Complaint to the Third Circuit and obtained a partial reversal of the Court's order granting Defendants' motion to dismiss;

---

[1]   As discussed *infra*, the claims with respect to Defendants Lowrey and Falzon were dismissed.

- 2 -

(d)    Identified and retained experts and consultants to facilitate the investigation into the facts that underlie the allegations and on issues of damages; and

(e)    Prepared for and participated in a private mediation with the assistance of a former federal judge.

5.    The cash settlement of $35 million is the product of thoughtful and persistent advocacy to uphold the Amended Complaint and takes into consideration the risks specific to this case.  Throughout the pleading stage, Defendants aggressively sought to defeat Lead Plaintiff's claims, challenging its allegations with respect to the issues of falsity, materiality, scienter, and loss causation.  Indeed, Defendants obtained a dismissal with prejudice of this action for failure to plead any false or misleading statements, and the Third Circuit affirmed that holding with respect to all but one set of alleged false statements.  Lead Plaintiff returned to the District Court with a single set of alleged misrepresentations and a shortened Class Period.

6.    Lead Plaintiff and Lead Counsel believe that the claims alleged have merit and that evidence obtained through discovery would corroborate the allegations already attributed to former employees in the Amended Complaint and would also uncover additional facts to support Lead Plaintiff's claims.  Lead Plaintiff and Lead Counsel also recognize, however, the challenges and risks associated with continuing litigation, including surviving the pleading stage on the issue of scienter; the complexities inherent in disputing the adequacy of life insurance reserve estimates;

- 3 -

4882-5686-1111.v1

and the difficulty of proving loss causation, damages, control, and other disputed elements of the claims.

7.      Defendants consistently maintained that Lead Plaintiff could not survive the pleading stage because the Amended Complaint merely alleged "fraud by hindsight."  Lead Plaintiff expects that Defendants would continue to make this assertion throughout summary judgment and trial, *i.e.*, that Prudential's July 2019 reserve increase was not an admission that its reserves were previously understated or its statements about them false or misleading.  Further, Defendants would likely continue to maintain that, to the extent Prudential was suffering from any issues related to life insurance underwriting, these issues were confined to the Hartford Block, that they were not indicative of performance in Individual Life as a whole, and that Lead Plaintiff improperly conflated mortality *experience* with mortality *assumptions* – arguments that could ultimately carry the day in front of a jury.

8.      Even with the most competent experts in the field, there could be no assurance that Lead Plaintiff would prevail on liability or damages, as Defendants would present equally qualified experts to counter Lead Plaintiff's experts.  Finally, even if Lead Plaintiff ultimately prevailed on any or all of its claims at a trial and was awarded damages, there was a substantial risk that Defendants would appeal any verdict or award, a process that could take years, during which time the Settlement Class would receive no distribution at all.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*,

- 4 -

2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, 2010 WL 5927988 (9th Cir. 2010). Of course, any appeal would include the risk of reversal, even after prevailing at trial. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing trial jury verdict for failure to present adequate evidence of loss causation).

9.      As such, even though Lead Plaintiff expected to move beyond the pleading stage, it would still likely face numerous obstacles in proving liability and damages.  Considering all the circumstances and risks in continuing to pursue years of further litigation, after having already spent almost five years at the pleading stage, Lead Plaintiff believes that settlement on the agreed terms is an excellent result and in the best interest of the Settlement Class.  The Settlement confers a substantial benefit on the Settlement Class now and eliminates the risks and costs of another round of motion-to-dismiss briefing, discovery, class certification, summary judgment, and trial, the outcome of which would be uncertain.  Upon the Court's recommendation that the parties engaged the Hon. Freda Wolfson, a former United States District Court Judge, to oversee mediation of the dispute prior to pursuing additional motion to dismiss briefing, the parties engaged in a day-long mediation and ultimately accepted the mediator's proposal to settle this Litigation, which was subsequently followed by negotiations as to the specific terms of the Settlement.

10.     As described below, Lead Plaintiff's Counsel have aggressively prosecuted this Litigation on a wholly-contingent basis for nearly five years and have

already advanced or incurred significant litigation expenses. Specifically, Lead Plaintiff's Counsel have incurred costs, charges, and expenses of more than $121,400.00. This amount includes, among other things: (a) fees and expenses of investigators and experts whose services were required in the successful prosecution and resolution of this case; (b) travel and court expenses; (c) online factual and legal research expenses; and (d) mediation fees.

11. As set forth in more detail in the accompanying declarations in support of the fee and expense award, each of the requested expenses was reasonably and necessarily incurred to plead Lead Plaintiff's claims with particularity and obtain a Third Circuit review of the Court's initial dismissal of the case.

12. The fee application for 25% of the Settlement Fund is fair both to the Settlement Class and Lead Counsel, has been approved by Lead Plaintiff, and warrants this Court's approval. This fee request is within the range of fees frequently awarded in these types of actions and is justified in light of the substantial benefits conferred on the Settlement Class and the quality of representation and extent of legal services performed to date.

13. Accordingly, it is respectfully submitted that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate, and counsel for Lead Plaintiff should be awarded attorneys' fees in the amount of 25% of the Settlement Fund and expenses in the amount of $121,454.48, plus interest.

4882-5686-1111.v1

## II.    RELEVANT PROCEDURAL HISTORY AND FACTUAL SUMMARY

### A.    The Complaint

14.    On November 27, 2019, Lead Plaintiff initiated this Litigation by filing a complaint against Defendants in this District alleging claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).[2] ECF 1.

15.    On January 27, 2020, Lead Plaintiff filed an unopposed motion seeking to be appointed lead plaintiff and to appoint Robbins Geller as Lead Counsel. ECF 16, 18.  On March 20, 2020, this Court issued an Order appointing City of Warren Police and Fire Retirement System as Lead Plaintiff and approving its selection of Robbins Geller as Lead Counsel.  ECF 21.

16.    On June 3, 2020, Lead Counsel filed the Amended Complaint alleging that, between February 15, 2019 and August 2, 2019, inclusive,[3] Defendants issued materially false and misleading statements concerning the Company's true financial condition and outlook.  ECF 22.  Specifically, the Amended Complaint alleged that

---

[2]    A substantially similar action was filed by Donald P. Crawford.  *Crawford v. Prudential Financial, Inc.*, No. 2:20-cv-00545-SRC-CLW, filed January 16, 2020. The Court consolidated these actions into the instant Litigation.  ECF 21.

[3]    As discussed *infra*, the class period was shortened to June 5, 2019 through August 2, 2019, inclusive (the "Class Period"), following the dismissal of certain alleged misstatements.

- 7 -

Defendants made materially false and misleading statements and/or failed to disclose adverse information regarding, among other things, the Company's life insurance reserves, including the methodology and assumptions used to determine those reserves, the adequacy of those reserves to meet current and future claims costs, quarterly and annual updates to those reserves, the potential for negative mortality development (*i.e.*, higher than expected death rates), and, as a result, the Company's current financial results and future prospects.

17.    The Amended Complaint alleged these statements were false because Defendants knew that the Company's reserve methodology failed to account for known material adverse mortality development, in particular adverse mortality within a block of business Prudential had acquired years prior from Hartford Life that was part of the Individual Life business segment ("the Hartford Block").  The Amended Complaint alleges that known negative mortality development occurred over the course of a year without any corresponding increase to reserves until the Company completed its annual reserve update.  As a result, the Company's Class Period reserves were alleged to be insufficient to meet known and expected policyholder obligations resulting in the Company overstating quarterly earnings and understating liabilities.

18.    In relevant part, on June 5, 2019, Prudential held its Investor Day, during which the Amended Complaint alleges that Defendants falsely stated that, based on its

- 8 -

4882-5686-1111.v1

assumption review to date, the prior year of mortality development in Individual Life was only "slightly negative" but nevertheless within the range of normal volatility. The Amended Complaint alleges that Defendants knew, however, this misrepresented the true state of affairs; mortality experience for the preceding three-plus quarters was actually extremely negative and had been highly volatile and that, as a result, internal discussions were already ongoing concerning a significant reserve charge. Duped investors, however, were relieved to hear that the prior year's mortality experience was stable and believed no reserve charge would be forthcoming.

19.    Based on statements from former Prudential employees, as well as Defendants' later admissions, the Amended Complaint alleges that Defendants knew or were reckless in not knowing these facts for several reasons:

(a)    First, the legacy Hartford Block was closely monitored from the time of its acquisition in 2013 and regularly missed internal expectations due to adverse mortality development; and the Hartford life policies were poorly underwritten and not priced to cover their mortality risk, though Prudential was powerless to increase the premiums.

(b)    Second, for a six-quarter period from July 2018 through the Class Period, the Hartford Block experienced consistently negative mortality; and, by May 2019, there were internal discussions that Individual Life would necessitate a significant increase in reserves and a corresponding charge to income. This increased

- 9 -

mortality also caused Defendants' internal forecasts to deviate from what had been communicated to investors.

(c)   Third, because reserves were materially understated, the Company's financial results, particularly net income, operating earnings, and EPS, were materially overstated in violation of GAAP and SEC disclosure rules.

20.   Lead Plaintiff alleged that because Defendants knowingly withheld this adverse information from the market, Prudential common stock traded at artificially inflated prices above $105 per share during the Class Period.

21.   On July 31, 2019, just eight weeks after the Investor Day in which Defendant Tanji assured that mortality development was consistent with expectations, the Company announced its second quarter 2019 financial results missed analyst consensus estimates by $0.09 per share.  The Company also disclosed that it would take a pre-tax charge of $208 million as a result of the annual reserve update.  In the earnings release, Prudential's CEO acknowledged that changes in "mortality assumptions" had negatively impacted the Company's results and would "trim" near-term momentum.

22.   On August 1, 2019, the Company held a conference call to discuss its second quarter 2019 financial results.  On the call, Defendants revealed that, in addition to the one-time $208 million charge, the change in mortality assumptions would result in a negative earnings impact of $25 million per quarter for the

- 10 -

foreseeable future, wiping out approximately one-third of the earnings attributable to the Individual Life business segment. Analysts immediately questioned why Defendants failed to disclose this material negative information concerning the prior year of mortality development when it addressed the market just weeks earlier. UBS stated that "[management] should have used its June investor day to lay out the new disclosure and reset the bar at that point." And Wells Fargo expressed that "investors will most likely be surprised since this came so close to its investor day in June." One analyst called the disclosures "Atrocious."

23. In response to these stunning revelations, investors immediately dumped Prudential stock; its share price declined more than 10% to close at $91.09 per share on August 1, 2019, on over 7.6 million shares traded.

### B.    The Motion to Dismiss

24. On August 19, 2020, Defendants filed a motion to dismiss the Amended Complaint, contending, among other things, that: (a) Lead Plaintiff failed to plead a strong inference of scienter; (b) Lead Plaintiff's allegations regarding Prudential's reserve estimates were inactionable statements of opinion; (c) the alleged misstatements were either not false or misleading, were inactionable as puffery or were protected forward-looking statements; (d) neither Item 303 nor GAAP created a duty to disclose further information; (e) Lead Plaintiff failed to plead loss causation;

- 11 -

and, therefore, (f) because Lead Plaintiff failed to plead a primary violation, there could be no control person liability.

25.   On October 7, 2020, Lead Plaintiff filed its opposition to Defendants' motion to dismiss, providing both legal and factual analysis demonstrating that the Amended Complaint alleged each element of Defendants' material misrepresentations with sufficient particularity to meet the heightened pleading standards under the PSLRA, and that, when the Court properly credited the accounts of former Prudential employees and drew all inferences in favor of Lead Plaintiff as required, the case should move to discovery.

26.   On December 29, 2020, the Court granted Defendants' motion to dismiss with prejudice, finding that the statements made concerning the adequacy of the Company's reserves were opinions and therefore subject to evaluation under the framework set forth in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015).  Discrediting the allegations Lead Plaintiff attributed to former Prudential employees, the Court found Lead Plaintiff's allegations were conclusory and were neither pled with particularity nor met the standard for pleading the material falsity of statements of opinion under *Omnicare*.

27.   With respect to the alleged false and misleading statements concerning Prudential's reserve-setting methodology, the Court found that statements about actuarial assumptions and methods for setting reserves were also subjective and

therefore subject to the *Omnicare* standard. The Court further held that even if they were not subject to the *Omnicare* standard, that Lead Plaintiff had failed to plead falsity with respect to the statements because Lead Plaintiff improperly equated poor performance in the Hartford Block with poor performance in Individual Life as a whole.

28. With respect to Defendants' statements relayed through analyst reports, the Court found that Lead Plaintiff had not adequately pled that any Defendant actually made the statements that were published in the analyst report and that Defendants could therefore not be held liable for those statements under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Court also found that the statements made in the analyst reports were inactionable puffery and/or protected forward-looking statements.

29. Because the Court did not find any of the alleged false and misleading statements were actionable under §10(b), the Court found that Defendants were also not liable under §20(a) as control persons.

## C.     Third Circuit Appeal

30. Lead Plaintiff appealed the District Court's motion to dismiss order to the Third Circuit Court of Appeals, arguing, among other things, that the District Court improperly applied *Omnicare* to the alleged false and/or misleading statements and failed to credit allegations attributed to Prudential's former employees. Lead Counsel

- 13 -

4882-5686-1111.v1

drafted compelling opening and reply briefs and expended numerous hours preparing for and presenting oral argument on October 27, 2021.

31.     On June 13, 2023, the Third Circuit issued a published, precedential opinion that largely affirmed the District Court's opinion but reversed with respect to one of the alleged misstatements.  Crediting the allegations of former employees, the Third Circuit reversed the District Court's opinion with regard to Defendant Tanji's statements made on the June 5 Investor Day, where he assured investors that Individual Life's recent mortality experience had been only "slightly negative."  The Third Circuit found that allegations concerning (i) an internal Prudential meeting in May 2019 where the need to take a large reserve charge was discussed, (ii) the temporal proximity of the June 5 statement to the later revelation of the truth just eight weeks later, and (iii) the magnitude of the ultimate reserve charge of $208 million, when considered together, plausibly alleged falsity.  Noting that the Class Period would need to be shortened to reflect the date on which the remaining statement was made, the Third Circuit then remanded the case to the District Court to consider the elements of scienter and loss causation in the first instance.  *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668 (3d Cir. 2023).

- 14 -

### D.     Procedure Following Remand

32.    In July 2023, following remand, the parties requested, and the Court ordered, that the parties submit additional briefing concerning the allegations of scienter and loss causation.

33.    On August 30, 2023, the Court held a status conference, during which the Court advised the parties to consider pursuing mediation with former District Court Judge Wolfson.  If the parties were to pursue mediation, then the Court would stay the briefing schedule it had ordered on the issues of scienter and loss causation.

34.    As discussed *infra* at §IV, the parties proceeded with mediation and reached an agreement in principle to settle the claims for $35 million after a day-long in-person session with Judge Wolfson.

## III.    EXPERT WITNESSES AND CONSULTANTS

35.    As part of the Litigation, Lead Plaintiff retained experts and consultants, including economists and factual investigators, to assist Lead Counsel in developing Lead Plaintiff's allegations and facilitating settlement efforts.  This work provided valuable insight to Lead Plaintiff and Lead Counsel in evaluating the costs and benefits of settlement at this early stage of the litigation.

### A.     Gryphon Strategies

36.    While investigating the alleged claims and drafting the Amended Complaint, Lead Plaintiff retained the services of Gryphon Strategies, an investigative

- 15 -

4882-5686-1111.v1

consulting firm.  Gryphon Strategies identified potential witnesses to the allegations, including former Prudential employees; located potential witnesses; contacted and interviewed selected individuals; and thereafter provided Lead Counsel with comprehensive interview summaries and other case reports.  Gryphon Strategies' assistance at the pleading stage of this Litigation supported Lead Plaintiff's ability to plead the falsity of the surviving alleged misrepresentation, which was largely dependent on the allegations attributed to former Prudential employees.

### B.      In-House Forensic Accountants

37.     In order to comprehensively analyze the financial and accounting misrepresentations alleged in the Amended Complaint, Lead Counsel utilized in-house forensic accounting professionals to provide investigative accounting, auditing, and financial expertise while drafting the Complaints.  In particular, Brad Sader, CPA, worked alongside Lead Counsel in investigating, evaluating, and prosecuting the case. Mr. Sader is a forensic accountant at Robbins Geller, a CPA, a Certified Fraud Examiner ("CFE"), and also holds the CFF (certified in financial forensics) credential. Mr. Sader has 21 years of professional experience, including forensic accounting consulting in numerous complex litigation matters and auditing and internal control compliance experience at a national CPA firm.

- 16 -

C.    **Crowninshield Financial Research**

38.    Lead Plaintiff retained the services of the highly-regarded economic consulting firm Crowninshield Financial Research ("CFR") to analyze whether damages could be measured on a class-wide basis and to analyze the amount of damages the Settlement Class allegedly suffered.  CFR assisted Lead Counsel's preparation for mediation and settlement discussions, as well as assisted in drafting the plan of allocation.

IV.    **THE SETTLEMENT**

39.    The proposed Settlement was the product of arm's-length negotiations between zealous advocates on both sides and could not have been reached without the guidance of a highly esteemed mediator.  Lead Counsel believes the proposed Settlement represents a successful and timely resolution of what would likely be a complex, lengthy, and risky class action to litigate through discovery and trial.

40.    On November 30, 2023, in Roseland, New Jersey, the parties participated in a full-day mediation overseen by retired United States District Court Judge Freda Wolfson.  In advance of the mediation, the parties exchanged and provided mediation statements with supporting exhibits to Judge Wolfson.  During the mediation, counsel for all parties engaged in discussions with Judge Wolfson concerning the perceived strengths and weaknesses of their respective cases and addressed challenges presented by Judge Wolfson.  After multiple exchanges, Judge Wolfson made a mediator's

- 17 -

proposal to resolve the litigation for $35 million, and the parties reached an agreement in principle to settle the claims.

41.    Following agreement upon the broad settlement terms, the parties worked diligently to document the Settlement and prepare preliminary settlement approval papers, negotiating the details of a stipulation of settlement, plan of allocation, and notice to the Settlement Class.   Lead Plaintiff filed its unopposed motion for preliminary approval of the Settlement on February 14, 2024.  ECF 60.  The Court entered the Order Preliminarily Approving Settlement and Providing for Notice on March 8, 2024 (the "Notice Order").  ECF 71.

### A.    The Strengths and Weaknesses of the Case Favor Settlement

42.    Based upon the detailed investigation undertaken in support of drafting multiple complaints and the hours spent analyzing the legal and factual issues at the pleading stage, Lead Counsel and Lead Plaintiff believe they have a strong understanding of the issues and risks that are likely to arise in this case.

43.    First, although Lead Plaintiff believes it would ultimately have prevailed on the supplemental briefing on Defendants' motion to dismiss, it also recognizes the challenge posed by the higher pleading standards for scienter than is required to plead falsity in a case arising under the PSLRA.  Assuming the Court denied Defendants' motion to dismiss, and because almost five years have already passed without any discovery to date, discovery would likely delve into analysis of complex insurance

- 18 -

and accounting issues and require additional years of vigorously contested litigation from both sides.

44.    Despite the strength of the allegations demonstrated to date, Defendants were equally confident they would defeat Lead Plaintiff's remaining claims at the pleading stage, and if not on their motion to dismiss, then on a subsequent summary judgment motion.  Indeed, Defendants vigorously contested each of Lead Plaintiff's allegations, maintaining that: (a) performance in the Hartford Block of policies was not indicative of performance of Individual Life as a whole; (b) Defendant Tanji spoke the truth about Prudential's ongoing actuarial assumption review; (c) Defendant Tanji's June 5 Investor Day statements, even if found misleading, were not made recklessly or knowingly; (d) the actuarial assumption review process was an extremely complex judgment-based process that could not be simplified in the manner in which Lead Plaintiff alleged; and (e) even if the fraud had occurred, the revelation of other significant news disclosed on July 31, 2019 would make it impossible for Lead Plaintiff to recover the amount of damages to which it believes the Settlement Class is entitled.

45.    As Lead Plaintiff has already uncovered facts through the accounts of former employees through its own investigation prior to discovery, however, Lead Plaintiff strongly believes that discovery from the Company would reveal further corroborating evidence to support its allegations.  For example, Lead Plaintiff believes

- 19 -

4882-5686-1111.v1

that discovery would reveal that the $141 billion purchase of the Hartford Block reflects the size and impact that the Hartford Block's performance can have on Individual Life as a whole and that internal discussions of the need to take a reserve charge would be corroborated by numerous other witnesses, including Individual Defendants.

46.    Even if Lead Plaintiff defeated Defendants' motion to dismiss, and even if Lead Plaintiff developed the necessary evidence to establish its claims through discovery, the case would likely involve years of discovery disputes, contested class certification motions, summary judgment motions, challenges to the parties' proffered experts, and potential appeals that could themselves take additional years to complete. If the case were ultimately to proceed to trial, Lead Plaintiff would then face the risks that the jury might not be convinced by the evidence presented in support of its complex financial fraud allegations and nuanced accounting and insurance issues underlying those allegations.  *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *1 (N.D. Cal. June 14, 2023) (noting jury trial rejected plaintiff's federal securities laws violations).  Given the complexity of the issues involved, and at this stage without knowing what evidence discovery will unveil, Lead Plaintiff may face significant hurdles in proving its claims to a jury.

47.    In addition, there was a substantial risk that Lead Plaintiff might not be able to prove loss causation and damages at trial.  A private plaintiff who claims

- 20 -

securities fraud must prove that the defendants' fraud caused an economic loss. Loss causation can be proved with evidence of a stock price decline when the facts revealing the company's true financial condition are disclosed. To establish loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the loss suffered by plaintiff. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-36 (2005); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007). Even if Lead Plaintiff succeeded in establishing Defendants' liability, Lead Plaintiff would likely face risks that could reduce the amount of damages if a jury were to find that other information on the alleged corrective disclosure dates caused Prudential's stock price to fall.

48. Even if Lead Plaintiff successfully litigated the case through discovery and to trial, there would still be a substantial risk that Defendants would appeal any verdict achieved in Lead Plaintiff's favor. *See, e.g.*, *Apollo*, 2008 WL 3072731; *Household Int'l, Inc.*, 787 F.3d 408. The appeals process could span years, during which time the Settlement Class would receive no recovery. Any appeal would also create the risk of reversal, in which case the Settlement Class would receive nothing even after having prevailed on the claims at trial.

49. Having considered the foregoing and evaluated Defendants' defenses at the motion-to-dismiss stage, which they are likely to maintain throughout the case, it was the informed judgment of Lead Plaintiff and Lead Counsel, based upon

- 21 -

proceedings to date and their extensive experience in litigating shareholder class actions, that the proposed Settlement of this matter for $35 million in exchange for a mutual release of all claims, and including the other terms set forth in the Stipulation, provides fair, reasonable, and adequate consideration; is in the best interests of the Settlement Class; and allows the parties to achieve early resolution of a complex and risky case.

### B.      The Plan of Allocation[4]

50.      The Plan of Allocation is set forth in the Notice of Pendency and Proposed Settlement of Class Action (attached as Exhibit 1 to the Notice Order), and provides that the Net Settlement Fund will be distributed *pro rata* to Settlement Class Members who submit valid, timely Proofs of Claim.  The Plan of Allocation provides that Settlement Class Members will be eligible to participate in the distribution of the Net Settlement Fund only if they purchased Prudential common stock between June 5, 2019 and August 2, 2019, inclusive.  No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

---

[4]   The summary of the Plan of Allocation provided herein is intended only to explain the basis on which the plan was developed in order to assist the Court in evaluating the fairness, reasonableness, and adequacy of the proposed Plan of Allocation. Nothing set forth herein is intended to, or does, modify or affect the interpretation of the Plan of Allocation, which is set forth in full in the Notice and will be applied by the Claims Administrator according to its express terms.

- 22 -

51.     Counsel created the proposed Plan of Allocation in an attempt to distribute the funds in a fair and equitable manner.  The Plan of Allocation was developed in consultation with Lead Plaintiff's damages consultant, who calculated the estimated amount of alleged artificial inflation in the per-share prices of Prudential common stock that was allegedly caused by Defendants' allegedly materially false and misleading statements and omissions.

52.     In calculating the estimated artificial inflation allegedly caused by the misrepresentations and omissions, Lead Plaintiff's damages consultant considered statistically significant price changes in Prudential common stock in reaction to the public disclosures that allegedly corrected the remaining alleged misrepresentations and omission, adjusting the price changes for factors that were attributable to market or industry forces, and for non-fraud-related, Prudential-specific information.

53.     The Settlement Fund will cover certain administrative expenses, attorneys' fees and expenses, settlement administration costs, and any applicable taxes.

54.     Pursuant to the Notice Order (ECF 71), and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim postmarked on or before July 30, 2024.  The Net Settlement Fund shall be distributed according to the Plan of Allocation, which is set forth in detail in the Notice.

4882-5686-1111.v1

55.     Based on Lead Counsel's experience in this and other securities actions and their understanding of the factual circumstances giving rise to this action and the risks of litigating this case through trial, including the risks to both liability and damages, Lead Counsel believes the Plan of Allocation set forth in the Notice provides a fair, reasonable, and adequate method of compensating Settlement Class Members for the economic harm they suffered as a result of the wrongdoing alleged.

56.     To date, no written objections have been filed by any potential Settlement Class Member to the Plan of Allocation.

**C.     Lead Plaintiff's Counsel's Motion for Attorneys' Fees and Expenses Is Reasonable**

57.     The successful prosecution of this Litigation required Lead Plaintiff's Counsel and their para-professionals to perform 3,573 hours of work valued at $2,848,115.50 and incur $121,454.48 in expenses, as detailed in the accompanying declarations.

58.     Based on the extensive efforts on behalf of the Settlement Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on behalf of all Lead Plaintiff's Counsel on a percentage basis and has requested a fee in the amount of 25% of the Settlement Fund.  In light of the nature and extent of the Litigation, the diligent prosecution of the Litigation, the complexity of the factual and legal issues presented, and the other factors described above and in the

- 24 -

accompanying motion for approval of the fee award, Lead Plaintiff and Lead Counsel believe that the requested fee of 25% of the Settlement Fund is fair and reasonable.

59.    A 25% fee award is justified by the specific circumstances in this case and the substantial risks that Lead Plaintiff has overcome to date. Indeed, there would be no case at all without the zealous advocacy of Lead Counsel at the Third Circuit. The $35 million cash Settlement was achieved as a result of extensive and vigorous prosecution of this Litigation and involved contentious motion practice and oral advocacy.

60.    The Settlement Amount of $35 million represents approximately 17% of the maximum estimated damages that Lead Plaintiff could reasonably expect to be recovered at trial. If a jury were to reject some of Lead Plaintiff's allegations of fraud for reasons described above, or if the Court were to reject the proffered damages methodology, the amount of damages recovered would have been significantly less and the percentage recovery under the Settlement proportionally higher.

61.    This Litigation was prosecuted by Lead Counsel on an "at-risk" contingent fee basis. Lead Counsel fully assumed the risk of an unsuccessful result and has received no compensation for services rendered or the significant expenses incurred in litigating this action for the benefit of the Settlement Class. Any fees or expenses awarded to Lead Counsel have always been at risk and completely contingent on the result achieved. Because the fee to be awarded in this matter is

- 25 -

4882-5686-1111.v1

entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort.

62.     To date, no written objections have been filed by any potential Settlement Class Member to the fee and expense request.

## V.     CONCLUSION

63.     For all of the foregoing reasons, Lead Counsel respectfully requests the Court to approve the Settlement and Plan of Allocation and to award Lead Plaintiff's Counsel 25% of the Settlement Fund plus $121,454.48 in expenses, plus interest.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of May, 2024, at San Francisco, California.

_____
DANIEL J. PFEFFERBAUM

4882-5686-1111.v1